Estate of Sam Maceo Deceased, Edna Sedgwick Maceo Plitt, Independent Executrix and Sam Serio, Independent Executor, and Edna Sedgwick Maceo Plitt, Individually, et al. 1 v. Commissioner. Estate of Maceo v. Comm'rDocket Nos. 55506, 55709, 63933, 63934. United States Tax CourtT.C. Memo 1964-46; 1964 Tax Ct. Memo LEXIS 290; 23 T.C.M. (CCH) 258; T.C.M. (RIA) 64046; February 27, 1964*290 Net worth increase: Burden of proof: Beginning and ending computations. - Errors in the Commissioner's beginning and ending computations of the networth of taxpayers who failed to maintain adequate records of their gambling activities did not destroy the presumption that the Commissioner's determinations were correct and impose the burden of proof on him. The burden remained upon the taxpayers to demonstrate that the Commissioner was wrong as to each item involved. Examination of books and records: Second examination: Amended returns. - After a first examination of the taxpayers' books and records by revenue agents, the taxpayers filed amended returns disclosing a substantial amount of unreported income. The revenue agents advised the taxpayers that the amended returns necessitated an examination. The taxpayers did not object, and a second examination was conducted. The Tax Court held that the protection afforded by the law against unnecessary examinations was waived by the taxpayers' failure to object. The Tax Court also said that the Commissioner was not prohibited from examining matters covered in the amended returns. Net worth increase: Cash on hand: Failure to follow leads. *291 - The Tax Court found that there was no merit in the taxpayers' argument that revenue agents disregarded leads as to cash on hand where the taxpayers rather than furnishing material information, at all times resisted the development of such information. Net worth increase: Adequacy of books: Expenditures exceeding income. - Use of the net worth method of reconstructing income is not restricted to a finding of particular inaccuracies, omissions, or defalcations in a taxpayers' books. Also, the Commissioner was not restricted from showing that disbursements made during the year were in excess of available funds at the start of the year plus those becoming available during the year. Net worth increase: Cash hoard: Gambling activities. - An individual who independently and as a partner engaged in gambling activities was found to have $95,000, rather than $350,000, cash on hand at the beginning of 1948. In reaching its conclusion, the Tax Court considered the facts that the taxpayer claimed $45,000 of cash on hand and in banks on his financial statement, that he had an interest in a partnership bank account, and that he needed a substantial bankroll to carry on his gambling activities. *292 Net worth increase: Cash hoard: Financial statements. - In finding that the taxpayers did not have $385,000 cash in a concealed safe at the beginning of 1948, the Tax Court considered financial statements which they had given to banks, and held that the Commissioner was warranted in using the stipulated bank balances shown on the financial statements in determining cash on hand. The taxpayers' contention that they had a large cash hoard was also refuted by their borrowings, and their withdrawal of dividends from their company to pay income taxes. Net worth increase: Cash on hand: Circumstantial evidence. - The Commissioner's finding that the taxpayer did not have an appriceiable amount of cash on hand in his safe deposit box as of January 1, 1948, was upheld by the Tax Court, which did not find the taxpayer to be a credibile witness. Circumstantial evidence which showed the improbability of a cash accumulation included the facts that the taxpayer had difficulty paying delinquent income taxes during 1936-1939, that he cashed Savings Bonds prior to their maturity during 1948, that he borrowed large sums during that year, and that his cash in the bank and at home remained relatively *293 constant throughout the year. Net worth increase: Cash on hand: Evidence. - In sustaining, with modifications, the Commissioner's reconstruction of the taxpayers' income under the net worth method, the Tax Court found that the taxpayers' contention that they had $3,000 on hand from the liquidation of a business late in 1947 was refuted by the fact that they did not meet payments due on their note in 1948, poor payment records with stores, borrowings on life insurance, financial statements with banks, borrowings from relatives, gifts received from relatives, and nondeductible expenditures. Tax Court Rules: Stipulation of evidence. - A stipulation as to gambling winnings agreed to by the Commissioner was set aside by the Tax Court on the ground that there was no meeting of the minds. The Commissioner would not have entered into the stipulation if he had been aware of the actual facts. Fraud: Understatement of income: Burden of proof. - In upholding the Commissioner's determination that understatements of income were fraudulent, the Tax Court remarked that the Commissioner cannot meet the burden of proof on the basis of the taxpayers' failure to prove error in the Commissioner's determination. *294 However, fraud penalties were upheld where the evidence showed that the taxpayers consistently substantially understated their income from gambling enterprises, failed to cooperate during investigations of their tax liability, filed amended returns of admittedly unreported income after the investigation started, failed to keep records of business receipts, particularly gambling winnings, and employed unusual accounting techinques. Joint returns: Fraud penalty: Wife's liability. - Wives who signed joint returns filed by their husbands, who were shown to have intended to evade income taxes, were jointly and severally liable for additions to tax for fraud. The wives resided with their husbands throughout the taxable year and elected to file joint returns. Fraud penalty: Amount of deficiency: Amended returns. - The total deficiency for the purpose of computing the 50 percent addition to tax for fraud is the difference between the tax liability and the amount shown on the original return, rather than the amount shown on an amended return. Statute of limitations: Waiver: Power of attorney. - Waivers of the statute of limitations executed by an individual who held a power of attorney from *295 the taxpayers were valid, even though the power of attorney did not specifically authorize him to execute waivers, where the individual was given broad powers to represent the taxpayers in "all matters pertaining to the adjustment and settlement of federal income taxes and claims in connection therewith." Furthermore, the taxpayers were estopped to deny the validity of the waivers, which were executed almost one month before the statute of limitations had run. If the waivers had not been executed, the Commissioner could have taken other steps to protect his interests. FISHERMemorandum Findings of Fact and Opinion FISHER, Judge: These consolidated proceedings involve the determination of deficiencies in income tax and additions to tax as follows: Estate of Sam Maceo, Deceased, et al., Docket No. 55506 Additions to Tax I.R.C. 1939YearDeficiencySec. 293(b)Sec. 294(d)(2)1948$148,016.64$107,705.60$11,484.67194944,140.1239,268.773,272.25195046,018.2623,009.13250.00Total$238,175.02$169,983.50$15,006.92Estate of Rosario Maceo, Deceased, et al., Docket No. 557091948$ 5,042.98$ 28,174.26$ 3,307.10194923,682.4829,734.671,783.61195036,196.2222,818.81Total$ 64,921.68$ 80,727.74$ 5,090.71O. E. Voigt, Docket No. 639331948$ 8,364.60$ 9,619.39$ 1,164.441949(.54) *3,679.3619502,324.68Total$ 8,364.06$ 15,623.43$ 1,164.44*296 Vincent A. Maceo and Estelle Maceo Parmer, Docket No. 63934 Additions to Tax I.R.C. 1939YearDeficiencySec. 293(b)Sec. 294(d)(2)1948$ 2,129.22$ 1,084.91$ 83.9419495,815.703,100.89273.8719504,811.682,405.84Total$ 12,756.60$ 6,591.64$ 357.81The cases were consolidated for hearing pursuant to agreement of the parties. The principal issues presented for our consideration are: (1) Whether respondent was justified in making use of the net worth plus expenditures method in reconstructing net income for the taxable years 1948 through 1950, inclusive; (2) Whether and to what extent petitioners understated their net taxable income for the years 1948 through 1950, inclusive; (3) Whether the capital investments of Sam Maceo, Rosario and Vincent in Maceo and Company at December 31, 1950, were $245,742.02, $245,742.02 and $80,792.31, respectively, as contended by respondent in his motion to correct the amounts previously stipulated as investments of Rosario and Vincent in said company; (4) Whether *297 any part of the deficiency determined against petitioners for each of the years 1948 through 1950, inclusive, was due to fraud with intent to evade tax within the meaning of section 293(b) of the 1939 Code; 2(5) Whether assessment and collection of deficiencies determined in Docket Nos. 55709 (Rosario and Frances) and 63934 (Vincent and Estelle) for the years 1948 and 1949 and for the year 1948 in Docket No. 63933 (O. E. Voigt) are barred by the statute of limitations, as provided by section 275(a) of the 1939 Code; (6) Whether Sam Maceo and Edna Maceo Plitt are liable for an addition to tax for 1950 for their failure to file a declaration of estimated tax for said year within the purview of section 294(d)(1)(B) of the 1939 Code; and (7) Whether the several petitioners are liable for the addition to tax for substantial underestimation of estimated tax under section 294(d)(2), Code of 1939, for the respective years for which determined by respondent. Findings of Fact Part of the facts are stipulated (orally and in writing) and, together with stipulated exhibits, were so found and are incorporated *298 by this reference. Background and General Facts The petitioners in Docket No. 55506 are the Estate of Sam Maceo, Deceased, and Edna Sedgwick Maceo Plitt, wife of the decedent. The petitioners in Docket No. 55709 are the Estate of Rosario Maceo, Deceased, and Frances Maceo, wife of the deceased. The petitioner in Docket No. 63933 is O. E. Voigt. The petitioners in Docket No. 63934 are Vincent A. Maceo and Estelle Maceo Parmer. During the taxable years 1948, 1949 and 1950, the aforesaid petitioners resided in Galveston, Texas. Frances Maceo and Sam Serio are duly qualified independent executrix and executor, respectively, of the Estate of Rosario Maceo, Deceased. Frances Maceo, wife of the deceased Rosario, is also a petitioner in this proceeding in her individual capacity. Sam Serio and Frances Maceo are citizens of the United States. Edna Sedgwick Maceo Plitt and Sam Serio are duly qualified independent executrix and executor, respectively, of the Estate of Sam Maceo, Deceased. Edna Sedgwick Maceo Plitt, former wife of the deceased Sam Maceo, is also a petitioner in this proceeding in her individual capacity. Sam Maceo was born in Palermo, Italy, on March 1, 1894. He became a United *299 States citizen through naturalization and took up residence in Galveston, Texas, in 1915, which continued to be his residence until the time of his demise on April 16, 1951. Sam Maceo was the younger brother of Rosario Maceo. Sam Maceo married Jessica McBride prior to 1932 and they were divorced on November 8, 1941. Sam Maceo married Edna Sedgwick on December 29, 1941, and she was his surviving spouse at the time of his death. Sam and Edna Sedgwick Maceo Plitt had three children as a result of their marriage. They were Salvatore Maceo and Victor Edward Maceo, born in 1942, and Edna Sedgwick Maceo born in 1944. Rosario Maceo was born in Palermo, Italy, on September 8, 1887, and came to the United States in 1901. Rosario was a citizen of the United States at the time of his demise on March 15, 1954. He established his residence in Galveston in 1913 and continued to reside there until the time of his death. Rosario Maceo married Frances Dispensa in September 1922. Frank Maceo and Vic C. Maceo are brothers and were first cousins of Sam Maceo and Rosario. O. E. Voigt was born in Brenham, Texas, on November 18, 1888. Voigt married Bessie Downey and they were divorced sometime during the *300 period 1923 to 1925. Voigt and Bessie had three children. The married names of Voigt's three children during the taxable years 1948, 1949 and 1950 were Bessie Cripps, Estelle Maceo Parmer and Margaret Williams. At the time of the instant trial Voigt had been engaged in the gambling business for about 50 years. He commenced his gambling activities in 1910 in Galveston where he ran a poker game. Sam and Rosario had been barbers for a number of years before they went into the bootlegging business with Voigt in 1923 or 1924. Vincent A. Maceo was born in New Orleans, Louisiana, on January 27, 1914. Vincent is the son of Frank Maceo and the son-in-law of O. E. Voigt. Vincent married Estelle Voigt, daughter of O. E. Voigt on June 1, 1939. Vincent and Estelle were divorced in November 1951. Vincent A. Maceo was a second cousin of Sam and Rosario. Vincent is the nephew of Vic C. Maceo. After Vincent left Texas A & M he worked as an apprentice for Home Electric Company until 1943. In 1943 Vincent acquired an interest in a partnership known as McCarty Roofing Co. , which continued the roofing business operated by J. E. McCarty under the name of J. E. McCarty and Co. In 1944 the McCarty Roofing *301 Co. partnership ceased operations. Vincent became a partner in the "Turf" owned by Maceo and Company on July 1, 1946, at which time he purchased a five percent interest from Voigt. Turf was organized on August 6, 1932. The organizers were Rosario, Sam, Voigt, Frank and D. D. Alexander. Sam Maceo, Rosario, Voigt and Vincent were partners in Maceo and Company during the taxable years 1948, 1949 and 1950. Maceo and Company was the successor of Turf and R. Maceo and Company. Partnerships in which Rosario, Sam, Voigt and Vincent had financial interests and the amount of their interests therein were as follows: PERCENTAGE INTERESTS IN PARTNERSHIPS Maceo and CompanySamRosarioVoigtVincentFrankAdamsVic C.SerioOthers10- 1-50 -1515557 1/255537 1/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- 1-46 -202010515151059-30-50Trustee10- 1-49 -2020105151510512-31-50R.M.A.C.4-25-45 - 9-30-462020151515105Turf7- 1-46 - 9-30-462020105151510510- 1-43 -20201515151056-30-461- 1-39 - 9-30-43No records available1- 1-36 -20202010 a1010 a1012-31-388- 6-32 -20202010 a10 a2012-31-35Hollywood Sui-JenDinner Club193620N.A. b*302 15N.A. b193520N.A. b15N.A. bVin-HollywoodSamRosarioVoigtcentFrankAdamsVic C.SerioOthersDinner Club1932 - 1934N.A.N.A. bN.A. bN.A. b1931252525251930N.A. bN.A. bN.A. b1928, 1929No records available192733 1/333 1/333 1/3192625252525GrottoDinner Club1931252525251929-1930No records available192833 1/333 1/333 1/3The Grotto Dinner Club, hereinafter referred to as Grotto, was a partnership formed in February 1928 by Sam, Rosario and Voigt. Grotto was a night club gambling casino located at Galveston Pleasure Pier. Grotto operated until at least 1931. The Hollywood Dinner Club, hereinafter referred to as Hollywood, was a partnership formed in June 1926 by Sam, Rosario, Voigt and Quinn. Hollywood was located at 6102 Avenue S, Galveston, Texas. Hollywood was organized as a fashionable dinner club which featured food, service, entertainment and gambling activities. Hollywood operated as a separate partnership through 1935. Commencing in 1936, Hollywood became Hollywood Sui-Jen Dinner Club, hereinafter referred to as Hollywood Sui-Jen. Sam, Rosario and Voigt had financial interests in Hollywood and Hollywood Sui-Jen during the years they were in operation. *303 Hollywood was started with an original capital of approximately $80,000, provided by the partners from their individual funds and from borrowed funds. Voigt paid in $40,000 which was allocated equally between him and Quinn. Sam and Rosario borrowed $35,000 of the $40,000 they invested in Hollywood. The monies provided by Rosario and Sam were shown on Hollywood's books as partnership loans. The partners of Turf caused Gulf to be incorporated under the laws of Texas in 1938 with an authorized and issued stock of $250,000, which consisted of 500 shares of common stock having a par value of $500. The incorporators, in exchange for the capital stock of Gulf, transferred to Gulf real estate (which was subject to outstanding liabilities) together with insurance policies on said real estate, cash and certain accounts receivable. Activities of Maceo and Company During the years ended September 30, 1947, through September 30, 1951, Maceo and Company owned the capital stock of several corporations. The amount of capital stock outstanding, the cost of such stock to Maceo and Company and the percent of stock in said corporations owned by Maceo and Company is as follows: Cost ofCapitalstock toPercent ofStockName of StockoutstandingMaceo & Co.stock owned(a) Derby Amusement Co.$10,000$ 12,000100(b) Beach Amusement Park5,0005,000100(c) Miss Hollywood, Inc.4,5004,500100(d) Galveston Pleasure Pier, Inc.3,00030,000100(e) Galveston Isle Publishing Co., Inc.2,5002,500100(f) Murdoch Bath House, Co.48,00040,750100(g) Galveston Pier Corp.N.A. **304 25,00025(h) San Luis CorporationN.A. *165,817.75100(i) Playland Amusement Co.N.A. *2,500 **20The Derby Amusement Company, Inc., hereinafter referred to as Derby, (a) above, was incorporated under the laws of the State of Texas in 1937. Derby leased the property located at 25th and Boulevard, Galveston, Texas. A carousel was located on said property and was operated under the name of "Racing Derby." Derby received income from the following sources in 1948, 1949 and 1950: YearRide receiptsRents1948$17,450.04$1,937.04 [$1,920]194919,550.702,430.001950NoneNoneOn December 31, 1948, Derby was indebted to Maceo and Company in the amount of $500. On December 31, 1949, and 1950, Maceo and Company owed Derby $4,500. Beach Amusement Park, Inc., hereinafter referred to as Beach, (b) above, was incorporated under the laws of the State of Texas in 1939. Beach operated the equipment used in an amusement park located on Seawall Boulevard, Galveston. Beach was indebted to Maceo and Company on an open account in the amount of $67,050, $76,050 and $87,250 at December 31, 1948, 1949 and 1950, respectively. Beach was also indebted on an open miscellaneous account of $3,400 at December 31, 1948, 1949 and 1950, respectively. The income *305 from Beach's operations was reported by Beach. Beach received income from the following sources during the taxable years 1948, 1949 and 1950: RideRide Re-ConcessionYearReceiptsceipts PierReceiptsRent1948$36,756.30$2,274.84$16,952.45$6,200.00194933,929.012,667.015,523.118,580.00195033,478.461,411.504,358.596,290.00 Miss Hollywood, Inc., hereinafter referred to as Hollywood, Inc., (c) above, was incorporated under the laws of the State of Texas in 1941. Hollywood, Inc., operated a pleasure boat called "Miss Hollywood." Hollywood, Inc., reported boat rental receipts of $13,350, $11,700 and $14,250 in the years 1948, 1949 and 1950, respectively. Hollywood, Inc., was indebted to Maceo and Company on open account in the amounts of $58,700, $68,200 and $69,200 at December 31, 1948, 1949 and 1950, respectively. Galveston Pleasure Pier, Inc., hereinafter referred to as Pleasure Pier, (d) above, was incorporated under the laws of the State of Texas in 1916. Pleasure Pier owned the pier in Galveston on which Turf Athletic Club Number 1, hereinafter called Balinese Room, was located. Pleasure Pier received income from rentals of $14,500, $16,500 and $15,500 for the years 1948, 1949 and 1950, respectively. *306 Pleasure Pier was indebted to Maceo and Company on open account in the amounts of $44,000 and $37,500 at December 31, 1948, and 1949, respectively. Pleasure Pier was indebted to R. Maceo, Trustee, an open account in the amount of $40,500 at December 31, 1950. Galveston Isle Publishing Co., Inc. , hereinafter referred to as Publication, (e) above, was incorporated under the laws of the State of Texas in 1947. Publication published a magazine called "Galveston Isle" which was distributed on a monthly basis to residents and visitors to Galveston. Books and records of Publication show that it received the following income and sustained the following expenses in 1948, 1949 and 1950: YearIncomeExpenses1948$72,580.71$72,551.99194968,787.3468,787.34195057,832.5657,832.56Murdoch Bath House Co., Inc., hereinafter sometimes called Murdoch, (f) above, was incorporated under the laws of the State of Texas in 1914. Murdoch owns the property known as Murdoch Bath House, hereinafter referred to as Bath House, 22nd and 23rd Streets and Seawall Boulevard, Galveston. Murdoch rented part of the space in the Bath House to Maceo and Company. Maceo and Company used this space for a bingo concession. Murdoch *307 also derived rental income from space leased for other concessions which were operated by individuals and companies that were not affiliated with the company. Murdoch received income from the follow sources in 1948, 1949 and 1950: ReceiptsYearBathRent1948$10,788.19$21,40019498,937.5024,25019506,979.3927,000 Murdoch was indebted to Maceo and Company on open account in the amounts of $45,000, $46,000 and $40,000 at December 31, 1948, 1949 and 1950. Galveston Pier Corporation, hereinafter referred to as Pier Corporation, (g) above, was incorporated under the laws of the State of Texas in 1947. The majority of the outstanding stock of Pier Corporation was held by the Moody interests of Galveston which represented 67 1/2 percent of the outstanding stock. San Luis Corporation, hereinafter referred to as San Luis, (h) above, was incorporated under the laws of the State of Texas. San Luis owned a parcel of land in Galveston. Playland Amusement Company, hereinafter referred to as Playland, (i) above, operated properties located at 6102 Avenue J, Galveston. The operations of Playland consisted of bingo. During the fiscal years ended September 30, 1948, 1949 and 1950, the operations of Maceo *308 and Company consisted of various types of gambling activities, the sale of food and drink and the rendition of services in connection with certain operations incident to the company's over-all gambling operations. The gambling activities of Maceo and Company involved the conduct of dice, roulette and card games in clubrooms; the operation of slot machines in establishments owned and operated by Maceo and Company and in establishments owned by third parties located on Galveston Isle; the acceptance of bets on horse races, baseball, football and basketball games; the conduct of bingo games and the sale of tips on tip book lotteries. During the fiscal years ended September 30, 1948, 1949 and 1950, Maceo and Company carried on its operations in properties and used equipment and fixtures owned by Maceo and Company, corporations controlled by Maceo and Company, Gulf and third parties. The locations at which Maceo and Company carried on operations during the taxable years are as follows: Locations at which Company carried on its operations Name of OperationAddressTurf Grill2210-2216 Market St.Turf Tap RoomGalveston, TexasStudio Lounge(Turf Grill Bldg.)Western RoomHorse OperationsLay-off bettingCigar stand - 2nd floorMurdoch Bath House - PierSeawall Blvd.Home Plate Cigar StandGalvestonBalinese RoomCenter and Seawall Blvd.Equipment Operations: Office - Turf Grill2210-2216 Market St.Warehouse Building in rear of Turf GrillMechanic StreetBldg.Store locationsThroughout GalvestonBird CageGalvestonCrystal Sportland # 12316 BoulevardCrystal Sportland # 22111 - 23rd St.Turf Stores2027 B. St.Stewart Beach Catering CompanyStewart BeachMaceo Catering Company2210-2216 Market St.and Center & Seawall Blvd.CornerGalvestonPlayland6102 Avenue JPark SportlandN.A. *Chill BowlKemah, TexasStreamline ClubAlgoe, TexasEdgewater LoungeKemah, TexasSilver Moon (Dickinson Club)Dickinson, Texas*309 Maceo and Company maintained offices at the Turf Grill Building, hereinafter referred to as "Turf," and in the building where the operations of Turf Stores were conducted. The offices of the Turf were located on the first and third floors. The first floor offices consisted of two offices that adjoined the check cashing booth. The first office was designated as the counting room and the second office, which contained two safes, was designated as the first floor office of Joe T. and Sam Serio, which is hereinafter referred to as the "safe office." The third floor of the Turf contained an office for Sam Serio, a large room for the acounting department, which adjoined a smaller office used jointly by Joe T. and Sam Serio, plus rooms used for other designated purposes. During the taxable years involved herein Maceo and Company carried on extensive gambling and nongambling activities. Nongambling activities consisted of: The sale of food, drink and rendition of related services; the supplying by Turf Stores of merchandise that was used by gambling and nongambling departments of Maceo and Company; the operation of phonograph machines and cigarette machines in establishments *310 owned and/or controlled by Maceo and Company in establishments on Galveston Isle which were owned by third parties; the conduct of a pool hall, and a check cashing booth. Gambling activities of Maceo and Company consisted of: The operation of clubrooms at which dice and roulette games were conducted; the operation of slot machines and pinball machines in establishments owned or controlled by Maceo and Company and in establishments located on Galveston Isle which were owned by third parties; the acceptance of bets on horse races, basketball, football and baseball games and other sporting events, which were made in person or via telephone to or at locations owned or controlled by Maceo and Company; the conduct of bingo games at locations owned by Maceo and Company; the sale of tip books at the cigar stand in the Turf Grill Building and the conduct of poker games on the second floor of the Turf Grill Building. Clubroom Operations Food, drink and other services were available at the locations where Maceo and Company conducted its clubroom operations. The supplying of food, drink and other services at such locations was not always under the control or direction of Maceo and Company. In *311 those instances where Maceo and Company was responsible for food, drink and other services, income was recorded on the books of Maceo and Company from such operations. Dice and roulette games were available at the clubrooms operated by Maceo and Company. In connection with its operation of dice, roulette and card games at the Balinese Room, Maceo and Company employed individuals designated as manager, floormen, cashier and tablemen. The manager of the Balinese Room was in charge of the operations conducted at the clubrooms. The manager was assisted by floormen. The cashier at the Balinese Room had custody of the bankroll and chips that were placed in the clubrooms by Maceo and Company. He cashed checks for customers who patronized both the dining rooms and clubrooms, and sold chips to customers who participated in the dice, roulette and card games conducted in the clubrooms. Also, the cashier furnished tablemen with chips to sell to customers and accounted for the income derived from the games conducted in the clubrooms. The floormen at the Balinese Room supervised the tablemen in their conduct of the gambling games and conferred with customers with respect to credit or approving the *312 customer's check. A dice game at the Balinese Room was conducted on dice tables and three or four tablemen were assigned to each table. The men were designated as stickmen, boxmen and dealers. The stickman in a dice game at the Balinese Room was in charge of the conduct of the game. The boxman in a dice game at the Balinese Room sold chips for cash only to customers. He raised the lid on a small mahogany box placed on the dice table and placed the cash in the box. The boxman could not withdraw money from the mahogany box after it had been placed therein. Roulette games at the Balinese Room were conducted at a table having a roulette wheel and an appropriate betting layout. The dealer at a roulette table sold chips to a customer for cash. The cash derived from the sale of chips at the roulette table was placed in a mahogany box which was built into the roulette table. When a customer purchased chips at the roulette table he would place the money in a slot in the table where it would then drop into the mahogany box which was built into the table. If the customer tendered currency to the dealer for chips, the currency was placed over the slot in the table and the dealer would then push *313 the currency through the slot by using a stick of wood. During the course of an evening's gambling at the Balinese Room, the cashier, among other duties, would perform the following tasks: (a) Cash checks for customers, some of whom bought chips from him at the time he cashed their checks. (b) Issue chips on credit directly to customers or to floormen who were acting for the customers and prepare records showing the amount of chips furnished on credit to customers, for example, making a notation in a special tablet maintained to show credit extended to customers or delivery of an IOU form for execution by the customer to evidence the customer's receipt on credit of a specified amount of chips. (c) Accept payments on customer's debts, for example, payments on debts incurred during the evening or on prior occasions and return the money to an open table. (d) Make arrangements with customers for the collection of debts incurred during the evening, for example, the acceptance of a postdated check or an IOU from the customer. (e) Work with the manager and floormen in preparing a report showing the total win or loss sustained at the Balinese Room during the evening which included a verification *314 of the checks and chips in his possession. When a clubroom was closed for the evening the manager and floormen counted the money in the money boxes. The cashier would fill any empty reserve chip boxes in his possession with chips that he had redeemed. The manager and floormen gave the cashier chips from a rack on the open table for the unredeemed IOU's received by the cashier during the course of the evening. The cashier filed the IOU's in an index box to await their collection. The cashier eliminated from his cash on hand at the close of business checks that were postdated more than one day. Postdated checks were placed in an index folder that was stored in the cashier's safe. The manager, floorman and the cashier prepared a report showing the cash on hand at the beginning of the evening, the win or loss for the evening, and the total currency, silver and collectible checks on hand at the close of business. Also, they each counted the cash on hand at the end of the evening. The report, for example, showing the win or loss at the Balinese Room for the evening was in the following form: VJF **315 Cash on HandCash on hand$10,000Win7,000Balance$17,000Checks5,000$12,000The amount designated as checks represented the amount of checks sent to the office of Maceo and Company to be cashed and the proceeds returned to the Balinese Room. The cashier of the Balinese Room prepared a slip of paper for his own record based on the aforesaid report in his safe for reference on the next business day. Said slip of paper showed the previous day's cash and checks. At the time the cashier closed his office, he had a report for the current day showing the net win or loss for the clubroom and the cash on hand consisting of currency and silver plus the checks he had sent to the cash office of Maceo and Company to be cashed. The cash on hand equalled the assigned bankroll adjusted by the cumulative net win or loss. The cashier was required to account each day for the exact amount of cash on hand. The cashier of the Balinese Room made arrangements for the delivery to the Maceo and Company safe office of the report showing the result of the day's operations and the checks which had been received during the course of the evening's operations. The next day, upon learning that the report had been delivered to the Maceo and Company *316 safe office and after checking his cash on hand, the cashier destroyed his copy of the previous day's report. The cashier of the Balinese Room, on occasion, personally went to Houston to cash checks where collection was uncertain. The cashier adjusted his cash on hand to reflect the proceeds from checks that were retained by the safe office of Maceo and Company or the cash that the cashier returned to said office on the request of an authorized official such as Joe T. During the taxable years 1948, 1949 and 1950, the cashier did not have more than $45,000 or $50,000 in cash on hand at any one time at the Balinese Room. On many occasions during the taxable period involved herein, the Balinese Room was charged with accumulated winnings in excess of $60,000. All of the clubrooms operated by Maceo and Company submitted reports of their daily gambling operations to Joe T. or Serio at the safe office. The reports from the Balinese Room showing results of the gambling activities were prepared at the close of the gambling activities each night. During 1948, 1949 and 1950, Maceo and Company operated a clubroom in Dickinson, Texas, hereinafter referred to as the "Silver Moon." The operations *317 were described on records maintained by Maceo and Company as Dickinson, Club or the Silver Moon Cafe. There were two dice tables and a roulette table at the Silver Moon. The restaurant operated in connection with the Silver Moon would seat about 50 people and served food and drink. Carlo Falco, Sam T. Maceo and Joe Salvato were in charge of the operations at the Silver Moon. Said individuals received a regular salary for the work they performed for Maceo and Company at the Silver Moon. Reports showing the results of the gambling activities at the Silver Moon were prepared at the close of business each night and were brought to Galveston each night for delivery to the safe office of Maceo and Company. The Streamline Dinner Club was also operated by Maceo and Company during 1949 and 1950. Carlo Falco was in charge of its operations. There were three dice tables and one roulette table at the Streamline. Reports were prepared at the close of business each night and were brought to Galveston for delivery to the safe office of Maceo and Company. Maceo and Company also operated and owned the entire interest in the Edgewater Lounge, hereinafter called Edgewater. Dice and roulette games were *318 operated at Edgewater. Reports would be prepared at the close of business each night showing the results of the gambling activities at Edgewater. Said reports were delivered to the safe office of Maceo and Company on a weekly basis, at which time approximately seven reports would be delivered to the safe office. Some of the checks received at Edgewater were taken to banks in Houston to be cashed. The Studio Lounge was operated by Maceo and Company during 1948, 1949 and 1950. The Studio Lounge followed the same procedures for reporting income derived from its gambling activities as did the Balinese Room. Money received at the Studio Lounge was kept in a safe located on the second floor of the Turf. The Western Room was opened by Maceo and Company in August 1950. Reports showing the results of gambling activities at said establishment were prepared at the close of business each night and were delivered to the safe office of Maceo and Company. Likewise, proceeds from the gambling operations conducted in the Western Room were delivered to the safe office. Equipment Operations of Maceo and Company Maceo and Company owned slot machines, pinball machines and phonograph machines which were *319 placed in approximately 300 establishments located throughout the city of Galveston. As part of this operation, Maceo and Company had a 75 percent interest in the Dickinson Equipment Company which owned pinball machines, slot machines, phonograph machines, and various other coin-operated devices which were placed in establishments located throughout the mainland portion of Galveston. The placing and servicing of pinball machines, slot machines and phonograph machines in Galveston was handled by a division of Maceo and Company called "Novelty." During the taxable years 1948, 1949 and 1950, John Arena was the manager and director of Novelty's operations. Fabj was in charge of collecting money from Novelty's machines during the taxable years involved. Arena was Fabj's boss. Fabj and Arena were sons-in-law of Frank. Novelty placed machines in locations subject to an agreement that the income derived from the machines would be divided equally between Novelty and the individual operating the location in which the machine was placed. In 1949 or 1950 Novelty changed its income-sharing ratio and began to retain 60 percent of the receipts obtained from the machines and return 40 percent of the *320 receipts to the location owner. Collections were made from Novelty's machines one or more times each week. The employee or Fabj counted the money removed from Novelty's machines immediately after removing the money from the machines. The collector would then withdraw sufficient monies from the receipts taken from the machines to reimburse the location owner for any expenses he had incurred in connection with Novelty's machines. The money that remained would then be available for division between Novelty and the location owner in the agreed percentages. If Novelty and/or Maceo and Company had advanced money to the location owner, the collector would apply a certain portion of the location owner's share of the monies collected that day in reduction of the location owner's debt to Novelty and/or Maceo and Company. In certain instances, the owner allowed his share of receipts from the machines to remain on deposit with Maceo and Company. The collector would complete the execution of the collection ticket. In the column designated "commission" the collector would enter the owner's commission on phonographs (victrolas) and all other machines. If any portion of the merchant's commissions *321 was applied against loans owed by him to Novelty, the amount so credited would be entered as a credit against the balance due from the owner which had been placed on the collection ticket by the Maceo and Company accounting clerk who had partially prepared the collection ticket for the collector. If the collector collected the stake money, the amount collected would be entered in the section of the collection ticket designated "stake." The collector would have the location owner sign the collection ticket to acknowledge that an accounting had been made to him for his share of the monies collected from the machines in his establishment. The original of the collection ticket would be left with the location owner and the duplicate would be delivered to Joe T. or Serio at the safe office of Maceo and Company at the close of the day. Fabj would prepare, from the retained duplicate collection tickets for that date, a single adding machine tape containing the following separate computations: (1) Total collections by locations that had been made from Novelty's machines. (2) Total collections from the owners that were recorded as credits on the duplicate collection tickets, that is, collections *322 from owners in respect to loans made to them by Novelty and collections from owners of stakes that had been placed ir Novelty's machines at the time the machines were placed in their establishments. (3) The total amount of cash collections for which Fabj had to make an accounting, that is, a computation showing the sum of collections from locations and collections for owners. Fabj delivered money to Joe T. or Serio at the safe office equal to the total amount of cash for which the collection tickets and related adding machine tapes showed that he was responsible. Betting Operations of Maceo and Company Betting operations of Maceo and Company were conducted by five different divisions of the company. The operations were conducted at the Turf, at locations throughout Galveston, and at two locations on the mainland in Galveston County. The betting operations involved wagers on sporting events (horse races, football, baseball and basketball games) and games of chance. Maceo and Company would also make and accept layoff bets on scheduled sporting events. Bets on Horse Races The horse race betting operations of Maceo and Company were carried on by the division known as "Horse Operations." *323 Bets on horse races were accepted by Maceo and Company at its operations conducted in the Turf, the Home Plate Cigar Stand and Murdoch Bath House Pier, all of which were located in Galveston, and at the Chili Bowl, located at Kemah, Texas, and the Streamline Dinner Club in Algoe, Texas. Various records were prepared by the employees and partners of Maceo and Company in connection with its horse race betting operations. Printed betting slips were bound in books and each book contained 20 sets of betting slips. Each set of betting slips consisted of an original and duplicate sheet of paper which was printed in 10 different sections, each of which represented a betting slip. Each betting slip on the original page was assigned an identifying number. Also prepared in connection with its horse betting operations were race sheets which showed the name of each horse that was running in a scheduled race. Maceo and Company also kept track sheets that showed the results of each scheduled race at a particular track which included the winning horse in the race, and the rate of the pay-off in respect to the winning horses. In carrying on horse race bets Maceo and Company would keep a bankroll at *324 each betting establishment to finance the betting operations carried on there. Individuals having winning tickets would present them to the cashier for payment. In order to record the payment of the bet the cashier would circle the serial number on the retained copy of the betting slip and then deposit the winning betting slip in a receptacle where it would be retained until the end of the day at which time it would be destroyed. At the close of each day the cashier or the individual in charge of the betting operation would add on an adding machine the amounts shown on the duplicate betting slips as "Tackes" (wins) and "Outs" (losses). The difference between the "Takes" and "Outs" represented a win or loss for the day. The adding machine tape would be placed with the duplicate betting slips and the track sheets and all of said records would be delivered to Joe T. or Serio at the safe office in the Turf. Betting operations at the Home Plate Cigar Stand, hereinafter sometimes referred to as Home Plate, differed from those carried on at Murdoch Bath House Pier, Turf, Chili Bowl, and Streamline Dinner Club, in that Home Plate was owned by Quinn. The horse race betting operations at Home *325 Plate were conducted by employees of Maceo and Company. Quinn and Maceo and Company split the income derived from the horse race betting operations. Maceo and Company received one-half of the net income and Quinn received one-half thereof. At the end of a day's betting operations at Home Plate, a report covering such operations and the net proceeds from the betting operations were delivered to Joe T. or Serio at the safe office at the Turf. In connection with its horse race betting operations during 1948, 1949 and 1950, Maceo and Company purchased a total of 3,831,000 individual betting slips and 113,675 individual track sheets. Bets on Baseball, Football and Basketball Games Bets on the baseball, football and basketball games were handled by employees of the divisions of Maceo and Company designated as "Cigar Stand" and "Horse Operations." Bets were accepted at the Tip Counter which was located on the first floor of the Turf and in the Horse Operations located on the second floor of the Turf. During the football and basketball seasons bets were accepted by Maceo and Company on football and basketball games at the Tip Counter in the Home Plate Cigar Stand and at 25 or 30 locations *326 throughout Galveston where Maceo and Company had made arrangements for the proprietors of such establishments to accept bets that were recorded on football and basketball cards. The proprietors of said locations received 25 percent of the total bets placed at their location. On Saturday morning before the commencement of the game scheduled for that date, employees of the Tip Counter visited the locations where football cards were being handled for Maceo and Company and picked up the money represented by such bets. At that time the employees of the Tip Counter would withdraw from said monies the 25 percent commission which the location owner received for having accepted the bets on behalf of Maceo and Company. The football cards were then taken to Maceo and Company where they were checked in by Joe T. Joe T. then placed the money in a safe until the scheduled games were completed and the football cards were processed. Joe T., Adams, and other employees processed the football cards to ascertain the number of winning bets that had been accepted. Employees of the Tip Counter would deliver to each location the funds necessary to pay off winning bets that had been accepted at such locations. *327 Records were prepared by Joe T. or other employees of Maceo and Company showing whether a net win or loss had been sustained in respect to bets accepted by a particular location and whether a net win or loss had been sustained in connection with football bets placed at all locations. The amount of the net win or loss sustained in respect to football bets for a particular date would be written on an envelope and delivered to Joe T. Telephone Bets and Lay-Off Bets Maceo and Company also accepted and made bets via telephone. The telephone bets were of two types, that is, a bet accepted by Maceo and Company from a bettor and bets that were being laid off by Maceo and Company to other book-makers. A lay-off bet arises when a bookmaker who has accepted a bet determines that the risk involved therein is too great to be borne solely by himself. Arrangements are then made with another bookmaker to accept an agreed portion of the bet. After the event on which a lay-off bet is completed, a settlement is made by the bettor making the lay-off and the bettor accepting the lay-off. Lay-off bets were made by Maceo and Company in respect to horse races, football and baseball games. Slips were executed *328 by Adams or Maceo and Company's employees showing the acceptance of telephone bets regardless of whether it was a direct or lay-off bet. The slip evidencing the bet showed the name of the bettor, the contest on which the bet was made, the amount and the date of the bet. The slips were delivered to Joe T. prior to the commencement of the event on which the bet had been accepted. The betting slip covering the telephone bet was placed by Joe T. in the safe located in the safe office. Bets placed by telephone could be paid in cash or by check depending upon the arrangements of Maceo and Company with the bettor. At the time Maceo and Company laid off some of its bets it had not received the money for the bet. Monies received in respect to lay-off bets were generally received by Adams. When a bet had been lost, Maceo and Company would pay the winner of the bet the full amount of the bet and then collect from the lay-off bookmaker the portion of the loss that had been covered by the lay-off bet. Maceo and Company obtained themoney to pay its lay-off bets from funds turned in by the various locations where it conducted horse operations or from the money kept by Joe T. in the safe in the safe *329 office. Poker A poker game was generally conducted on the second floor of the Turf on several nights each week. The game was conducted by a dealer working under the direction of Joe Megna. The amount specified as the "house's" share of the betting income was withdrawn by the dealer from the betting pot developed on each hand of poker. At the end of each evening Megna would compute the net income derived from the game, that is, the house's share of the bets minus any expenses that he sustained in conducting the game. Megna would place 50 percent of the net income in an envelope, mark "poker" on the envelope, and turn it over to the night watchman for delivery to Joe T. Upon receiving the envelope, Joe T. would count the money in the envelope, return the money to the envelope, reseal and place it in the safe in the safe office. Bingo Maceo and Company operated bingo games at Murdoch Bath House Pier and the Chili Bowl. Maceo and Company also had a percentage interest in the bingo games operated by Playland Amusement Company. At the end of each day employees conducting the bingo games at Murdoch Bath House Pier and the Chili Bowl prepared a report showing the number of games played *330 and the income derived therefrom. The report was delivered to Joe T.'s office at the Turf where the amount of money turned in was verified by Joe T. Tip Books The Cigar Stand of Maceo and Company was open 24 hours per day where so-called "tips" were sold from "tip books." Tip books were sold by Turf Stores to the Cigar Stand. Tip books represent a form of gambling whereby an individual for the payment of five cents or ten cents can take a chance on winning a sum of money not to exceed a specified amount. Money from the sale of tip books was delivered to the safe office on the first floor of the Turf. Employees of the Tip Counter at the Cigar Stand maintained a journal book in which was entered income and expenses attributed to the sale of tip books. Nongambling Operations Food and beverages were sold at a number of locations where Maceo and Company had clubrooms and in four establishments where there were no clubrooms; that is, Turf Grill, Turf Tap Room, Stewart Beach and The Corner. At the close of each day a locked pouch was received at the safe office from each location at which food and drink services were supplied. Each pouch contained the day's receipts, food and beverage checks *331 and cash register tapes. Joe T. counted the money received from the locations. Turf Stores were operated as a central purchasing agency for various divisions of Maceo and Company or for the corporations which were owned or controlled by Maceo and Company or its partners. Turf Stores consisted of a warehouse in which food stocks and beverages were stored. Maceo and Company maintained a check cashing booth on the first floor of the Turf Grill Building. A ten cent charge was made to cash checks. Records Maintained by Maceo and Company in Respect to Receipts and Expenditures The receipt of cash by Maceo and Company was verified by Joe T., Serio, Adams or other individuals working in the safe office on the first floor of the Turf. In accordance with Rosario's wishes, money of Maceo and Company was always counted in the presence of two trusted individuals, that is, either partners like Serio and Adams or employees such as Joe T. and Frank Fertitta. The following records were prepared and maintained in connection with the clerical work performed in the safe office: (a) daily cash statements showing the cash received from locations at which nongambling activities were conducted by Maceo and *332 Company or its controlled corporations; (b) daily and periodic cash statements showing cash to be reported as having been received at locations or in connection with gambling operations conducted by Maceo and Company; (c) deposit slips recording deposits made to bank accounts maintained in the name of Maceo and Company or in the name of a nominee or designee thereof, such as Galveston Novelty Company; (d) memoranda showing income reported by various divisions and locations as being derived from gambling operations carried on by Maceo and Company in its clubrooms and at the locations where it accepted bets on sporting events; (e) memoranda showing postdated checks received and held at the safe office; (f) memoranda showing portions of money received from clubrooms that were placed in the safe of the cashier's office and not deposited in the bank accounts of Maceo and Company or distributed to the partners of Maceo and Company; (g) win and loss books showing some of the income received from some of the clubrooms operated by Maceo and Company. The records maintained by the accounting department included, inter alia, a cash receipts journal, a cash disbursements journal, check stub books, *333 daily and weekly cash position analysis, general journals, general ledger, payroll journals, departmental payroll summary sheets showing departments included in particular payrolls, monthly financial statements showing the results of the company's operations per the general ledger; daily or weekly summaries of checking account balances, and records showing income received by Maceo and Company from slot machines, pinball machines, marble machines and victrolas installed in establishments located throughout Galveston. Receipts Recorded on General Ledger of Maceo and Company Receipts reported by Maceo and Company on its books as having been received from its various operations during its fiscal years ended September 30, 1948, 1949 and 1950 are set forth in the following summary: Year ended September 30194819491950Income from gamblingoperations: Clubrooms$ 564,905.35$ 720,903.15$ 830,586.25Betting operations262,545.80210,911.69371,263.44Equipment operations513,694.50553,929.10564,463.00Gambling games and pool223,019.60229,164.71223,812.99Total$1,564,165.25$1,714,908.65$1,990,125.68Income from nongamblingactivities: Sale of food, drink & other$1,091,223.18$1,135,597.43$1,231,398.61services & dues & feesSale of merchandise583,182.58582,652.37613,684.74Total$1,674,405.76$1,718,249.80$1,845,083.35Income from gambling$3,238,571.01$3,433,158.45$3,835,209.03operations & sales of food,drink, services, merchandise& supplies recorded ongeneral ledger & reported onincome tax returns as totalreceipts*334 Receipts from gambling at clubrooms during the years ended September 30, 1948, 1949 and 1950 which were recorded on the various accounting records of Maceo and Company are as follows: Year ended September 30Name of Operation194819491950Income from gambling operations atclubroomsoperated by company: (A) Net wins shown on clubroomwin-and-loss books kept by Companyand accounted for as part of"Clubroom Receipts - Horse Account":Balinese Room$448,622.59$585,370.70$551,536.34Studio Lounge25,995.1155,959.1713,448.50Silver Moon21,576.22 a*336 Edgewater Lounge33,613.08Western Room12,084.11 aTotal$474,617.70$641,338.87$632,258.25Total brought forward$474,617.70$641,338.87$597,714.25Less net wins shown on clubroomwin-and-loss bookBalinese Room - win37,218.00 aStudio Lounge - (loss)(5,145.00 a )Western Room - win165.00 aEdgewater Lounge - win2,306.00 aNet wins not reported$ 34,544.00Total$474,617.70$641,338.87$597,714.25(B) Amounts separately recorded asclubroomreceipts in cash receipts journal -HorseAccount: 1. Dickinson Clubrooma. Distribution12,000.005,000.00b. Salaries paid with clubroom55,744.4758,938.15receipts2. Salaries paid with clubroom21,946.18receipts from unidentified clubrooms3. Poker596.003,427.004. Tax paid with clubroom receipts10,069.19from unidentified sources(C) Error in computation - Balinese1.00RoomTotal clubroom receipts recorded in$564,905.35$718,773.21$597,714.25clubroom receipts "Horse Account" onGeneral Ledger(D) Clubroom receipts of Streamline2,129.94170,458.12 aDinner Club separately recorded inwin-and-loss book [Ex. S(33)] andseparately shown in general ledgerunder Dinner Club(E) Clubroom receipts of Studio62,413.88Lounge separately recorded ongeneral ledger and omitted fromwin-and-loss bookTotal clubroom receipts recorded in$564,905.35$720,903.15$830,586.25general ledger*335 Receipts from bingo, tip books and pool during the years ended September 30, 1948, 1949 and 1950 that were recorded on the accounting records of Maceo and Company were as follows: Name of Operation194819491950Income from gambling games and pool: Bingo: Murdoch Bath House Pier$ 87,028.80$ 66,691.00$ 56,791.00Playland6,904.50ChiliBowl27,360.35Tip Books - Cigar Stand124,840.60151,333.70122,817.10Pool - Cigar Stand11,150.2011,140.019,940.04Total$223,019.60$229,164.71$223,812.99Receipts from nongambling activities during the years ended September 30, 1948, 1949 and 1950 were recorded on the accounting records of Maceo and Company as follows: Income from Nongambling194819491950Activities1. Sale of food, drink andother services,and dues and fees: Turf Grill$ 355,056.68$ 369,173.20$ 336,816.09Turf Tap Room126,090.1199,932.4277,917.62Studio Lounge21,508.1894,602.0987,473.01Western Room10,464.55Horse Operations7,431.00978.704,154.38Cigar Stand173.20494.45Balinese Room506,980.31498,861.42505,140.06Stewart Beach Catering Co.73,094.4767,980.9961,092.93Fish House23.18Maceo Catering Company1,039.251,200.001,332.50Corner17,885.63Chili Bowl14,164.51Streamline Dinner Club2,695.41114,462.88Total$1,091.223.18$1,135,597.43$1,231,398.612. Sale of merchandise,supplies, etc.Bingo - Murdoch Bath House1,791.001,648.001,604.00PierTurf Stores581,391.58581,004.37612,080.74$ 583,182.58$ 582,652.37$ 613,684.74Total income from nongamblingactivities$1,674,405.76$1,718,249.80$1,845,083.35*337 Handling and Accounting for Cash in the Safe Office Monies received from the gambling and nongambling activities of Maceo and Company, with one exception involving the Studio Lounge, were received and counted in the so-called "safe office." After the net receipts from a nongambling location were counted, a daily cash statement was prepared showing the net amount being deposited in that location's bank account for that day's operations. Collections on customers' accounts receivable attributable to particular locations were delivered to Joe T. for counting and inclusion in the location's daily cash statement and bank deposit. The receipts that were turned in each day by each location at which Maceo and Company conducted horse race betting operations were counted by Joe T. On occasion, the amount turned in by a location was increased or decreased by an amount representing the monies that Joe T. would attribute to lay-off bets handled by Maceo and Company. After the completion of the aforesaid count, Joe T. would prepare a recapitulation or summary (consolidated report) showing an amount that would be recorded on the books of Maceo and Company as the net wins or losses sustained by Maceo *338 and Company on that date at its various locations; that is, the Turf, Home Plate, Murdoch Bath House Pier, Chili Bowl and Streamline Dinner Club. The amount shown on the recapitulation sheet as the net win or loss from horse race betting operations was reduced by the cost of daily racing forms that had been purchased with cash supplied by the safe office. The net amount was then entered on a daily cash statement as the net income for the horse betting operations conducted by Maceo and Company on that date. The data submitted by the locations in support of the wins or losses reported by them was destroyed as soon as Joe T. prepared the recapitulation. In connection with its horse race betting operations, Maceo and Company from time to time received checks from individuals in settlement of their gambling debts subject to an agreement that the checks would be held for a period of time prior to their presentment for payment. The checks would be delivered to the safe office or to the accounting office where they would be retained until they were cashed at a Galveston bank. The following checks were received by Maceo and Company in settlement of debts incurred by C. H. Alexander and were *339 cashed in accordance with A. J. Adams' agreement with Alexander. Checks received on or about September 18, 1948.Date ofAmount ofDate cashed atcheckPayeecheckGalveston bankForm of endorsement9-18-48A. J. Adams$1,1309-20-48A. J. Adams; "MACEO &COMPANY [stamp]9-18-48A. J. Adams1,50011-17-48A. J. Adams9-18-48A. J. Adams1,5001-17-49A. J. Adams: "ENDORSED FORCASH ONLY FOR THE TURFA. J. ADAMS" [stamp]9-18-48A. J. Adams1,5001-17-49A. J. AdamsTotal$5,630Checks received on or about January 22, 1949.1-22-49A. J. Adams$1,500 *3-31-49A. J. Adams; "ENDORSED FORCASH ONLY FOR MACEO &COMPANY JOE T. MACEO"[stamp]1-22-49A. J. Adams1,5004-25-49A. J. Adams; "MACEO &COMPANY" [stamp]1-22-49A. J. Adams1,500 *6-20-49"ENDORSED FOR CASH ONLYFOR MACEO & COMPANYJOE T. MACEO NO. 2" [stamp]Total$4,500Said checks cannot be traced as specific amounts into the cash receipts journal (horse account) of Maceo and Company. Receipts were turned in by the Cigar Stand employees covering baseball bets made at the Tip Counter. Each day the employees turned in an envelope showing the win or loss *340 on baseball bets. Joe T. entered on a daily cash statement for the Horse Operations an amount designated as the net win or loss of Maceo and Company in respect to its baseball bets for that date. Joe T. then destroyed the envelope showing the results of the baseball betting that had been received from the Tip Counter. The cash turned in by the Tip Counter employees in respect to football bets handled by Maceo and Company was counted by Joe T. and checked against the reports turned in by each location. After a net win or loss was determined in respect to football bets accepted by Maceo and Company during a particular week, Joe T. would prepare a daily cash statement showing an amount which was recorded as the net win or loss for the football betting operations. The data used in checking the amount of money turned in to Maceo and Company by locations handling its football cards was destroyed by Joe T. immediately after he checked the records. The monies turned in by the "robbers" each day as the result of their equipment collections were counted by Joe T. or Serio. After the money was counted it was placed in the safe in the safe office. After counting the money, Joe T. wrote two amounts *341 on a sheet of paper. One amount was designated as Maceo and Company's share of income collected from its machines and the other amount was designated as monies collected from location owners in respect to debts owed Novelty or to Maceo and Company. The entries made by Joe T. on the sheet of paper were made on a daily basis. At the end of each week the entries appearing on the sheet of paper maintained by Joe T. were totaled. A cash statement was perpared once each week by Joe T. which showed two amounts: that is, an amount of money that was to be recorded on the books of Maceo and Company as income from its equipment operations and an amount of money that was to be recorded as collections on loans made in connection with the equipment operations of Maceo and Company. Reports submitted by the clubrooms were reviewed by Joe T. or Serio upon their receipt from the clubrooms. The clubrooms sent checks into the safe office for cashing or depositing to the account of Maceo and Company. Clubrooms located on the mainland generally took checks they had received in their operations to Houston and cashed them at the banks on which they were drawn. Clubrooms located on the mainland sent cash *342 to the safe office to pay the salary expense incurred by the clubrooms or by other departments of Maceo and Company which were operated at the locations where Maceo and Company had clubrooms; for example, Silver Moon, Streamline Dinner Club, Edgewater Lounge. Joe T. prepared an adding machine tape covering the checks that were sent to the safe office to verify the correctness of the total shown on the adding machine tape that was attached to the checks that had been received from the clubrooms. If the checks were to be cash pursuant to the "AJA" check cashing arrangement that Maceo and Company had with two Galveston banks, (explained infra) the tape that had been furnished by the clubroom was detached from the checks and the tape prepared by Joe T. substituted for it. The "AJA" check cashing agreement that Maceo and Company had in effect in 1948, 1949 and 1950 with the United States National Bank, Galveston, and the City National Bank, Galveston, was an agreement whereby checks presented to such banks would be accepted or cashed by such banks without a formal endorsement by Maceo and Company. Maceo and Company and the banks agreed that the identifying initials "AJA" would be written *343 in the upper left-hand corner of each check in lieu of a formal endorsement on the reverse side of each check. In connection with said check handling agreement, Maceo and Company furnished the banks with letters which advised the banks that in the event checks containing the identifying initials "AJA" were returned to the banks for any reason, Maceo and Company would immediately reimburse the bank for the amount of the returned check. Postdated checks which had been received by clubrooms such as the Balinese Room were cashed in accordance with the "AJA" check cashing arrangement. In some cases, Maceo and Company placed identifying numbers in the lower left-hand corner of postdated checks which they had accepted in satisfaction of gambling debts incurred at its clubrooms. The identifying numbers enabled Maceo and Company to account for the checks in its possession and the sequence in which they were to be cashed. The Balinese Room did not maintain records showing the number or amount of postdated checks turned over to the safe office. Checks picked up in Houston by clubroom employees from Houston residents who had become indebted to Maceo and Company for gambling losses sustained at *344 the Balinese Room and Studio Lounge were also cashed under the "AJA" check cashing arrangement. The clubroom or location at which individuals lost money was sometimes indicated by writing an appropriate identifying initial next to the "AJA" initials that were placed on the checks prior to their cashing. Serio stamped the initial "B" on checks which he sent to the safe office from the Balinese Room. The initial "S" was used to identify checks that were sent to the safe office by the Studio Lounge. Prior to the cashing of certain of the "AJA" checks, someone working in Maceo and Company placed a check mark on the face of checks sent by clubrooms to the safe office for cashing. Monies received from "AJA" checks which were actually cashed by Maceo and Company were returned to the safe office. The exact amount of money represented by the "AJA" checks which had been received at the safe office from a clubroom was returned to the clubroom accompanied by the original adding machine tape that had been submitted by the clubroom. After "AJA" checks of a clubroom were cashed, sufficient money would be withdrawn from the cash derived from such checks to reimburse Joe T. for the cost of dice which *345 he had purchased for a clubroom. The remainder of the cash attributable to the foregoing "AJA" checks was then returned to the clubroom that had sent the checks to the safe office. A portion of the monies derived from the cashing of "AJA" checks was returned to the clubroom and the remainder of the monies attributed to the cashing of "AJA" checks was retained in the safe office by Joe T. and classified as surplus money of a clubroom. Checks cashed or deposited during various periods in 1948, 1949 and 1950 by Maceo and Company pursuant to its "AJA" check cashing arrangements were as follows: Amount ofNo. ofchecks cashedchecksPeriod coveredand/or deposited1178150 days during period 1-29-49 to 6-22-49$ 377,346.66125990 days during period 6-22-49 to 10-1-49331,649.241869124 days during period 6-22-49 to 9-15-49427,435.11Total$1,136,431.01Moody National Bank successor to City National Bank1199476 days during period 12-31-47 to 1-3-50415,449.09Total checks$1,551,880.10 From time to time Joe T. reviewed his records showing the amount of cash on hand at the clubrooms to ascertain if the cash being retained by the clubroom was in excess of the amount needed for its operations. If Joe T. determined *346 that there was too much cash at a clubroom, he would request the clubroom to send in the excess cash to the safe office. When excess or surplus cash was received from a clubroom, the excess cash was placed in a safe in the safe office and a slip of columnar accounting paper was placed upon it noting the clubroom from which it had been received. Such funds which were delivered to the safe office were regarded by Joe T. as surplus funds of the particular clubroom from which they had been received. The surplus funds of each clubroom were segregated from the surplus funds of every other clubroom. (There were no compartments in the lock box in the safe in the safe office.) Joe T. placed the daily reports received from the clubrooms in the safe in the safe office along with the surplus cash of a clubroom and the related sheet of columnar accounting paper used by him to account for the monies which he had set aside as surplus funds of a clubroom. In addition to the surplus monies from the clubrooms that were kept in the two-door safe in the safe office, there was also a $100,000 bankroll which had been supplied for company use by the partners of Maceo and Company. The $100,000 bankroll was *347 not recorded on the general ledger of Maceo and Company. The $100,000 bankroll was used to provide bankrolls for the various clubrooms operated by Maceo and Company and to supply cash for the check cashing operations carried on by Maceo and Company. Joe T. also supervised the bankrolls which were supplied to the gambling operations of Maceo and Company other than the clubrooms. The bankrolls for the aforesaid gambling operations were established with monies from a "petty cash fund" (equivalent to "bankroll") that was reflected on the general ledger of Maceo and Company. Monies were advanced to, or for the benefit of, the partners of Maceo and Company from the safe in which the $100,000 bankroll and the surplus funds of the clubrooms were maintained. Monies advanced to or for the partners of Maceo and Company were used to purchase cashier's checks. On occasion, Joe T. would be notified by the accounting department that funds were needed to finance certain phases of the operations of Maceo and Company which included such things as salary expenses of the clubrooms, expenses sustained in the dining room operations carried on in connection with clubrooms operated by Maceo and Company and *348 the cost of operating the yacht, Miss Hollywood. In this connection, the accounting department furnished Joe T. with a monthly profit and loss statement showing the results of the operations of the departments needing funds. In addition, Joe T. was furnished with a statement showing the balances in the various bank accounts maintained by Maceo and Company. Joe T. withdrew sufficient funds from the monies he had previously designated as surplus funds of clubrooms in order to defray the expenses or losses of the various operations needing funds. Serio withdrew money from the surplus funds of the clubrooms to make distributions to the partners which were described by the partners as "dividends." The records of Maceo and Company include daily cash statements on the horse account which record the receipt of clubroom receipts that were used to defray expenses or provide funds for various departments of Maceo and Company. These daily cash statements also show the disbursement of the same funds to the department or location of Maceo and Company or partner of Maceo and Company receiving such funds. In the fiscal year ended September 30, 1950, funds were received and daily cash statements were *349 prepared in the safe office for the Studio Lounge recording clubroom receipts in the total amount of $62,413.88. Said clubroom receipts were used to pay salaries and entertainment expenses incurred in connection with the operation of Maceo and Company. This amount of $62,413.88 was in addition to clubroom receipts of the Studio Lounge that were included in clubroom receipts reported in the horse account. In the fiscal years ending September 30, 1949, and 1950, funds were received and daily cash statements were prepared for the Streamline Dinner Club, recording clubroom receipts in the total amounts of $2,129.44 and $170,458.12, respectively. Said receipts were used to pay salaries and entertainment expenses incurred in connection with the operation of the Streamline Dinner Club. Joe T. or Serio prepared bank deposits consisting of cash, currency and checks after daily cash statements were prepared showing the results of the operations at the nongambling locations operated by Maceo and Company and at those gambling operations of Maceo and Company other than the clubrooms. Joe T. and Serio also prepared bank deposits at the time receipts from the clubrooms were made available for use *350 in the operations of Maceo and Company. Personnel in the accounting department of Maceo and Company generally prepared, on a monthly basis, a daily cash statement for the horse account that showed the receipt and use of monies that were described as clubroom receipts to pay salaries incurred in connection with the operation of the respective clubrooms. The cash statements prepared during the months of March, April and May 1950 by Maceo and Company personnel did not account for the entire amount of clubroom receipts which were used in those months to pay clubroom salaries. A cash statement was not prepared in June 1950 to account for the clubroom receipts used to pay clubroom salaries in that month. On July 31, 1950, a daily cash statement was prepared showing the use of $67,640.08 in clubroom receipts to defray salary expenses incurred by various clubrooms operated by Maceo and Company during the months of March through July 1950. An adding machine tape was attached to the cash statement which showed the amount of clubroom salaries which had been paid with such clubroom receipts. The amount of salaries paid with said receipts, the clubrooms and the months of payment are shown in the *351 following schedule. Months in 1950 inName of clubroomwhich salaries paidAmountEdgewater LoungeMarch through July$22,355.49Balinese Room and Studio LoungeMarch, June and July41,043.49Silver MoonJune and July4,241.10$67,640.08 Records Showing the Results of Gambling Activities Carried on at Clubrooms Operated by Maceo and Company Two bound columnar journals, hereinafter referred to as win-and-loss books (10inch X 12 1/3inch in size) having prenumbered columnar pages were produced by Joe T. at the trial. Poe T. identified said journals as the only records showing the daily wins and losses of Maceo and Company at its clubrooms in the years 1948 through 1950. The win-and-loss books did not show the daily wins or losses sustained by Maceo and Company in 1948 and 1949 at the Silver Moon. Daily cash statements of Maceo and Company and entries in the cash receipts journal of the horse account record the receipt in 1948 and 1949 of $67,744.47 and $63,938.15, respectively, in "Clubroom receipts of the Silver Moon." Daily cash statements of Maceo and Company and entries in the cash receipts journal of the horse account record the receipt in 1948 of $21,946.18 in clubroom receipts, without an *352 identification being made as to the clubroom which had received such receipts. A daily cash statement of Maceo and Company and an entry in the cash receipts journal of the horse account dated September 30, 1949, record the receipt of $10,069.19 of clubroom receipts. Neither the daily cash statement nor the entry in the cash receipts journal identify the clubroom from which the money was received. Both documents have the notation "Tax" written next to the entry. The win-and-loss book showing the 1949 operations of the various Maceo and Company clubrooms does not show a withdrawal of clubroom receipts in September 1949 in the amount of $10,069.19. The win-and-loss book showing the results of the gambling operations at the Studio Lounge in the year ended September 30, 1950, does not include the winnings totaling $62,413.88 which were separately recorded on daily cash statements. Joe T. made the entries in the win-and-loss book during the periods September 30, 1947, through September 30, 1950. After September 30, 1950, Frank Fertitta maintained the win-and-loss book. Each page of the win-and-loss books on which were posted the wins or losses of a clubroom was divided into seven columns. *353 Said books reported, inter alia, amounts won and lost by a clubroom on a particular date, salaries paid to clubroom employees with winnings of the clubroom, and the accumulated amount of cash chargeable to a clubroom, that is, the bankroll with which the clubroom was charged plus all winnings with which the clubroom was charged minus recorded withdrawals of bankroll and minus recorded withdrawals of monies to pay salaries to provide other departments with funds or make dividend payments to the partners of Maceo and Company. Additions or reductions of the bankroll assigned to a clubroom were indicated by entries in the column in the win-and-loss book designated "Cap." On those dates on which salaries were recorded in the win-and-loss book as being paid with clubroom winnings, the amount designated as the win or loss for that date differed from the actual win or loss sustained on that date. Every month from January 1, 1948, through February 1950, clubroom receipts were credited with a certain amount of winnings and the payroll account was charged with the same amount. The reports submitted by the clubrooms were not posted to the win-and-loss book on a daily basis. Instead, Joe T. accumulated *354 the daily reports submitted by the clubrooms for periods of three or four weeks and posted from such reports at one time. The win-and-loss books were allegedly kept in Joe T.'s desk in his third floor office at the Turf Building. Once every three or four weeks Joe T. would remove from the double door safe in the safe office all of the records that had been developed in connection with the income received from the various clubrooms. Joe T. then allegedly posted the data from said records to the win-and-loss book. The records used by Joe T. in posting to the win-and-loss books were: (1) Daily reports that had been received from the Balinese Room and other clubs. Some of the daily reports from the Balinese Room had notations that had been written thereon by Joe T. which showed the amount of money that Joe T. had requested the Balinese Room to return to the safe office on the ground that such monies exceeded the total amount of cash that Maceo and Company wanted to maintain at the Balinese Room; the amount of money that Joe T. had not returned to the Balinese Room after he had cashed "AJA" type checks which had been submitted to the safe office for cashing; and the amount of any monies *355 derived from cashing postdated checks that had been turned in to the safe office. (2) A memorandum sheet on which Joe T. had noted the amount of money the payroll department had requested him to deposit in the payroll bank account in order to cover clubroom salaries; amounts withdrawn from surplus funds of the clubroom for the purpose of making advances to partners; and the amount of monies withdrawn in order that they could be used in the general operations of Maceo and Company. (3) Records or documents prepared by Serio or others as to the amount of cash dividend that had been paid to partners of Maceo and Company with monies derived from the clubrooms. The foregoing data would then be examined and entries based upon notes and memoranda made by Joe T. and the daily reports submitted by the clubrooms would be entered in the win-and-loss book. After the win or loss and any other entries were posted, a computation was made to show the amount of funds (balance) with which a clubroom was charged. At the time Joe T. made entries in the win-or-loss books the balance that appeared on the daily report submitted by the Balinese Room was not the same as the balance that appeared in the win-and-loss *356 book for the reason that the Balinese Room was not advised of the withdrawal and use of surplus funds by Joe T. Based upon entries in the win-and-loss book, the final daily report for the month of October 1948 that would have been submitted by the Balinese Room would have shown a balance of $52,511.66, whereas, the win-and-loss book showed that the Balinese Room was charged with a bankroll plus accumulated winnings minus withdrawals of $13,656. The win-and-loss book of Maceo and Company shows a $121 net loss ($10,000 opening bankroll minus $9,879, closing bankroll) from the operations of the Streamline Dinner Club that was not deducted from clubroom receipts of $2,129.44 which was reported as clubroom winnings for the Streamline Dinner Club for the period September 21 through 30, 1949. The win-and-loss book of Maceo and Company shows the following net wins or losses that were not included in the clubroom receipts of horse account, Studio Lounge and Streamline Dinner Club. Clubrooms having winnings orlosses not included in clubroomCash balanceOmitted netreceipts shown on generalat clubroomswins or (loss)ledger at 9-30-50Amounton 9-30-50at 9-30-50Balinese Room$15,000$52,218$37,218Studio Lounge10,0004,855(5,145)Western Room10,00010,165165Edgewater Lounge10,00012,3062,306Streamline Dinner Club10,00012,9252,925Silver Moon10,0005,732(4,268)Net wins per win-and-loss book$33,201The *357 unreported net clubroom winnings of Maceo and Company for its year ended September 30, 1950, were $33,322, which included an unclaimed $121 loss of Streamline at September 30, 1949. In order to eliminate the need for a $121 compensating adjustment in the year ended September 30, 1949, respondent's adjustments to the partners' capital accounts at September 30, 1950, have been based upon unreported winnings of $33,201. Accounting Department Personnel and Procedures Maceo and Company had an accounting department during the fiscal years ended September 30, 1948, 1949 and 1950 which was conducted under the supervision of Sam Serio. The accounting department personnel maintained the general ledger, cash receipts and disbursements journals, general journal, payroll records, subsidiary accounts receivable ledger and accounts payable records of Maceo and Company and related businesses. The daily cash statements showing the net cash received at the safe office along with cash register tapes, food and beverage checks and other memoranda submitted by the nongambling operations of Maceo and Company were processed by the accounting department after they had been received from the safe office. Employees *358 of the accounting department, among other things, completed the daily cash statement and prepared analyses showing the receipts derived from the sale of food, beverage and cigarettes. Said analyses were based upon a review of each individual customer check. Maceo and Company had an internal auditing staff which prepared detailed analyses showing the results of its various nongambling operations. Said audit was carried on under the direction of a national firm of accountants specializing in food and beverage control for institutions and hotels. In connection with this activity, Maceo and Company maintained a perpetual inventory and took weekly physical inventories of merchandise that was in stock at the locations where it carried on its nongambling activities. The accounting department, under the supervision of R. N. Cox, prepared annual balance sheets and monthly profit and loss statements which showed the results of the operations of the various departments as recorded on the general ledger of Maceo and Company. Daily cash statements covering the gambling operations of Maceo and Company were submitted to the accounting department for entry in the various cash receipts and disbursements *359 journals of Maceo and Company. The personnel in the accounting department had no knowledge as to whether win-and-loss books were maintained by Maceo and Company to show the results of the gambling operations that were conducted at its clubrooms or at the locations where it accepted bets. Transactions recorded in the cash receipts and disbursements journals of Maceo and Company did not always occur in the manner indicated by the entries recorded in such journals, that is, matters actually handled by Maceo and Company as cash transactions were written in such a way that they appeared to have been handled as check transactions which passed through the bank accounts of Maceo and Company. For example, entries would be made showing the deposit of funds in a bank account and the simultaneous crediting of such funds to an appropriate nominal or real account and entries would concurrently be made in the cash disbursements journal showing the withdrawal of the same funds from the bank and the use of such funds to discharge certain obligations of Maceo and Company. Clubroom winnings were entered on the general books of Maceo and Company in order that monies could be made available to an operation *360 needing money. Clubroom receipts were shown in the cash receipts book of the horse account as a deposit into and withdrawal from the horse account checking account and the monies were then entered as a deposit in the bank account of the operation needing the money. Transactions Not Reflected on the Books of Maceo and Company Maceo and Company conducted betting transactions with W. M. (Boston) Smith in the years 1948, 1949 and 1950. Maceo and Company maintained subsidiary accounts receivable to which were charged amounts owed it by W. M. Smith and to which were credited amounts received from Smith in payment of his debts to Maceo and Company. Smith issued the following checks to Maceo and Company: EndorsementDate cashed byDatePayeeAmount(Stamped)Maceo & Company9- 8-48Turf Athletic Club$1,445Turf Athletic Club9-10-4812-13-48Turf Athletic Club1,500Turf Athletic Club12-14-481- 1-49Turf Athletic Club1,000Turf Athletic Club1- 6-4910- 3-49Turf Athletic Club300Turf Athletic Club10- 5-49The accounts receivable ledger sheet of Maceo and Company for W. M. Smith contains the following entries between the dates of August 31, 1948, through January 24, 1949. DebitsCreditsDateFol.AmountDateAmount194819488-31$1,435.659-9$1,445.0012-61234550.0012-4550.00194919491-241336550.001-22550.005-3016171,000.005-281,000.009-26300.0010-4300.00The *361 aforesaid numbers 1234, 1336 and 1617 were the numbers of Maceo and Company checks drawn on the horse bank account that were issued to W. M. Smith in payment or settlement of claims that Smith had against Maceo and Company. Each of the foregoing checks was issued after Maceo and Company's liability to Smith was recorded on its books. The credits of $1,445 on September 9, 1948, and $300 on October 4, 1949, which appear on the accounts receivable ledger sheet for Smith represent Smith's payment or settlement of his account with Maceo and Company. Each of the foregoing checks was received by Maceo and Company after Smith's liability to Maceo and Company was recorded on its books. The cash receipts journal for the horse account shows the receipt of $1,445 (from Smith) on September 9, 1948, which was recorded as a payment on an account receivable and was included in a deposit made to the account of Maceo and Company in the Moody Bank in the amount of $2,427.95. The cash receipts journal for the horse account shows a payment on accounts receivable (from Smith) of $300 on October 4, 1949, and such payment was then included in a net deposit of $1,235.20 which was made in the Moody Bank. The *362 daily cash statement for October 4, 1949, shows the collection of two accounts receivable, that is, one from Andrew D'Albergo, $20, and Boston Smith, $300. The subsidiary accounts receivable records of Maceo and Company do not show the receipt from Boston Smith of the following checks which were payable to Turf Athletic Club. Date of CheckPayeeAmount12-13-48Turf Athletic Club$1,5001- 1-49Turf Athletic Club1,000Neither the daily cash statements for the horse account nor the cash receipts journal horse account of Maceo and Company show the collection of $1,500 and $1,000 from Boston Smith on or about December 31, 1948, or January 1, 1949. The $1,200 collection on accounts receivable on January 4, 1949, is identified as a collection from T. K. Jackson. Maceo and Company purchased three separate cashier's checks (Nos. 13826, 13827, 13828) on December 12, 1948, in the amount of $1,000 each which were payable to Wheaton B. Nichols. The checks were purchased in order to pay Nichols the net amount of his winnings at the Balinese Room about July 12, 1948. The records of Maceo and Company do not show the source of the funds used to purchase said cashier's checks. There are no disbursements *363 from the checking accounts of the Balinese Room, the Horse Account, the Cigar Stand, the Bingo Account or the Equipment Account on or about December 12, 1948, to account for the source of funds used to purchase said cashier's checks. On January 4, 1949, a cashier's check, No. 135542 in the amount of $1,500 payable to T. H. Ivey, was purchased by Maceo and Company from The City National Bank, Galveston. The check was mailed to Ivey at his home in Dallas. The check register of Maceo and Company does not show the disbursement of any monies on or around January 4, 1949, by the Balinese Room, Studio Lounge, Cigar Stand, Bingo, Equipment or Horse Accounts that would provide the funds which were used for the purchase of the cashier's check on January 4, 1949. During the fiscal years ended September 30, 1948, 1949 and 1950, cashier's checks totaling $807,826.79 were purchased at Galveston banks by employees and partners of Maceo and Company, viz., Joe T., Adams and Serio. The cashier's checks were generally purchased with cash. The names in which the cashier's checks were purchased as shown by bank records and the total amount of such purchases is as follows: Names ofHutchings-SealyThe CityFirstU.S.W. L.PurchasersMoodyof Cashier'sNationalNationalNationalNational& Co.Checksper BankBankBankBankBankBankersRecordsTurf, The Turf,$ 99,765.86$317,100.28$ 65,008.04Turf (cash)Turf Athletic55.00150,535.96ClubTurf-Joe T.;16,251.5225,801.54Sam Maceo-Turf;Poretti-Turf;Turf Cit. St.Bk.-Houston;Turf Grill; A.J. Adams-TurfMaceo and35,029.105,506.46$ 1,435.1415,128.25CompanyCollection2,650.001,599.40Sam Maceo-L. J.1,000.006,000.00Dibrell for SamMaceoRosario Maceo12,000.00Maceo30,185.24Joe Maceo$22,775.00$134,849.96$342,508.26$31,620.38$276,073.19$22,775.00*364 Cashier's checks that were purchased in the years 1948, 1949 and 1950 to make payments on the partners' income tax liabilities totaled $525,332.34. Monies received by Galveston Novelty Co. with respect to loans to individuals operating establishments into which Maceo and Company had placed its slot machines and victrolas, and from other sources, were deposited in the First National Bank, Galveston. The account was maintained in the name of Galveston Novelty Company and was not recorded on the books of Maceo and Company as a bank account owned and controlled by it. During the period December 6, 1948, through December 30, 1950, Galveston Novelty Company deposited the total amount of $517,607.22 in the bank. Income Tax Returns Filed by Petitioners The income tax returns filed by Sam and Edna, Rosario and Frances, Voigt, and Vincent and Estelle for the years 1947, 1948 and 1949 were examined by Revenue Agent Donald Whitaker. As a result of said examination, petitioners agreed to the deficiencies shown in the following schedule: Date PetitionersAgreed to Deficiencyby Execution of Form870, Waiver ofAmount ofRestriction on Assess-YearAgreed Deficiencyment and CollectionPetitionerExamined(Overassessment)of Deficiency on TaxRosario1947$ 643.5112-16-49Frances1947643.5112-16-49Rosario and Frances19481,466.5712-16-49Rosario and Frances19494,942.393-12-51Sam1947946.0812-16-49Edna1947946.0812-16-49Sam and Edna19481,204.0412-16-49Sam and Edna19486,389.945-19-50Sam and Edna1949903.043-12-51Voigt1947(1,289.78)1- 9-5019481,444.611- 9-5019491,552.143-12-51Vincent1947(91.69)12-16-49Estelle1947(91.69)12-16-49Vincent and Estelle194840.6012-16-49Vincent and Estelle1949386.083-12-51*365 On July 19, 1951, Rosario and Frances and Sam and Edna filed amended joint income tax returns for 1948, 1949 and 1950 with the collector of internal revenue, first district, Austin, Texas. On the same date Voigt also filed amended separate income tax returns for the years 1948, 1949 and 1950 with the same collector of internal revenue. An examination was conducted beginning September 10, 1951, and ensuing years by the Intelligence Division of the Internal Revenue Service of the original and amended returns filed by Rosario and Frances, Sam and Edna and Voigt for the years 1948, 1949 and 1950. An examination was also made of the original returns filed by Vincent and Estelle for the years 1948, 1949 and 1950 concurrently with the examination of the aforesaid returns. The original and amended returns filed by Adams, Frank, Vic C. and Serio and their respective spouses for the years 1948, 1949 and 1950, were also examined by the Intelligence Division of the Internal Revenue Service at the same time the returns of the petitioners in the instant cases were examined. Sam Maceo reported income from bets and wagers on his income tax returns for a number of years. The amount of such income as *366 shown by the returns, revenue agents' reports and work papers used in the preparation of his returns was as follows: Revenue Agents'OriginalAmendedYearReportsWork PapersReturnsReturn1950$11,350$11,350$ 59,262 *194913,700 **13,70074,263 *194838,50038,500100,947 *19468,30019454,50019435,4005,35019424,87019401,4831936$2,3752,37519353,150Rosario reported income from bets and wagers on his income tax returns for a number of years. The amount of such income as shown by the returns, revenue agents' reports and work papers used in the preparation of his returns was as follows: Revenue Agents'OriginalAmendedYearReportsWork PapersReturnsReturn1950$42,330 *1949No Amount **53,045 *1948$3,000$3,00072,105 *19454,50019402,5001936$3,5003,50019353,150 Voigt reported income from bets and wagers on his income tax returns for a number of years. The amount of such income as shown by the returns, revenue agents' reports and work papers used in the preparation *367 of his returns was as follows: Revenue Agents'OriginalAmendedYearReportsWork PapersReturnsReturn1950$ 8,466194910,609194814,4211936No Amount *$2,5001936No Amount *Sam's account receivable ledger sheet with Maceo and Company (horse account) shows that Sam had net winnings of $25,250 as a result of bets he had placed with Maceo and Company in 1948. The work papers used in the preparation of Sam and Edna's original 1949 return shows income from bets and wagers of $13,700. On the line of the work papers where the $13,700 appears, there are two figures that have been crossed out, that is, $11,200 and $2,500. A transcript of Sam's account receivable ledger sheet (horse account) reveals that Sam won the aggregate amount of $11,200 betting with Maceo and Company in September and October 1949. Said bets were paid Sam on March 15, 1950, when the Bingo section issued its check No. 598 for $11,200 to Sam. The work papers used in the preparation of Sam and Edna's original 1950 return show income from bets and wagers in the amount of $11,350. The $11,350 figure was given to Serio by Sam. A transcript *368 of Sam's account receivable ledger sheet (horse account) reveals that Sam won $2,600 betting with Maceo and Company in September 1950. Said bets were not paid by Maceo and Company in 1950. The work papers used in the preparation of the original 1948 return of Rosario and Frances show income from bets and wagers in the amount of $3,000. The work papers used in the preparation of the original 1949 return of Rosario and Frances contains the notation "Bets" written on the left side of the page. The notation "Bets" was scratched out by Serio after he had asked Rosario if he had any bets and wagers and found that Rosario had none. After the work papers and records pertaining to each partner's income tax liability had been prepared and assembled, Serio would send the work papers and documents to T. W. Lain, an employee of a Galveston bank who prepared income tax returns as a side line occupation. Lain would take the work papers and records supplied by Serio to his home and prepare ink copies of returns for the partners on the basis of the information submitted to him by Serio. Lain did not check the oil figures shown on the schedules given him by Serio. When the ink copies of the returns *369 were completed, Lain would take them to Serio at his office in the Turf Building. Maceo and Company employees would then type the final returns. Lain would return to the office of Maceo and Company and verify that the returns had been correctly typed. In addition to preparing the returns for the partners of Maceo and Company, Lain also reviewed the partnership return of Maceo and Company after it had been prepared by Raymond Cox. Serio would question Lain in respect to items appearing on the returns. Sam and Edna made the following payments on their declarations of estimated tax for the years 1948, 1949 and 1950: 194819491950Sam$12,000Edna12,000Sam and Edna$24,000$7,500Rosario and Frances made the following payments on their declarations of estimated tax for the years 1948, 1949 and 1950: 194819491950Rosario$31,821.48Frances13,500.00Rosario andFrances$30,803.16$34,884.94 Voigt made payments totaling $20,965 on his 1948 declaration of estimated tax. Vincent and Estelle made payments totaling $7,052.12 and $3,554.46 on their 1948 and 1949 declarations of estimated tax, respectively. The statutory notices of deficiency in the instant cases were mailed on the dates shown in the following *370 schedule: Docket No.Date of Statutory Notice55506Sept. 23, 195455709Sept. 28, 195463933June 8, 195663934June 8, 1956Preparation of Amended Returns During the latter part of April 1951, Garrett, a cerified public accountant, was contacted by an associate of the petitioners and was told to communicate with Rosario or Serio. On or about April 27, 1951, Garrett contacted Serio who introduced him to Rosario. Rosario, acting on behalf of Sam Maceo and the other individuals who had been partners of Maceo and Company during the taxable years 1948, 1949 and 1950, hired Garrett. Rosario informed Garrett that he wanted Garrett to review the individual partners' returns and in addition he wanted the books of Maceo and Company compared with the partnership returns of Maceo and Company to see if all the money received had been recorded on the books of Maceo and Company and reported on the various returns. Garrett recommended to Rosario and Serio that all the partners of Maceo and Company execute powers of attorney authorizing him to represent them before the Treasury Department in all tax matters for the years 1948, 1949 and 1950. Garrett furnished Serio with a blank form for a power of attorney. *371 After Garrett had given Serio said blank power of attorney, Serio had copies of the form prepared. Rosario and Frances, the Estate of Sam Maceo and Edna, Voigt, and Vincent then executed the powers of attorney and Serio delivered them to Garrett. Garrett had no conferences with any of the partners other than Serio and Rosario during the course of his examination. The other partners, who were then living, were Adams, Vincent, Voigt, Frank and Vic C. In connection with his work, Garrett prepared schedules showing information pertaining to Maceo and Company and each partner of Maceo and Company, four of whom are petitioners in these cases. Garrett prepared schedules of cash disbursements for the years 1948, 1949 and 1950 for Rosario, Sam, Voigt and Vincent; an analysis of partnership drawings and other cash income for said period; and an analysis of the returns of Rosario and Voigt for 1950, of Sam for 1948 through 1950, inclusive, and none for Vincent. The amounts entered on these schedules were copied from various records examined by Garrett. Garrett did not verify the accuracy of the amounts he copied on to the schedules. The preparation of the aforesaid schedules was completed prior *372 to June 15 or 20, 1951. In addition to said schedules, Garrett prepared the following single page schedules. 1. Schedule of additional income to partners of Maceo and Company for the years 1948 through 1950. 2. Schedule of cash income to partners of Maceo and Company for the years 1948, 1949 and 1950 which showed income from Maceo and Company, additional bets and wagers, and other sources. Garrett for the taxable years involved herein did not: (a) Analyze the individual partners' bank accounts to determine the nature of disbursements and withdrawals. (b) Ascertain the circumstances of specific withdrawals by the partners from Maceo and Company other than to determine whether the withdrawals were cash withdrawals or otherwise. (c) Examine subsidiary records in support of the general journal, general ledger or cash receipts and disbursements books. (d) Prepare a working trial balance of Maceo and Company's books nor utilize the trial balance prepared by the employees of Maceo and Company. (e) Make an independent analysis of the amounts that appear in the income and expense accounts on the general ledger of Maceo and Company for the fiscal years ending September 30, 1948, 1949 and 1950. *373 Garrett did trace income and expense account balances for the year ended September 30, 1950, from the general ledger to the partnership income tax return. (f) Examine, verify or analyze the win and loss books, accounts receivable, accounts payable, major assets, loans payable or the capital accounts of the partners of Maceo and Company on the books of Maceo and Company. (g) Reconcile the bank account of Maceo and Company or obtain verification from the banks of the bank balances of the bank accounts of Maceo and Company. (h) Ascertain how many clubrooms Maceo and Company operated, or examine records of Maceo and Company which showed income derived from horse race, baseball, basketball and slot machine betting carried on by it in Galveston or on the mainland. (i) Examine the records of Dickinson Equipment Company to determine if Maceo and Company correctly reported its share of the earnings. (j) Analyze the intercompanies' accounts receivable and accounts payable records on the books of Maceo and Company and related operating corporations in which Maceo and Company had a proprietary interest. (k) Review the system of internal control utilized by Maceo and Company. (l) Verify the figures *374 complied by the employees of Sam Maceo Oil Operations showing expenditures by the partners nor analyze disbursements made on behalf of the partners by Sam Maceo Oil Operations. (m) Make an independent analysis of the capital investments of each partner in Sam Maceo Oil Operations nor analyze the depletion claimed by each partner for 1948, 1949 and 1950, nor verify the income received by each partner from Sam Maceo Oil Operations. (n) Verify independently the income reported and deductions claimed by each partner on their individual income tax returns for the years 1948, 1949 and 1950. During the year 1952 Garrett examined retained copies of Sam Maceo's income tax returns back to the year 1940 and examined income tax returns of the other partners for the years prior to the tax year 1948 at the office of Maceo and Company. During the instant proceedings Serio did not produce the retained copies of Sam and Jessica's returns for the years 1932 to 1941, or the retained copies of Sam and Edna's returns for the years 1941 through 1947. Garrett prepared a statement which showed that the partners' cash expenditures for oil investments exceeded the cash receipts for the years involved. This *375 statement was prepared after Garrett had completed his analysis of the individual partners' transactions. Garrett prepared a final schedule after he completed his accumulation of cash income and cash disbursements which showed cash income or receipts and cash disbursements. This schedule was given to Serio in 1954. The schedule had been subpoenaed, but Garrett did not produce it at the trial. After Garrett completed his work, he had a conference with Rosario and Serio sometime during the period June 15 and 21, 1951, and told Rosario and Serio that his examination showed that most of the partners' cash expenditures were in excess of their cash income for the three years involved. Garrett questioned Serio and Rosario as to the sources of income examined, but they did not inform Garrett at this time as to any additional source of income. Garrett di dnot make any specific recommendations at this meeting. On or about June 20, 1951, Serio telephoned Garrett and asked him to come to Galveston. Garrett went to Galveston and conferred with Serio individually and with Rosario and Serio jointly. During his individual conference with Serio, Garrett was given a schedule which Serio told him he *376 had prepared on the basis of figures Rosario had given him. Serio told Garrett the schedule showed income which the seven participating partners had failed to report on their individual income tax returns. Garrett made no examination or inquiries to verify the correctness of the figures as to the additional unreported income of the partners that had been furnished to him by Serio. The written statement submitted by Garrett to Agents Roberts, Ney and Schwartzbach on September 12, 1951, contained the following explanations as to the source of the income set forth in the schedule Serio gave Garrett: During the course of my examination of the partnership records and tax returns of the partners, it was noted that the partners' interests in oil & gas leases was maintained individually and separate from all other partnership interests. Upon inquiry as to the reasons for this, Mr. Serio stated that the oil & gas business was started with funds received from sources known only to Sam Maceo, and that he had received as his part, over a period of years, various sums from Mr. Maceo amounting to approximately $33,500.00. As this income was received in small amounts over a period of five or six *377 years, and no records maintained, it was overlooked and forgotten about, when the tax returns were filed. This additional income was apportioned to the years 1948, 1949 & 1950, being the only years open, on the basis of $14,421.00 for 1948, $10,609.00 for 1949, $8,466.00 for 1950. Using the above total of $33,496.00 as 5% of the total partners' income from the source mentioned, the total additional income for the partners amounted to $669,920.00 for the three years as follows: 194819491950Sam Maceo35%$100,947$ 74,263$ 59,262Rose Maceo25%72,10553,04542,330Frank Maceo20%57,68442,43633,864A. J. Adams5%14,42110,6098,466Sam Serio5%14,42110,6098,466Vic Maceo5%14,42110,6098,466O. E. Voigt5%14,42110,6098,466$288,420$212,180$169,320 Amended returns were prepared, filed and the tax paid on this additional income. * * *During his joint conference with Rosario and Serio about June 22, 1951, Garrett recommended that the partners report the income that had been disclosed to him and pay the tax on it. Rosario directed Garrett to prepare amended income tax returns. Rosario also instructed Garrett to hold up the actual preparation of the amended income tax returns until the publicity of the Texas Crime *378 Committee had died down. On July 10, 1951, Serio told Garrett to prepare the amended income tax returns for the partners of Maceo and Company but not to prepare an amended return for Vincent. Garrett completed the preparation of the amended income tax returns for the partners for the years 1948, 1949 and 1950 by July 12, 1951. The amended returns were signed by the partners on July 17, 1951, and filed by Garrett with the collector of internal revenue at Austin, Texas, on July 19, 1951. The amended individual income tax returns prepared by Garrett reported the receipt of additional income from bets and wagers in the aggregate amount of $669,920 that had been omitted from the original income of the individuals. The $669,920 of unreported income on the amended returns was the same amount of income that was shown on the statement Garrett gave the agents on September 12, 1951. The amended returns filed by Sam and Edna, Rosario and Frances, and Voigt had the following unsigned statement attached to them: STATEMENT CONCERNING THE FILING OF AMENDED INCOME TAX RETURNS FOR THE YEARS 1948, 1949 and 1950 ATTACHED On or about April 28, 1951, Ernest E. Garrett was engaged by Maceo & Co., a partnership, *379 to make a tax audit of the partnership books in conjunction with income as reported on the partners' personal Income Tax Returns. During the course of the examination, certain income to the partners was disclosed that had not been included in the Partnership Tax Returns, and therefore overlooked in the preparation of the Individual Returns. The methods used in reporting such income to the office by the deceased partner evidently accounted for the oversight. This income has been included in the amended returns. Joe Salvato owned a one-fourth interest in Dickinson Equipment Company, and Maceo and Company owned a three-fourths interest in Dickinson Equipment Company which was a partnership during the years involved. During March 1951, Agent Nuel Lewellan completed an examination of the income tax returns for the years 1948 and 1949 of Salvato, who was associated with Maceo and Company in certain business interests. In connection with a more detailed examination to be made of Salvato's 1948 and 1949 income tax returns, Agent Lewellan visited the office of Serio in Galveston on July 10, 1951, in order to examine records of Dickinson Equipment Company, Sam Maceo Oil Operations, Gulf Properties, *380 Inc., and any other records pertaining to the tax liability of Salvato. Serio was informed that a fraud examination was being conducted with respect to Salvato. Serio caused the general ledger and general journal of Dickinson Equipment Company to be made available for Lewellan's inspection. No collection tickets, location ledger or route cards were produced. On July 11 and 12, 1951, Lewellan returned to the offices of Maceo and Company and worked on the records of the oil operations. Investigation of Income Tax Returns Filed for Maceo and Company and Its Various Partners The examination of the original and amended income tax returns filed by the partners of Maceo and Company for the years 1948, 1949 and 1950 was conducted by agents assigned to the Intelligence Unit of the Internal Revenue Service. On September 17, 1951, Acting Special Agents Bernard Roberts and Bernard Schwartzbach informed petitioners' representatives Garrett and Serio, that an investigation was to be conducted of the partners of Maceo and Company for the taxable years 1948, 1949 and 1950. Sam Rosario, Voigt and Vincent were four of the partners of Maceo and Company whose income tax returns were examined. Garrett *381 and Serio were also informed on that date of the nature and type of examination that would be conducted by respondent's agents. On September 19, 1951, Garrett, Serio, Rosario, Adams, Voigt, Vincent, Frank and Vic C. met with Roberts and Schwartzbach and were informed that the latter were assigned to the Intelligence Unit of the Internal Revenue Service and that their examination would go outside the available books and records of the partners. Each of the partners of Maceo and Company who were present were questioned individually as to the status of their respective books and records. Rosario, Voigt and Vincent stated that they had no personal books and records. During the conference on September 17, 1951, Serio was asked by respondent's agents to ascertain if the partners of Maceo and Company had any cancelled checks, bank statements, check stubs and deposit slips. Serio subsequently informed respondent's agents that all the records about which inquiry had been made had been destroyed. The investigation of the income tax returns filed by the partners of Maceo and Company, four of whom are petitioners in these cases, for the years 1948, 1949 and 1950 commenced in September 1951. At *382 the time theinvestigation was started Serio requested respondent's agents not to question Rosario, claiming that the latter was physically ill and that any questioning might jeopardize his health. Serio submitted statements from doctors which supported his statements with respect to Rosario's health. In view of Serio's request, Rosario was not interviewed during the course of the investigation. Throughout the investigation of the income tax returns of the partners of Maceo and Company, the partners always referred the examining agents to Serio in order to obtain answers to their questions. The examining agents investigated leads wherever information appeared to be reasonably susceptible to investigation and was relevant to the examination they were conducting. At the commencement of the investigation in September 1951, neither Garrett as representative, nor Serio as spokesman, for the partners of Maceo and Company, and none of the partners of Maceo and Company in their individual capacities protested the examination of their 1948 and 1949 returns on the grounds that it constituted a second examination by the respondent of their returns for such years. At the time various books and *383 records of Maceo and Company and the other books and records which were subject to the control of the partners of Maceo and Company were being inspected by respondent's agents, no protest was made by the partners of Maceo and Company or their representative, Garrett, and their spokesman, Serio, that the work of the respondent's agents constituted a second examination of the partners' 1948 and 1949 income tax returns. For the first time on December 7, 1953, petitioners' representatives requested a letter from the respondent authorizing a second examination of the partners' 1948 and 1949 income tax returns. At no time has the respondent issued a letter to the partners of Maceo and Company (four of whom are petitioners in the instant case) in which they were notified that a second examination of their 1948 and 1949 income tax returns was being authorized. Commencing in September 1951, Serio, as spokesman for the partners, allowed respondent's agents to inspect certain books and records of Maceo and Company and its related business enterprises. On October 7, 1952, Serio refused to allow the agents to have further access to said records. Upon subsequent requests to review certain books *384 and records of Maceo and Company, Serio refused to grant the requests. In connection with their examination of the partners' income tax liabilities, respondent's agents made a detailed investigation of the affairs of the partners for the years 1948, 1949 and 1950. The work performed by the respondent's agents included, among other things, the following: (a) Preparation of trial balances of the accounts appearing in the general ledger of Maceo and Company, Dickinson and Gulf for the years ending September 30, 1947, through September 30, 1950. In addition, a trial balance of the accounts appearing in the general ledger of Trustee for the fiscal year ended September 30, 1950, was prepared. (b) Preparation of transcripts of various accounts listed on the books and records of Maceo and Company (horse account), Dickinson, Sam Maceo Oil Operations, Gulf and Trustee. (c) Review, wholly or partially, of the general ledger, general journal, cash receipts and disbursements journal and some daily cash statements of Maceo and Company for the fiscal years ended September 30, 1947, through September 30, 1950. (d) Review of the general ledger, general journal and cash receipts and disbursements journal *385 of Gulf. (e) Examination of the books of account of Sam Maceo Oil Operations. (f) Examination of the income tax return filed by Maceo and Company and Dickinson for the year ended September 30, 1950. (g) Preparation of a check spread based upon information shown on Recordak films of Galveston banks as to all transactions recorded in the checking and savings accounts of the following individuals for the years 1948, 1949 and 1950: Sam and Edna; Rosario and Frances; Vincent and Estelle; Vic C. and his wife; Adams and his wife; Frank and his wife; Serio and his wife; and Voigt. Said check spread listed the date the check was issued by the individual drawing the check, the amount, payee, name of the maker of the check, endorsements, and the date of payment by the bank on which the check was drawn. It took two agents three to four months of full time work to complete the check spreads. The preparation of the check spreads was commenced after Serio informed the agents that the partners of Maceo and Company had destroyed their cancelled checks, check stubs, bank statements, and bank deposit slips. When Serio learned that the agents were making said check spreads, he offered to have employees *386 of Maceo and Company prepare a ditto stencil in order that columnar headings could be printed on the accounting paper used by the agents in preparing their check spreads. Serio dittoed the headings onto the ledger paper for the agents. (h) Interviewed owners and employees of business organizations doing business with Maceo and Company, and the partners of Maceo and Company, in order to secure information, documents and records pertaining to such transactions. In this connection the information contained in the aforesaid documents and records was analyzed to determine the assets acquired, liabilities and expenditures paid or incurred by the partners of Maceo and Company. Said investigation involved contacting individuals and businesses located in Galveston, Houston, Dallas and San Antonio, Texas, as well as individuals living in Detroit, Michigan, Chicago, Illinois, New York, Los Angeles, and various other places. (i) Copying all of the bank records pertinent to the investigation of the affairs of the partners of Maceo and Company for the taxable years. (j)Confirmation of bank loans made by the various partners of Maceo and Company, and Gulf for the taxable years involved. (k) Conduct *387 of interviews with the partners of Maceo and Company. (l) Inspection of records of Maceo and Company stored at the Hollywood Dinner Club. During the inspection of said records, the agents found wood barrels full of Maceo and Company food checks for the years commencing in 1943 or 1944 up to and including the year 1949 as well as some cancelled checks and bank statements of Maceo and Company. After October 1952, respondent's agents were not allowed to inspect the books and records of Maceo and Company or its related partnership. Also, after October 1952, respondent's agents were not allowed to inspect the books and records of corporations controlled by Maceo and Company without first issuing a summons. Prior to June 1952, Schwartzbach requested the production of all subsidiary records including win and loss books that would support entries in the horse account which were classified as clubroom receipts. At that time(prior to June 1952), Joe T. stated that all daily wins or losses from the clubrooms were entered on little tabs of paper and that when the money was brought in and put in the bank and entered on the daily cash report forms of Maceo and Company those tabs were destroyed. *388 Joe T. did not deliver the win and loss books maintained by Maceo and Company to respondent's agents at the time the aforesaid request was made. On March 8, 1955, Joe T. admitted that a daily win and loss record had been maintained by Maceo and Company to show the operations of the clubrooms during the years 1948, 1949 and 1950. At the same time Joe T. stated that the win and loss books had been in his possession until May or June 1951. Serio told respondent's agents that all cancelled checks, bank statements, check stubs and deposit slips on the checking accounts of the partners for the taxable years involved had been destroyed. During the trial of the instant cases in 1960, the original cancelled checks, bank statements, and check stubs of Frances and the check stubs on the checking account of Rosario for the years 1938, 1949 and 1950 were produced. The original cancelled checks and supporting check stubs of Sam and Edna for the taxable years were made available to respondent's agents for the first time in New Orleans, Louisiana, in March of 1960. The original cancelled checks and supporting check stubs of Voigt for the years 1948, 1949 and 1950 were made available to the agents *389 for the first time during the year 1954. The original cancelled checks, bank statements and check stubs of Vincent and Estelle for the taxable years were never produced for examination by respondent's agents. Serio requested the United States National Bank of Galveston to return all financial statements of the partners of Maceo and Company, Maceo and Company, and Gulf to him prior to the time the agents interviewed the officials of the United States National Bank. The foregoing financial statements were returned to Serio by the United States National Bank. In 1956 or 1957 when an official of said bank was being interviewed in connection with a grand jury hearing in Austin, he was asked about the whereabouts of the aforesaid financial statements. The president of the United States National Bank requested that Serio return to the bank the financial statements that the bank had delivered back to Serio at his request. Serio returned the financial statements to the United States National Bank in 1956 or 1957. In an interview with the respondent's agents during the latter part of 1952, Serio denied the existence of books showing the daily wins or losses that were sustained at the clubrooms *390 during the taxable period. On March 4, 1955, Serio admitted the existence of daily win and loss books for the clubrooms which were operated by Maceo and Company during the taxable years, and promised to produce the win and loss books when they were found. Said books were produced for inspection for the first time at the trial of the instant cases pursuant to a summons served on Serio and other partners of Maceo and Company. Respondent's agents found that the books of account of Maceo and Company which were based upon a double entry system of accounting were in balance. The agents also found that the balances appearing in the income and expense accounts of the books of Maceo and Company corresponded to and were in agreement with the items of income and expense that were listed on the partnership information returns for the fiscal years ended September 30, 1947, 1948, 1949 and 1950. On August 25, 1952, Serio told respondent's agents that the additional income from bets and wagers reported on the amended returns for the taxable years involved had been taken "out of the air." The following day Serio informed respondent's agents he had figured out how much he had spent in the oil business *391 and used that amount plus an additional amount to be on the safe side as a basis for determining the amount of additional income from bets and wagers that was reported on the amended income tax returns of the partners of Maceo and Company for the taxable years involved. On March 4, 1955, Serio told respondent's agents that he and Rosario had computed the amount of additional income from bets and wagers that was to be reported on the partners' amended income tax returns for the years 1948, 1949 and 1950. On August 28, 1952, respondent had a conference with Garrett. Respondent's agents at that time requested that financial statements be submitted by the partners of Maceo and Company in order to facilitate the investigation of the returns for the years 1948, 1949 and 1950. Garrett denied the request stating that the agents had already been given the answer to that request six months before and that the answer was still the same. On occasions prior to March 4, 1955, the respondent's agents had asked both Serio and Garrett for net worth statements of the partners and for information as to the amount of cash that the individual partners had on hand during the years 1948, 1949 and 1950. Serio *392 and Garrett stated that no net worth statements could be prepared because they could not figure out the cash on hand of the partners during those years. Opinion Respondent's Determination Not Arbitrary Petitioners' fundamental objection is to the effect that respondent's determinations of deficiencies in tax in the consolidated cases herein are arbitrary and without rational foundation and that, therefore, the presumptive correctness of such determinations falls. In the same vein, petitioners maintain that the burden of proof "shifted" to the respondent to show that his determinations were correct in their entirety upon the showing by petitioners that some part of the deficiency was erroneous; and that since respondent has not done so, decision must be for the petitioners, citing, inter alia, Helvering v. Taylor, 293 U.S. 507 (1935) affirming 70 F.2d 619 (C.A. 2, 1934); Harp v. Commissioner, 263 F. 2d 139 (C.A. 6, 1959); Thomas v. Commissioner, 223 F. 2d 83 (C.A. 6, 1955); Estate of Albert D. Phillips v. Commissioner, 246 F. 2d 209 (C.A. 5, 1957) and Weir v. Commissioner, 283 F. 2d 675 (C.A. 1960), all reversing Memorandum Opinions of this Court. Analysis of those cases does not lead *393 us to conclude that a showing of error as to some items in the respondent's determination relieves the taxpayer of the burden of showing error as to other items. Indeed it has long been recognized that the taxpayer has the onus of showing with respect to each item that the respondent was wrong. Anderson v. Commissioner, 250 F. 2d 242, 246, (C.A. 5, 1957), certiorari denied 356 U.S. 950, affirming a Memorandum Opinion of this Court. Moreover, we note that in Helvering v. Taylor, supra, only one item was in dispute. In essence, as a basis for their contention, petitioners argue that the respondent was arbitrary in several respects, such as his assignment of zero cash on hand in his net worth statement for Sam and Edna; respondent's failure to establish with reasonable certainty the net worth of Rosario and Frances Maceo as of January 1, 1948; respondent's failure to effectively negate the existence of prior accumulated cash on January 1, 1948; and his failure to track down all revelant leads. We shall consider these contentions, which we have found without merit, hereinafter in detail. It is well settled that petitioner has the burden of establishing by a preponderance of the evidence *394 that respondent's reconstruction of income is erroneous. Of course, the burden of proving increases in deficiencies and additions to tax, affirmatively alleged by amended answer, and the burden of proving fraud, rests on respondent. Joseph V. Moriarty, 18 T.C. 327, 329 (1952), affd. per curiam 208 F. 2d 43 (C.A. D.C. 1953). It is clear that respondent, in the exercise of his judgment in making his statutory determination, may properly place the burden on the taxpayer of establishing all of the elements upon which petitioners' contentions are based. See Burnet v. Houston, 283 U.S. 223 (1931). A holding by this Court, on the record before us, disagreeing with some part of respondent's determination is not of itself equivalent to a finding that the determination was arbitrary. See Bodoglau v. Commissioner, 230 F. 2d 336 (C.A. 7, 1957), affirming 22 T.C. 912. If the rule were otherwise, we would find it necessary to invalidate, in toto, every determination with which we did not wholly agree. Such a view would emasculate the well established rules relating to the burden of proof and seriously undermine the effect of the statutory notice upon which the principle of the burden of proof is *395 found in the usual situation. In the absence of records or reliable information, respondent was obliged to resort to some reasonably effective technique for the determination of income and petitioners cannot, by lack of cooperation and concealment, deprive respondent of the right to use a practical method of making his determination. Obviously, petitioners' difficulty is of their own making in failing to maintain proper records of their extensive gambling activities and other material facts. We reject petitioners' contention that certain errors in respondent's beginning and ending net worth computations, supra, destroy the presumption of correctness that normally attaches to his determination and shifts the burden to respondent of proving that his determination herein was correct. In our view, the method adopted by respondent and the results reached were not arbitrary, and the necessary adjustments which petitioners established at the trial with respect to a few items did not impose on respondent the burden of proving that his determination of deficiencies for the years in question was correct in all respects. In Commissioner v. Smith, 285 F. 2d 91 (C.A. 5, 1960), affirming a Memorandum *396 Opinion of this Court, where it was likewise urged that the presumption "dropped out" of the case once evidence was produced by the taxpayer, the Court said that " a finding against the Commissioner on one item still leaves on the taxpayer the burden of showing with respect to each other item that the Commissioner was wrong. * * *" Likewise, in Cefalu v. Commissioner, 276 F. 2d 122 (C.A. 5, 1960), affirming a Memorandum Opinion of this Court, the Court of Appeals said (p. 126): A determination of tax liability made by the Commissioner is presumptively correct; the burden is on the taxpayer to prove it erroneous. * * * If the taxpayer shows that part of the Commissioner's determination was wrong, it does not destroy the presumption of correctness that attaches to his findings. Anderson v. Commissioner, 5 Cir. 1957, 250 F. 2d 242 [52 AFTR 1037], certiorari denied 356 U.S. 950, 78 S.Ct. 915, 2 L.Ed. 2d 844. * * *To the same effect see Clark v. Commissioner, 266 F. 2d 698 (C.A. 9, 1959) and Hoffman v. Commissioner, 298 F. 2d 784 (C.A. 3, 1962), both of which affirmed in whole or in part Memorandum Opinions of this Court. On the basis of the foregoing discussion, we hold that a finding *397 by us against respondent with respect to one or more items comprising his over-all determination of deficiencies still leaves on the petitioners the burden of demonstrating with respect to each other item that respondent was wrong; or that respondent's determination was arbitrary or invalid. Second Examination of Petitioners' Books Petitioners in Docket Nos. 55709, 63933 and 63934 urge that respondent's determination for 1948 and 1949 was the result of a second examination of petitioners' books and records and is, therefore, null and void because the Commissioner did not notify the petitioners in writing that an additional inspection was necessary. The petitioners rely upon section 3631 of the 1939 Code. 3Petitioners maintain that the Commissioner had made a prior examination of petitioners' books and *398 records for the years 1948 and 1949 in Docket Nos. 55709, 63933 and 63934, and since no permission was granted by the petitioners nor any permission was sought by the Commissioner for a second examination, the determination of deficiencies for these two years is void in said dockets. As will appear in our discussion, infra, it is our opinion that petitioners have not shown that such violations occurred. Moreover, this is not a defense invalidating the deficiencies since the examination, if so made, was apparently conducted without timely objection by the petitioners and the protection thus afforded by section 3631 was therefore waived by the failure to object. It is clear that the necessity for the second examination for 1948 and 1949 in Docket Nos. 55709 and 63933 stemmed from petitioners' own actions. After the first examination by respondent's agent's, petitioners in these dockets filed amended returns for 1948 and 1949 disclosing a substantial amount of unreported income. The amended returns were filed by petitioners on July 19, 1951, and subsequently they were notified in writing that they each owned an additional deficiency for the years in question. Manifestly, under the circumstances, *399 respondent is not prohibited from an examination of the matters covered in the amended returns. After the amended returns were received by respondent, the respondent's agents advised petitioners that the filing of the amended returns necessitated the examination of the petitioners' returns. The petitioners did not object to the examination which was conducted in accordance with the statements made to the petitioners when they met with respondent's agents on September 17, 1951. In this connection, we note that petitioners' counsel at the trial, when asked by the Court whether he objected to the second investigation at the time it was made or when it was proposed to be made, stated that he could not find any evidence that it was objected to. In our view, the examinations were apparently conducted without timely objection by the petitioners and the protection thus afforded them by section 3631, supra, was waived by the failure to object. United States v. O'Connor, 237 F. 2d 466, 476 (C.A. 2, 1956); Mangone Co., Inc. v. United States, 54 F. 2d 168 (1931) (73 Ct. Cls. 239); Leslie A. Sutor, 17 T.C. 64, 69 (1951). We believe that Reineman v. United States, U.S.D.C. No. Dist. Ill., March *400 13, 1961 (unreported), aff'd 301 F. 2d 267 (C.A. 7, 1962), cited by petitioners, is inapposite. Unlike the instant case, in Reineman the taxpayers objected to the second examination at the time it was proposed by the agents, and no amended returns had been filed after the due date of the original returns. Opinion Following Leads We find no merit in petitioners' argument, repeated throughout their briefs, to the effect that under Holland v. United States, 348 U.S. 121 (1954), leads which were available to respondent and his agents well before the instant trial in all of the cases herein were disregarded. We have already set forth, in part, the facts relating to following leads in our background and general findings relevant to the issue of cash on hand and the necessity to resort to the net worth method. At no time during the investigation of petitioners for the taxable years 1948 through 1950, inclusive, did the agents involved in the investigation receive any significant leads with respect to the amount of cash on hand now claimed by petitioners, although the control of any material information in relation to the existence and amount of cash (and loans receivable) was in petitioners *401 who resisted rather than aided the development of such information. In our opinion, the record of the examination by respondent's agents leaves no doubt that they explored all reasonable leads that might reveal information as to the amount of cash owned by petitioners at December 31, 1947, 1948, 1949 and 1950 not on deposit in banks. At each way station in their extensive investigation, however, respondent's agents encountered numerous obstacles. Thus, at the outset of the examination, respondent's agents sought to interview Rosario, but were advised by Serio that such an examination could not be permitted because of Rosario's bad health. During the examination, respondent's agents made repeated attempts to ascertain from both Serio and Garrett the amount of cash Rosario and Sam owned during the years 1948, 1949 and 1950, and with special reference to the first and last days of each such period. At the time the inquiries were made, Serio was the independent executor of Sam's estate and either the delegated representative of Rosario or the independent executor of Rosario's estate. At these times Serio and Garrett stated that net worth statements or financial statements. could not be *402 prepared and submitted on behalf of Sam and Rosario because Serio and Garrett could not arrive at a cash on land figure for either one. It was only after the issuance of the statutory notices of deficiency in these cases that Serio made the statement that Sam and Rosario each had $300,000 cash on hand at December 31, 1947. Many months were consumed by respondent's agents in investigating the financial affairs of petitioners because of the latter's refusal to produce data as to their financial affairs that were actually in their possession. All of the petitioners, except Sam who was dead, informed respondent's agents during the examination that none of their personal records or bank records for the years involved under the examination were available. Serio told respondent's agents that Sam had no personal records of his financial affairs. As a result of these representations, the respondent's agents spent some months preparing "check spreads" of the banking transactions of the partners of Maceo and Company in order to ascertain the facts that ultimately became the basis for the respondent's determinations. About five years after the completion of respondent's examination, petitioners *403 revealed for the first time that they actually had their personal banking records. These bank records were finally made available to the respondent in 1960 when his attorneys were completing their preparation of these cases for trial. In October 1952, the books and records of Maceo and Company were closed to the examination of respondent's agents who at that time had not completed the examination of said records. Moreover, Serio misled respondent's agents by telling them Maceo and Company had no win and loss books and by not producing the win and loss books during the agents' examination. Under all the circumstances, respondent's agents determined that it would be necessary to attempt to establish all relevant facts pertaining to the income received by the petitioners by resorting to records in the possession of third parties. At the completion of their examination of the third party records, however, respondent's agents concluded that such records failed to develop definitive evidence of the amount of cash on hand owned by each petitioner as of the dates herein significant. To the extent that there were leads, petitioners had as much opportunity to follow them up as the agents. Moreover, *404 vague assertions about a cash hoard or receivables are hardly in the category of "relevant leads" referred to by the Supreme Court in the Holland case. Petitioners remained quiet at their peril. We think there is no substance to the complaint of failure to follow leads. In Holland v. United States, supra, the Supreme Court said, in part, (p. 138): But where relevant leads are not forth-coming, the Government is not required to negate every possible source of nontaxable income, a matter peculiarly within the knowledge of the defendant. * * * See also Fairchild v. United States, 240 F. 2d 944 (C.A. 5, 1957); Kampmeyer v. United States, 227 F. 2d 313, 316-317 (C.A. 8, 1955). Under the circumstances we believe there can be no question but that respondent fully complied with the requirements established in Holland v. United States, supra. Opinion Use of Net Worth and Expenditures Method At the threshold of our discussion of this issue, we note that petitioners do not appear to seriously contest respondent's right to resort to the comparative net worth plus gross expenditures method in reconstructing petitioners' taxable income during the years ending December 31, 1948, through December *405 31, 1950, inclusive. Petitioners' primary objection is to the effect that respondent indulged in guesswork, unfounded inferences, contradictory conclusions, and that the net worth method, when properly applied to the facts of record, establishes that petitioners fully reported their taxable income for the years in controversy. Apart from the foregoing, we note that unreported earnings or inadequate records which are present in the instant case are an invitation to an audit or checkup which will bring the facts to light. In the circumstances of this case, where petitioners admittedly failed to report alleged earnings in the amount of $669,920 from joint venture gambling, and where there are no records of such earnings, respondent was obliged to resort to some reasonably effective technique for the determination of income. Petitioners, by merely alleging that complete records were kept, cannot deprive respondent of the right to use a practical method of making his determination and checking on petitioners' returns. Obviously, petitioners' difficulty is of their own making in failing to keep proper records either of their business activities or other facts material to the determination *406 of their income tax liability. An examination of our findings demonstrates that the use of the net worth method by the respondent was fully justified as a test of the accuracy of the petitioners' income tax returns and also as significant evidence of their correct net income. Carmack v. Commissioner, 183 F. 2d 1 (C.A. 5, 1950), affirming a Memorandum Opinion of this Court, certiorari denied 340 U.S. 875 (1950); Frank Imburgia, 22 T.C. 1002 (1954). The courts have repeatedly held that the right of respondent to resort to the net worth method is not dependent on finding first (and without regard to the implications of the net worth computation) that petitioners' books and records were not sufficient to properly reflect income. It is quite possible that, even though a taxpayer may have a complete set of books and may employ a method of accounting which is capable of accurately reflecting the taxpayer's income, there may be false or incorrect entries made on his books, such as nonbusiness expenses, excessive credits to drawing accounts, omission of cash receipts and the like. Under such circumstances, the income determined from the books would not reflect the taxpayer's true income. Unquestionably *407 there are manifold schemes whereby incorrect entries may be recorded in an otherwise complete and adequate set of books, and it may therefore be difficult, if not impossible, to pinpoint the particular entry or entries that are false or erroneous. In Estate of W. D. Bartlett, 22 T.C. 1228 (1954), we held that where the taxpayer presents a set of books and records which appear to be superficially adequate, the so-called net worth method may be resorted to and applied as a technique for disclosing a substantial gap between actual income and reported income, and thereby suggest the untrustworthiness of the books as a whole. In Morris Lipsitz, 21 T.C. 917 (1954), affd. 220 F. 2d 871 (C.A. 4, 1955), certiorari denied 350 U.S. 845 (1955), we said, in part (p. 931): when the increase in net worth is greater than that reported on a taxpayer's returns or is inconsistent with such books or records as are maintained by him, the net worth method is cogent evidence that there is unreported income or that the books and records are inadequate, inaccurate, or false. It is not correct to say that the use of the net worth method is forbidden where the taxpayer presents books from which income can be *408 computed, for the net worth method itself may provide strong evidence that the books are unreliable. * * * This view, of course, recognizes that the so-called net worth method (or available funds method) is not itself a system of accounting but merely a technique for reconstructing a taxpayer's correct net income, regardless of the method of accounting followed by the taxpayer in keeping his books. By a showing of a substantial increase in net worth in excess of reported income, without reasonable explanation of such discrepancy as being attributable to gifts, inheritances, or other nontaxable receipts, the net worth method furnishes persuasive evidence of unreported income and reflects on the over-all accuracy of income reported on the books and on the returns. Michael Potson, 22 T.C. 912 (1954), affd. sub. nom. Bodoglau v. Commissioner, 230 F. 2d 336 (C.A. 7, 1956); Estate of George L. Cury, 23 T.C. 305 (1954); Harry Gleis, 24 T.C. 941 (1955), affd. 245 F. 2d 237 (C.A. 6, 1957). In this connection, the Supreme Court said, in part, in Holland v. United States, 348 U.S. 121 (1954), rehearing denied 348 U.S. 932 (1955), p. 131: The net worth technique, as used in this case, is not *409 a method of accounting different from the one employed by defendants. It is not a method of accounting at all, except insofar as it calls upon taxpayers to account for their unexplained income. Petitioners' accounting system was appropriate for their business purposes; and, admittedly, the Government did not detect any specific false entries therein. Nevertheless, if we believe the Government's evidence, as the jury did, we must conclude that the defendants' books were more consistent than truthful, and that many items of income had disappeared before they had even reached the recording stage. Certainly Congress never intended to make § 41 a set of blinders which prevents the Government from looking beyond the self-serving declarations in a taxpayer's books. * * * Judge Goodrich, although speaking particularly of the expenditures factor, clearly and briefly explained the net worth approach in United States v. Caserta, 199 F. 2d 905, 907 (C.A. 3, 1952), in which he said, in part, (pp. 906-907): An outgrowth of this net worth method is the "expenditure" test involved in this case. The theory of it is simple, though its application may become difficult. It starts with an appraisal of *410 the taxpayer's net worth situation at the beginning of a period. He may have much or he may have nothing. If, during that period, his expenditures have exceeded the amount he has returned as income and his net worth at the end of the period is the same as it was at the beginning (or any difference accounted for), then it may be concluded that his income tax return shows less income than he has in fact received. * * * We need not, therefore, restrict the use of the net worth method here to finding particular inaccuracies, omissions, or defalcations in the taxpayers' books. Such may or may not exist and may or may not be discernible. Nevertheless, those which we have pointed out in the instant case, supra, add significance to the need of using the net worth method. Under all the circumstances in the instant case, we have no doubt that resort to the net worth and expenditure basis was appropriate. We note respondent avers that the unreported income of several of the petitioners herein (i.e. Rosario and Frances and Sam and Edna) is correctly computed both under the so-called available funds and net worth methods of reconstructing income, and has requested findings of fact in support *411 thereof. Although respondent has not discussed the disputed items relating to the aforesaid petitioners in the context of the so-called available funds method, he does make some use of the latter method in supporting his contention that petitioners' expenditures during the taxable years exceeded their available cash. The available funds method is similar to the so-called net worth approach in that a pivotal element which must be established with reasonable certainty is what cash funds, if any, were available to the taxpayer at the opening date of the net worth period. Another critical element is the amount of "available funds" acquired during the particular year in question as reflected on the income tax return filed for the taxable year, since "expenditures" made during that year against such funds indicate only what would be expected of a taxpayer who filed a correct return. In order to show a failure to report the full amount of income by the use of this method, it must be demonstrated that the disbursements made during the taxable year were in excess of the available funds at the start of each year plus funds becoming available during the year which were reported on the tax return. *412 Of course, in the available funds method, as well as the net worth method, appropriate adjustment must be made to exclude assets acquired from nontaxable sources. Dupree v. United States, 218 F. 2d 781, 784 (C.A. 5, 1955). We hardly need add that there is no restriction on the methods or theories by which respondent may test his views that unreported income exists provided they are reasonably calculated to disclose the presence or absence of unreported income. Campbell v. Guetersloh, 287 F. 2d 878, 880 (C.A. 5, 1961). See also Kenney v. Commissioner, 111 F. 2d 374-375 (C.A. 5, 1940), affirming a Memorandum Opinion of this Court; Goldberg v. Commissioner, 239 F. 2d 316 (C.A. 5, 1956), reversing on another issue a Memorandum Opinion of this Court; Cohen v. Commissioner, 176 F. 2d 394 (C.A. 10, 1949), affirming 9 T.C. 1162-1163 (1947). In our subsequent discussion of the particular dockets involved herein, we shall consider the separate contentions of the petitioners relating to the use of the net worth and expenditure method in the context of their particular case. Understatements of Income Introductory Although we approve the use of the net worth expenditures method to determine *413 petitioners' income, we hold that petitioners have, in part, met the burden of proof of error in respondent's determination. For a more understandable presentation of the issues of fact and law to be considered, infra, we have included our revision of the net worth schedules for each of the petitioners, as computed by respondent, in the separate section of the Findings of Fact relating to each of them. Disputed items are indicated by the letter "d". Items without designation are either stipulated, conceded or uncontested. Where a contested item raises an issue of fact, we resolve the issue in our findings relating thereto, with further explanation in our Opinion to the extent that elaboration of the basis of our ultimate findings seems required. Where the contested item involves the burden of proof, we likewise explain our view in our Opinion. Our Findings of Fact and Opinion with respect to the disputed items will be set forth hereinafter in the order in which they appear on our revised net worth schedules, infra. In several instances, however, where petitioners contend that respondent erroneously omitted certain assets or liabilities, we resolve the issue in the appropriate relationship *414 to other disputed items. Corrected Net Income of Sam Maceo and Edna Sedgwick Maceo Plitt for 1948, 1949 and 1950 under the Net Worth Method. (Docket No. 55506) Findings of Fact Sam Maceo was born in Palermo, Italy, on March 1, 1894. He became a United States citizen through naturalization and took up desidence in Galveston, Texas, in 1915, which continued to be his residence until the time of his demise on April 16, 1951. Sam was the younger brother of Rosario Maceo. He married Jessica McBride prior to 1932 and they were divorced on November 8, 1941. Sam married Edna Sedgwick on December 29, 1941, and she was his surviving spouse at the time of his death. Sam and Edna Sedgwick Maceo Plitt, hereinafter sometimes called petitioners, had three children as a result of their marriage. On September 30, 1941, Sam sold his community 20 percent interest in the partnership known as the "Turf" to various partners of the Turf. During October 1941, Gulf Properties, Inc., purchased 100 shares of its capital stock from Sam. The total consideration received by Sam from the sale of the community interest in the capital stock of Gulf Properties, Inc., and the community interest in the Truf was $40,000. *415 Sam reported the foregoing sales in his 1941 income tax return and claimed the entide community net capital loss of $75,271.69 on his 1941 return. The cost basis claimed by Sam in the 100 shares of capital stock of Gulf Properties, Inc., and the partnership known as the Turf was $115,271.69. On November 8, 1941, Jessica Maceo obtained a divorce from Sam. Upon the granting of the divorce, Sam agreed to pay to Jessica the sum of $20,000 in consideration of Jessica releasing and relinquishing to him any and all claims of whatsoever nature that she may have or might assert against him, and further agreed that all property vested in his name and belonging either to his separate estate or to the community estate would be and remain his property. Texas is a community property state and Jessica was entitled to one-half of the assets of the community at the time the community was terminated by divorce. Sam commenced arrangements for the disposition of the community's assets and in connection therewith sold his interest in Gulf and in the Turf for $40,000. In reporting the aforesaid transaction on his 1941 income tax return, Sam claimed a capital loss in respect to it. Sam then delivered $20,000 *416 (one-half of the $40,000 received on the sale of the community assets) to Jessica in full and final settlement of all of her community rights. On November 8, 1941, Jessica executed the following instrument in her maiden name of Jessica McBride: I, Jessica McBride, * * * do hereby acknowledge receipt of the sum of * * * $20,000.00 cash to me in hand paid by the said Sam Maceo in full and final settlement of all of my community property rights, and in consideration of such payment I do hereby fully and forever release and discharge the said Sam Maceo from any and all claims of whatsoever nature I may now have or in the future assert against him growing out of property rights of every kind and character acquired by me during my marriage to him. On December 31, 1947, and throughout the years 1948, 1949, and 1950 the partners of Maceo and Company maintained a cash bankroll for the purpose of financing its gambling operations carried on within the partnership of Maceo and Company. Said bankroll amounted to $100,000 at December 31, 1947, 1948, 1949 and 1950. Sam's share of the $100,000 cash bankroll was 20 percent, or $20,000. Sam submitted financial statements to the United States National *417 Bank of Galveston which set forth his cash on hand and in bank as well as his net worth as of a particular date. Sam's cash on hand and in banks and his net worth, as stated in the financial statements, are as follows: FinancialCash on HandStatement as ofand in BankNet WorthApril 9, 1947$45,000$327,740.92April 8, 194825,000431,121.28January 1, 194933,500478,945.15December 31, 194915,000552,315.68Using said financial statements and the stipulated cash in banks for the taxable years involved, respondent determined the amount of undeposited cash owned by Sam as follows: 4-9-474-7-481-1-4912-31-49Cash on hand and in banks per$45,000.00$25,000.00$38,500.00$15,000.00financial statementStipulated cashr in banksN/A *N/A *12,639.323,778.92Cash not on deposit in banksN/A *N/A *$25,860.68$11,221.08On May 20, 1936, a notice of tax due and demand therefor was issued to Sam and his wife, Jessica, in respect to their income tax liability for the years 1933 and 1934 in the total amount of $4,246.44. On May 29, 1936, Louis Dibrell, an attorney, acting on behalf of Sam and Jessica, wrote the collector of internal revenue, Austin, Texas, and stated that Sam and Jessica found it *418 impossible at that time to pay in full the additional income tax due from them for 1933 and 1934. Dibrell requested that Sam and Jessica be given additional time to pay the balance of the tax due from them. Dibrell informed the collector that such additional time was needed because Sam and others in the Turf had recently been forced to mortgage practically all of their real estate holdings in order to purchase the Murdoch Bath House of Galveston. Dibrell at that time enclosed with the letter a cashier's check in the amount of $1,061.61 which was in payment of one-quarter (1/4) of the tax due from Sam and Jessica. The $1,061.61 payment was allocated by the collector as follows: 1933 - additional tax $243.03; 1934 - additional tax $818.58. On June 23, 1936, Dibrell again wrote the collector and renewed his request that Sam and Jessica be given additional time in which to pay the additional tax they owed for 1933 and 1934. On July 24, 1936, Dibrell was notified by the collector that warrants for distraint had been issued against Sam and Jessica for the balance of the tax due in the amount of $736.80 for the additional taxes for 1933 and 1934. The $3,242.70 balance due on the additional *419 tax for 1933 and 1934 ($4,246.44 tax, plus $57.87 interest, minus $1,061.61) was paid at the following times: Date ofAdditionalDate ofAdditionalPaymentTax 1933PaymentTax 1934July 27, 1936$737.819-26-36$ 613.949-28-361,250.3710-22-36641.68During the examination of Sam and Edna's 1948, 1949 and 1950 tax returns, Serio and Garrett had, from time to time, informed respondent's agents that net worth statements could not be prepared and submitted to respondent's agents on behalf of Sam and Edna because they could not arrive at a cash on hand figure. On August 18, 1947, Sam borrowed $60,000 from the City National Bank of Houston, Houston, Texas. Said loan was to be repaid in 36 monthly installments. The first 35 of such installments were in the amount of $1,300 each, plus interest accrued thereon. The first installment was payable on September 20, 1947. The 36th installment was an amount equal to the unpaid balance then due and owing. The rate of interest was 5 percent. On August 18, 1947, Sam purchased from Ernest Adams of Houston, Texas, certain oil properties for a consideration of $75,000 of which $60,000 was received by Ernest Adams direct from the City National Bank of Houston, pursuant *420 to instructions given such bank by Sam in connection with the aforesaid loan. On December 30, 1947, Sam transferred said oil properties in trust to the United States National Bank of Galveston as trustee. Sam transferred an undivided one-third interest to each of his sons, Salvatore and Victor Edward, and the remaining undivided interest to his daughter, Edna Sedgwick Maceo. The statutory notice of deficiency setting forth Sam and Edna's liability for income tax and penalties for the years 1948, 1949 and 1950 was issued on September 23, 1954. After the issuance of said notice of deficiency, Serio made statements on two occasions that Rosario and Sam Maceo each had $300,000 in cash in September 1947. The first statement was made in an affidavit dated January 15, 1955, that was executed by Serio and filed with the Department of Justice in connection with a tax case involving A. J. Adams. The second statement was made in the course of Revenue Agents Ney and Logan's interview with Serio on March 4, 1955. Prior to December 31, 1947, Sam and Edna acquired certain jewelry which was insured by them in 1949. This jewelry was described in a schedule attached to the insurance policy. In addition, *421 Sam and Edna purchased jewelry in the amount of $499.80 and $588 in 1949 and 1950. Respondent, in his statutory notice of deficiency, determined that Sam and Edna had acquired jewelry in 1949 and 1950 costing $106,469.80 and $558, respectively. Of said amount, $105,970 of said jewelry was acquired by Sam and Edna in the years prior to January 1, 1948, and constitutes an asset through December 31, 1950. In March 1948 Sam Maceo was indebted to Gulf in the amount of $13,000. On March 6, 1948, a payment of $13,000 was recorded in the cash receipts journal of Gulf as a payment on the account of Sam. Said payment was recorded in the cash receipts journal of Gulf as one of four receipts comprising a $38,365 ($13,000 from Sam; $25,000 from Rosario; $65 - 23rd St.; $300 - beach and camps) deposit in the Moody Bank. An offsetting entry in the cash disbursements journal shows $38,000 being transferred to Maceo and Company to be applied on Gulf's account. The foregoing $38,000 ($13,000 from Sam and $25,000 from Rosario) was not actually deposited and then withdrawn from Gulf's checking account at W. L. Moody & Co., Bankers. Said $38,000, which included Sam's $13,000 payment, was deposited in Maceo *422 and Company's bank account as part of a deposit totaling $46,574.74. Said deposit consisted of currency $26,409, silver $0.87, and two groups of checks totaling $20,164.87, which had been received in the regular course of business by Maceo and Company. Sam's account on the books of Gulf, after crediting the $13,000 payment, appeared as follows at March 31, 1948: DebitDate1948AmountJan. 1$13,213.73Mar. 3112.51CreditJan. 31$ 213.73Mar. 3113,000.00On October 1, 1948, a loan of $425,000 was closed by ANICO with Gulf, San Luis, Murdoch and Trustee, which was secured by eight pieces of property. The loan was designated as Loan No. 8091 and was payable in monthly installments of $5,000 principal, plus interest. Loan No. 8091 refinanced the balance still due on Loan No. 7707 of Gulf Properties, Inc., and Loan No. 7708 of San Luis Corporation which had been made on May 22, 1947. ANICO issued check No. 628272 dated October 4, 1948, to Gulf Properties, Inc., San Luis, Murdoch, and Trustee in the amount of $320,000. Serio endorsed the check on behalf of Gulf, San Luis and Murdoch and Rosario endorsed the check on behalf of Trustee. The check was paid on October 6, 1948. The cash disbursements *423 journal of Gulf shows the issuance of the following checks on October 5, 1948: Check No.PayeeAmountAccount Charged3845R. Maceo$ 5,000.00Accts. Payable-Maceo & Co.3846R. Maceo20,000.00Accts. Payable-Maceo & Co.3847R. Maceo25,000.00Accts. Payable-Maceo & Co.3848Sam Maceo25,000.00Accts. Payable-Maceo & Co.3849Sam Maceo25,000.00Accets. Payable-Maceo & Co.3850A. J. Adams37,500.00Accts. Payable-Maceo & Co.3851Frank Maceo37,500.00Accts. Payable-Maceo & Co.3852Vic C. Maceo25,000.00Accts. Payable-Maceo & Co.3853O. E. Voigt25,000.00Accts. Payable-Maceo & Co.3854Sam Serio12,500.00Accts. Payable-Maceo & Co.3855Vincent A. Maceo12,500.00Accts. Payable-Maceo & Co.3856W. L. Moody & Co.25,563.89Accts. Payable-Maceo & Co.3857U.S. National Bank50,461.11Accts. Payable-Maceo & Co.$326,025.00The cash disbursements journal of Maceo and Company records noncheck disbursements from the horse account on October 5, 1948, as follows: AccountDebitCreditR. MaceoDrawing$50,000.00Sam MaceoDrawing50,000.00Frank MaceoDrawing37,500.00A. J. AdamsDrawing37,500.00Vic C. MaceoDrawing25,000.00O. E. VoigtDrawing25,000.00Sam SerioDrawing12,500.00Vincent A. MaceoDrawing12,500.00San Luis CorporationAccounts Receivable55,000.00W. L. Moody & Co.Notes Payable25,000.00InterestInterest563.89U.S. National BankNotes Payable50,000.00InterestInterest461.11$381,025.00*424 Sam Maceo had work performed for his personal account by Alamo Iron Works at a cost of $1,888.02 and by K. E. Crampton at a cost of $200. Sam also purchased household furnishings from Robijohn-Gibbings & Co. in 1950 in the amount of $25,000. Sam's payment of $25,000 to Robijohn-Gibbings was accomplished through the issuance of the following checks: CheckDate ofAccount on whichBank on whichAmount ofNo.CheckCheck DrawnCheck DrawnCheck435612-6-50Gulf Properties, Inc.W. L. Moody & Co.$10,00035012-6-50Maceo and CompanyHutchings-Sealy10,000National Bank344212-6-50Murdoch Bath HouseThe City National Bank5,000Co., Inc.$25,000 Each of said checks was prepared by Serio and signed by Sam Maceo. Said checks were not entered in the cash disbursements journals for the companies on whose account the checks were drawn. Funds were deposited in the checking accounts on which check Nos. 4356, 350 and 3442 were drawn to reimburse the accounts. The funds deposited in respect to check Nos. 4356 and 350 were included with other funds which were deposited in the accounts. The deposits covering check Nos. 4356, 350 and 3442 were made on December 7, 1950. Check Nos. 4356, 350 and 3442 were removed from the *425 cancelled checks by Serio and turned over to Sam Maceo. The original checks were not available at the trial. The $10,000 deposited in the account of Gulf in respect to check No. 4356 was part of a total deposit of $12,088.02 that was made on December 7, 1950. Said deposit included checks totaling $11,421.16, currency in the amount of $666 and silver in the amount of 86 cents. The checks totaling $11,421.16 were received by Maceo and Company in connection with its various operations. No portion of the deposit of $12,088.02 was recorded in the cash receipts journal of Gulf. The aforesaid deposit in the account of Gulf of $12,088.02 included $2,088.02 which was deposited in order to reimburse Gulf's account for the following additional checks drawn on it at the request of Sam Maceo: CheckDate ofNo.CheckPayeeAmount435712-6-50Alamo Iron Works$1,888.02435812-5-50K. E. Crampton200.00 Check Nos. 4357 and 4358 were not entered in the cash disbursements journal of Gulf in December 1950. Said checks were prepared by Serio and signed by Sam. The checks were issued in discharge of Sam's personal liabilities. When check Nos. 4357 and 4358 were returned to Gulf they were withdrawn from the cancelled *426 checks. On December 7, 1950, the sum of $15,061.85 was deposited in the account of Maceo and Company at the Hutchings-Sealy National Bank. Included in the foregoing deposit were the following items: DescriptionAmount12-6-50 net deposit of Chill Bowl receipts ($1,902.15 less $10.00$1,892.15shortage)12-6-50 net deposit of receipts byStreamline Dinner Club ($3,205.55 less $35.85)3,169.70$5,061.85Serio prepared the deposit slip covering the deposit of the aforesaid $5,061.85. The deposit consisted of currency in the amount of $5,087, silver in the amount of 88 cents and a group of checks which were shown on an adding machine list attached to the deposit slip in the amount of $9,973.97. The $10,000 portion of the deposit was not recorded as a deposit in any of the departmental operations of Maceo and Company. The cash receipts and disbursements journal of Murdoch Bath House Co., Inc., contains no entry, reference or explanation as to the manner in which check No. 3442 was handled on the books of that company. On December 7, 1950, a deposit of $5,000 in respect to check No. 3442 was made in the account of Murdoch Bath House Co., Inc., at The City National Bank. The deposit consisted of *427 currency in the amount of $500 and a check in the amount of $4,500. The entry originally made on the deposit slip was one showing a deposit of $5,000 in currency. Serio changed the deposit slip to show the deposit of currency in the amount $500of and a check in the amount of $4,500. The check that was deposited in the account of Murdoch Bath House Co., Inc., was check No. 3483 in the amount of $4,500 which had been issued to Sam Maceo by the Equipment Department of Maceo and Company and charged to his drawing account. The $4,500 check issued to Sam Maceo was part of a partnership distribution of profits. The check contains the endorsements of Sam Maceo and Murdoch Bath House Company. The following schedule shows the cashier's checks purchased by the partners on January 14, 1948: No. ofTotal Amount ofChecks Issued byChecksPartnerChecks PurchasedU.S. National Bank2Rosario *$ 34,890U.S. National Bank2Vincent *5,400U.S. National Bank2Sam *27,000Hutchings-Sealy National Bank1Voigt17,000U.S. National Bank2Frank *22,500City National Bank2Serio *4,000Hutchings-Sealy National Bank2Vic C. *11,500W. L. Moody & Co., Bankers2Adams *22,775$145,065Serio was interviewed *428 by the respondent's agents on March 4, 1955, at which time he informed them that (a) Daily win and loss books were maintained by Maceo and Company during the taxable years to show the activity of the clubrooms and that these win and loss books would be made available when they were found; (b) the source of the income (in the amount of $669,920) reported on the amended 1948, 1949 and 1950 income tax returns of the partners of Maceo and Company was Sam's outside gambling activities; and (c) financial statements could not be prepared for Sam Maceo for the taxable years. The daily win and loss book maintained by Maceo and Company was produced for the first time for respondent's examination when subpoenaed in the instant trial. Sam Maceo reported income from bets and wagers on his income tax returns for a number of years. The amount of such income as shown by the returns, revenue agents' reports and work papers used in the preparation of his returns was as follows: RevenueAgents'WorkOriginalAmendedYearReportsPapersReturnReturn1950$11,350$11,350$ 59,262 **429 194913,700 **13,70074,263 *194838,50038,500100,947 *19468,30019454,50019435,4005,35019424,87019401,4831936$2,3752,37519353,150The work papers used in the preparation of petitioners' original 1948 return show income from bets and wagers in the amount of $38,500. Sam's account receivable ledger sheet with Maceo and Company (horse account) shows that Sam had net winnings of $25,250 as a result of bets he had placed with Maceo and Company in 1948. The winnings occurred as follows: Paid byDate ofMaceo andWinningWinDate BetCompanyBet(Loss)PaidCheck9-24-48$ 8,0009-25-481069 *9-25-485,0009-27-481070 *9-26-485,0009-27-481071 *9-27-48 **(4,000)9-28-489-28-48 **3,0009-29-481075 *9-29-485,0009-29-481077 *10- 6-483,25010- 7-481104 *$25,250The work papers used in the preparation of Sam and Edna's original 1949 return shows income from bets and wagers of $13,700. On the line of the work paper where the $13,700 appears there are two figures that have been crossed out; that is, $11,200 and $2,500. A transcript of Sam's account receivable ledger sheet (horse account) reveals that *430 Sam won $11,200 betting with Maceo and Company in September and October 1949. The dates and amounts of the bets were as follows: Date of BetWin (Loss)9/24$ 1,1009/259009/261,40010/52,20010/6(2,000)10/72,50010/83,00010/92,100$11,200Said bets were paid Sam on March 15, 1950, when the Bingo section issued its check No. 598 for $11,200 to Sam. The work papers used in the preparation of Sam and Edna's original 1950 return shows income from bets and wagers in the amount of $11,350. The $11,350 figure was given to Serio by Sam Maceo. A transcript of Sam's account receivable ledger sheet (horse account) reveals that Sam won $2,600 betting with Maceo and Company in September 1950 as follows: Date of BetWin (Loss)9-15-50$1,0009-16-502,2009-17-501,4009-18-50(2,000)$2,600 Said bets were not paid by Maceo and Company in 1950. Joe T. obtained some of the information about income received by the partners of Maceo and Company and turned it over to Serio for use in the preparation of the partners' income tax returns. Sam Maceo gave Joe T. a slip of paper showing what Sam thought that he had won on personal wagers. In addition, Joe T. would examine the records of Maceo and Company to determine the extent *431 to which Sam Maceo had won bets from Maceo and Company. After Joe T. had checked the records of Maceo and Company he turned the slip of paper over to Serio. Sam and Edna made the following payments on their declarations of estimated tax for the years 1948, 1949 and 1950: 194819491950Sam$12,000Edna12,000Sam and Edna$24,000$7,500Sam and Edna did not file a timely 1950 declaration of estimated tax. Sam and Edna received income tax refunds in 1949 and 1950 of $14,466.98 and $7,083.80, respectively. Petitioners' increases in net worth in 1948, 1949 and 1950 and their nondeductible expenditures did not come from gifts, inheritances or other nontaxable sources, except to the extent specified hereinabove. The income tax returns filed by Sam and Edna were examined by Revenue Agent Donald Whitaker and as a result of said examination petitioners agreed to deficiencies as follows: Amount ofAgreedPetitionerYearDeficiencySam1947$ 946.08Edna1947946.08Sam and Edna19481,204.04Sam and Edna19486,389.94Sam and Edna1949903.04 Sam Maceo died April 15, 1951. The statutory notice of deficiency in Sam and Edna's case (Docket No. 55506) was issued on September 23, 1954. Petitioners, Edna Maceo Plitt and Sam *432 Serio, are the duly qualified executors of Sam Maceo's estate. Edna is an individual petitioner. Schedule I represents our reconstruction of respondent's computation of increase in net worth for the taxable years 1948, 1949 and 1950, beginning December 31, 1947 and ending December 31, 1948, for Sam Maceo and Edna Sedgwick Maceo Plitt (Docket No. 55506). Disputed items are indicated by the letter "d." Items without designation are either stipulated, conceded or uncontested. SCHEDULE I.Sam Maceo and Edna Sedgwick Maceo Plitt - Docket No. 55506Reconstruction of Income for the Years 1948, 1949 and 1950 by the Net Worthand Nondeductible Expenditures Method.ASSETSDecember 31, 1947December 31, 1948(d) Cash on Hand$ 25,000.00Cash advanced to Maceo &20,000.00$ 20,000.00Co. for bankrolls(d) Cash on hand - jt.35,000.0035,000.00venture gambling bankroll(d) Cash on hand -15,000.0015,000.00independent gamblingbankrollCash in banks - U.S. Natl.Bk., GalvestonCk. a/c - Sam Maceo$ 14,351.75$ 5,545.25Ck. a/c - Mrs. Sam Maceo492.73464.39Sav. a/c # X3754, Mrs. E.50.0050.45S. MaceoHutchings - Sealy Natl. Bk.Ck. a/c - Mrs. Sam Maceo258.821,579.23W. L. Moody & Co., BankersCk. a/c5,000.0020,153.305,000.0012,639.32Accts. Rec. due from: Victor FertittaMaceo & Co.Loans Rec. due from: Victor FertittaJohnny Mitchell, TrusteeJohnny Mitchell2,000.00R. L. TurnerN. E. ScottFreddie KaplanCharles A. CostibleEdward McHarg2,000.00James Dunn1,000.005,000.00Investments: Capital Account balance$308,121.28$374,445.19Less: Drawing Account1,950.0051,950.00balanceInvestment per general306,171.28322,495.19ledgerAgreed adjustments perprior examination ofMaceo & Co. income tax2,443.302,759.41returnsTOTAL$308,614.58$325,254.60Reversal of adjustmentsarising out of priorexaminations & placed onbooks in 1949 by Maceo &Co.Interest in unreportedclubroom receipts(d) Elimination of cash$308,614.58$325,254.60drawings recorded on booksof Maceo & Co. as of Dec.1950 & not paid until 1951Varnell Liquor Co.29,107.5725,329.63(Partnership)Gulf Properties, Inc. (Cap.50,000.0050,000.00stock)U.S. Government Bonds15,050.0015,181.25R. Maceo, TrusteeReal Estate: 1/2 interest NE 1/4 of SE$ 10,500.00Blk, outlot 92Brick Building$ 24,902.701/4 interest, Blk. 14, 16,48, 49 & S-1/2 of 13Orchard Place1,500.001,500.00Lots 78, 79, 80 & 86 Cedar16,000.0016,000.00Lawn AdditionImprovements$ 28,000.00$ 42,402.70Automobiles: 1947 Buick Coupe2,738.502,738.501949 Cadillac Sedan1951 Cadillac2,738.502,738.50Furs: Four skin Stone-Marten700.00700.00scarvesAlteration to four skin495.90Stone-MartenNorwegian Blue Fox Coat10.00Silverblue Mink Cape3,154.00Silver Fox Stole1,231.05White Mink StolePlatine Fox Cape750.00750.00Natural Eastern Mink Coat4,500.004,500.00Natural Ranch Mink Stole5,950.0010,840.95Furnishings for homeOil Properties: Investmentat December 31,1947: Apple Franklin Loan -$ 714.79$ 714.79Carter Co., OklahomaR. P. Smith Lease678.29678.29R. P. Smith Lease53.3253.32Rodgers Lease, Jackson Co.,7,941.597,941.59TexasRodgers Lease, Jackson Co.,798.02798.02TexasInvestment at 12-31-48NoneNoneInvestment at 12-31-49NoneNoneProperties acquired by SamNone231,461.21Maceo, Oil OperationsHanson & Scranton Lease #1None26,558.05Piehl #1None1,743.35Vernon Parish LeaseNone1,500.00L. M. Josey RoyaltyNoneJackson County, Texas,NoneLeaseNoneJalowy Heirs LeaseNoneNoneR. L. Turner, Luling-SeguinAreaLayne & Bowler Well, BlueRidgeOther300.00TOTAL10,186.01271,748.62Less: Intangible Payments124,348.1010,186.01147,400.52Less: Duplicate Payment2,950.0010,186.01144,450.52Less: Abandonment Loss$ 10,186.01$144,450.52(d) Jewelry105,970.00105,970.00TOTAL ASSETS$670,769.96$809,807.47Stipulated in part anddisputed in part.LIABILITIES and RESERVESLoans Payable: First Natl. Bk., GalvestonFirst Natl. Bk., HoustonLoan #241,376Loan #265,571U.S. National BankNote #1788$50,000.00Note #4997$ 50,000.00Accounts Payable: Gulf Properties, Inc.13,213.73Maceo & Co., Per Accts.Rec. Ledger3,154.23Less: Deductible Portion(1,592.08)14,775.88Reserves: Depreciation5,448.29$ 7,290.0620,430.29Depletion1,492.676,940.965,298.62$ 12,588.68Total$ 71,716.84$ 12,588.68Net Worth$599,053.12$797,218.79Net Worth at beginning of$599,053.12yearNet Worth Increase$198,165.67Net Worth Increase Brought$198,165.67ForwardADD: Nondeductible PersonalExpendituresStip. per Jt. Exhs.$ 43,129.99392-B(15th), 393-C(15th),394-D(15th)Nondeductible medical1,029.50expensesStip. of Facts VI, Par. 12Income Tax payments51,528.81Gifts to U.S. Natl. Bk. astrustee for: Victor Edward Maceo500.00Edna Sedgwick Maceo500.00Salvatore Maceo500.00Maceo and CompanyTurf Grill789.40Adjustment to reflect(65.15)accts. payable dischargedHorse operations acct.12.15T.A.C.6,967.87Adjustment to reflect(3,089.08)accts. payable dischargedTurf Stores$101,803.49Nondeductible loss on saleof autoDeduct nontaxable portion(547.50)of capital gainsDeduct income tax refundTotal$299,421.66(d) Additional unidentifiedexpenditures to bring netinc. reported onamended ret.Corrected Net IncomeNet Income per original(2,629.67)returnsNet Income omitted from$302,051.33original returns*433 SCHEDULE I.Sam Maceo and Edna Sedgwick Maceo Plitt - Docket No. 55506Reconstruction of Income for the Years 1948, 1949 and 1950 by the Net Worthand Nondeductible Expenditures Method.ASSETSDecember 31, 1949December 31, 1950(d) Cash on HandCash advanced to Maceo &$ 20,000.00$ 20,000.00Co. for bankrolls(d) Cash on hand - jt.35,000.0035,000.00venture gambling bankroll(d) Cash on hand -15,000.0015,000.00independent gamblingbankrollCash in banks - U.S. Natl.Bk., GalvestonCk. a/c - Sam Maceo$ 944.48$ 8,056.95Ck. a/c - Mrs. Sam Maceo1,141.71569.12Sav. a/c # X3754, Mrs. E.50.9551.45S. MaceoHutchings - Sealy Natl. Bk.Ck. a/c - Mrs. Sam Maceo1,641.7818.84W. L. Moody & Co., BankersCk. a/c3,778.928,696.36Accts. Rec. due from: Victor Fertitta1,367.25Maceo & Co.11,000.0011,000.002,600.003,967.25Loans Rec. due from: Victor Fertitta40,000.00Johnny Mitchell, Trustee13,466.18Johnny Mitchell2,695.892,695.89R. L. Turner1,628.58N. E. Scott500.00Freddie Kaplan500.00Charles A. Costible1,500.00Edward McHarg2,000.001,500.00James Dunn1,000.0019,162.071,000.0049,324.47Investments: Capital Account balance$270,592.43$244,101.79Less: Drawing Account1,950.0023,400.00balanceInvestment per general268,642.43220,701.79ledgerAgreed adjustments perprior examination ofMaceo & Co. income tax8,048.886,873.44returnsTOTAL$276,691.31$227,575.23Reversal of adjustments(3,473.41)(3,473.41)arising out of priorexaminations & placed onbooks in 1949 by Maceo &Co.273,217.90224,101.82Interest in unreported6,640.20clubroom receipts(d) Elimination of cash$273,217.9015,000.00$245,742.02drawings recorded on booksof Maceo & Co. as of Dec.1950 & not paid until 1951Varnell Liquor Co.(Partnership)Gulf Properties, Inc. (Cap.50,000.0050,000.00stock)U.S. Government Bonds15,256.2515,856.25R. Maceo, Trustee103,904.98105,869.53Real Estate: 1/2 interest NE 1/4 of SEBlk, outlot 92Brick Building$ 24,902.70$ 24,902.701/4 interest, Blk. 14, 16,48, 49 & S-1/2 of 13Orchard Place1,500.001,500.00Lots 78, 79, 80 & 86 Cedar16,000.0016,000.00Lawn AdditionImprovements$ 42,402.706,684.69$ 49,087.39Automobiles: 1947 Buick Coupe2,738.504,907.849,351.461949 Cadillac Sedan4,907.844,907.841951 Cadillac7,646.344,443.629,351.46Furs: Four skin Stone-Marten700.00700.00scarvesAlteration to four skin495.90495.90Stone-MartenNorwegian Blue Fox Coat1,810.002,000.00Silverblue Mink Cape3,154.003,154.00Silver Fox Stole1,231.051,231.05White Mink Stole2,100.00Platine Fox Cape750.00750.00Natural Eastern Mink Coat4,500.004,500.00Natural Ranch Mink Stole12,640.951,500.0016,430.95Furnishings for home25,000.00Oil Properties: Investmentat December 31,1947: Apple Franklin Loan -Carter Co., OklahomaR. P. Smith LeaseR. P. Smith LeaseRodgers Lease, Jackson Co.,TexasRodgers Lease, Jackson Co.,TexasInvestment at 12-31-48$144,450.52Investment at 12-31-49144,450.52$246,438.95Properties acquired by Sam199,644.84268,599.27Maceo, Oil OperationsHanson & Scranton Lease #1Piehl #1Vernon Parish LeaseL. M. Josey Royalty1,250.00Jackson County, Texas,5,000.00Lease4,960.94Jalowy Heirs Lease1,250.00500.00R. L. Turner, Luling-Seguin3,750.00AreaLayne & Bowler Well, Blue8,854.26RidgeOtherTOTAL369,660.56515,038.22Less: Intangible Payments123,221.61166,009.00246,438.95349,029.22Less: Duplicate Payment246,438.95349,029.22Less: Abandonment Loss$246,438.95912.64$348,116.58(d) Jewelry106,469.80107,027.80TOTAL ASSETS$961,918.86$1,104,470.06Stipulated in part anddisputed in part.LIABILITIES and RESERVESLoans Payable: First Natl. Bk., Galveston$ 8,135.50$ 13,841.40First Natl. Bk., HoustonLoan #241,37665,015.00Loan #265,571115,900.77U.S. National BankNote #1788Note #499750,000.00$123,150.50$129,742.17Accounts Payable: Gulf Properties, Inc.Maceo & Co., Per Accts.Rec. LedgerLess: Deductible PortionReserves: Depreciation53,617.37Depletion16,129.0936,559.3843,171.9796,789.34Total$159,709.88$226,531.51Net Worth$802,208.98$877,938.55Net Worth at beginning of$797,218.79$802,208.98yearNet Worth Increase$ 4,990.19$ 75,729.57Net Worth Increase Brought$ 4,990.19$ 75,729.57ForwardADD: Nondeductible PersonalExpendituresStip. per Jt. Exhs.$ 26,383.52$ 33,703.67392-B(15th), 393-C(15th),394-D(15th)Nondeductible medical1,686.70336.60expensesStip. of Facts VI, Par. 12622.77Income Tax paymentsGifts to U.S. Natl. Bk. astrustee for: Victor Edward Maceo2,750.003,000.00Edna Sedgwick Maceo2,750.003,000.00Salvatore Maceo2,750.003,000.00Maceo and CompanyTurf Grill44.358.50Adjustment to reflectaccts. payable dischargedHorse operations acct.34.10T.A.C.6,594.853,888.16Adjustment to reflectaccts. payable dischargedTurf Stores$ 43,616.2911.40$ 46,948.33Nondeductible loss on sale1,638.50of autoDeduct nontaxable portionof capital gainsDeduct income tax refund(14,466.98)(7,083.80)Total$ 34,139.50$117,232.60(d) Additional unidentifiedexpenditures to bring netinc. reported onamended ret.45,358.23Corrected Net Income$ 79,497.83Net Income per original(14,579.53)(30,743.68)returnsNet Income omitted from$ 94,077.26$147,976.28original returns*434 Opinion Corrected Net Income of Sam Maceo and Edna Sedgwick Maceo Plitt for 1948, 1949 and 1950. (Docket No. 55506) Respondent, in his statutory notice, determined deficiencies in income tax and additions to tax for the calendar year 1948 through 1950, inclusive, for Edna Maceo, Executrix of the Estate of Sam Maceo, Deceased, and Edna Maceo, Individually, (hereinafter sometimes called petitioners) in Docket No. 55506 as follows: Additions to Tax,I.R.C. 1939Sec.YearDeficiencySec. 293(b)294(d)(2)1948$148,016.64$107,705.60$11,484.67194944,140.1239,268.773,272.25195046,018.2623,009.13250.00Petitioners' net income for the years 1948 through 1950, inclusive, as disclosed by their original returns, and the amounts of net income (adjusted) determined by respondent in his notice of deficiency for said period is as follows: OriginalNotice ofYearReturnDeficiency1948$ (2,629.67)$325,303.591949(14,579.53)149,237.861950(30,743.68)98,784.28Respondent, in his computation of Sam and Edna's net worth for each of the taxable years 1948, 1949 and 1950, determined that they had no cash on hand as of December 31, 1947, through 1950, inclusive. Petitioners, in opposition, contend that Sam and Rosario (both *435 deceased at the time of trial) each had $300,000 of undeposited cash in December 1947 in a so-called "concealed safe" in the safe office of Maceo and Company. It is argued on behalf of Sam Maceo that several withdrawals of cash from said safe were made by Sam Serio within the taxable period and expended by petitioners, and at his death in April 1951, Sam Maceo had little undeposited cash remaining in the concealed safe. Petitioners argue further that in addition to the $300,000 cash hoard, Sam Maceo had $50,000 to $100,000 cash in his personal possession; and a 20 percent interest in a $100,000 bankroll in the possession of Maceo and Company. Essentially, it is petitioners' position that Sam Maceo amassed a cash hoard of $300,000 from his extensive bootlegging and gambling activities prior to the taxable years involved, which he merely converted into other assets or applied toward the reduction of their liabilities. We agree with petitioners' contention only in part. It is fundamental in the use of the net worth method to determine, with reasonable certainty, an opening net worth to serve as a starting point from which to calculate future increases in the taxpayer's assets. Holland v. United States, 348 U.S. 121 (1954); *436 Merritt v. Commissioner, 301 F. 2d 484, 486 (C.A. 5, 1962), affirming a Memorandum Opinion of this Court. Petitioners have advanced a possible source for Sam's accumulation of the alleged cash hoard of $300,000 on hand as of December 31, 1947, but in view of other facts of record, to be discussed, infra, we find the testimony with respect to his alleged cache unacceptable and insufficient to support the existence of a cash reserve in the amount claimed. We do not doubt, however, that he did keep substantial funds on hand prior to and during some of the critical years involved herein. The significant question is how much of said personal cash funds were on hand on December 31, 1947. It would extend this opinion interminably, and at the same time serve no useful purpose, to analyze all of the arguments pro and con advanced on behalf of Sam Maceo, on the one hand, and respondent on the other. We have examined each of them with meticulous care. Most of the arguments presented on petitioner's behalf are either unsound, inconclusive, or based on evidence unworthy of belief. It is impossible on the record presented for us to reach a precise conclusion. On the basis of the circumstantial evidence *437 before us, we have determined the amount of Sam's personal cash reserve on December 31, 1947, to be $95,000, and, in our judgment, there is no credible evidence of an amount in excess of that figure. We do not attribute any additional cash on hand to Edna. While we have reached this conclusion only after a careful analysis of the entire record, the result we have reached is substantially based upon the discussion which follows. Although we do not doubt that Sam Maceo engaged in extensive bootlegging activities during the prohibition era, and gambling enterprises during and after said era, it has not been established to our satisfaction that the alleged net profits were kept in cash and intact during the intervening years before December 31, 1947. No reliable records of his alcohol purchases, sales, and cash retentions over the years prior to the critical dates were introduced into evidence on his behalf. Nor have petitioners presented any affirmative evidence relating to gambling receipts of Sam during the period prior to the taxable years involved herein. Assuming that Sam Maceo may have done well from his illicit operations, the facts of record show that during some of the years *438 prior to the taxable period herein, he was investing substantial amounts in speculative ventures, including oil properties and real estate. There is no evidence of frugality on the part of petitioners prior to or during the taxable years in question. Contrariwise, the record shows that during the years involved herein they maintained a comfortable standard of living and purchased expensive furs, furniture, and jewelry. See Schedule 1, supra. We recognize that the taxpayer in a net worth case, as here, may encounter much difficulty in furnishing corroboration of a cash hoard story since the keeper, for protective reasons, is usually somewhat secretive about his cache of money. On the other hand, however, we are mindful that on occasion, particularly for corroborative purposes, it is advantageous to the taxpayer to make known the existence and amount of his alleged hoard to several witnesses. "This favorite defense asserts that the cache is made up of many years' savings which for various years were hidden and not expended until the prosecution period." Holland v. United States, 348 U.S. 121 (1954). The courts have often rejected a taxpayer's belated assertion of having owned a secret *439 hoard of money. 4Here, in an attempt to establish a plausible basis for A. J. Adams and Sam Serio to have knowledge as to the claimed existence of the alleged hoard of $600,000 (i.e., $300,000 belonging to Sam and $300,000 to Rosario in a fungible cache), petitioners offer a story that is built around Serio's and Rosario's trip to Italy in 1947. Succinctly, Serio testified that around June or July 1947, Rosario brought into the safe office in the Turf Building a small safe which was placed in an enclosure underneath the staircase and that the two large safes that were in the office were rolled in front of the concealed enclosure; that in September 1947, prior to Serio and Rosario's trip to Italy, Rosario gave the combination to the concealed safe to Serio who then opened it for the first time; and that the cash hoard was exposed to the view of Serio, Rosario, Frank, *440 Adams and Sam Maceo. Rosario, on this occasion, purportedly stated to Sam Maceo: "Here's $600,000. Three hundred of that is yours and three hundred is mine. I am going to leave it with you and turn over the combination of the safe to you." Assuming that Serio and Adams were present when the cash hoard was exposed, the narration fails to establish the quantity of the cash actually involved. Admittedly, there is testimony about the existence of 12 bundles of money, that a bundle of money is composed of 10 packages, and that a package of money consists of 50 bills. But the testimony does not establish to our satisfaction that there were actually six thousand $100 bills involved in the alleged hoard. Serio accounted for a total of twenty-four $100 bills; that is, the first and last bill of each bundle, but there is no assurance of the denomination of the intervening bills. Adams stated that on the date in September 1947 when the $600,000 in cash was removed from the concealed safe, Serio "thumbed" the bundles of cash. Manifestly, this testimony does not constitute affirmative proof of the existence of bundles of cash each of which contained $50,000 in $100 bills. Moreover, we think it *441 clear from the record as a whole that there is an inherent improbability in the testimony of Serio, Adams and Joe T. We did not find their corroborative testimony impressive or convincing. We are urged to accept the testimony offered by these witnesses as uncontradicted, but it is clear from the circumstances of the case that we are not bound to do so. Moreover, these witnesses were, in our opinion, unworthy of belief. Obviously, we are not required to accept blindly testimony which patently appears to be "highly improbable and manifestly unreasonable." Quock Ting v. United States, 140 U.S. 417, 420-421 (1891); Archer v. Commissioner, 227 F.2d 270, 273, (C.A. 5, 1955), affirming a Memorandum Opinion of this Court, and Carmack v. Commissioner, 183 F. 2d 1 (C.A. 5, 1950). Each of the witnesses is clearly biased and interested in the outcome of the instant cases. Joe T. Maceo is the son of Frank Maceo, second cousin of Sam and Rosario, brother of Vincent A. Maceo, and nephew of Vic C. Maceo. Concerning Joe T.'s credibility, we note that Joe T. told respondent's agents during their examination that he had nothing to do with the preparation of the partners' returns and did not know where *442 the figures came from which were on the returns. However, at the trial, he testified that he gathered many of the figures which were on the returns. Also, Joe T., who was in charge of the so-called win and loss books and kept them in his desk drawer in the Turf Building, testified that a little child tore up and mutilated the various pages thereof and, therefore, it was necessary to rewrite said books. We do not believe this explanation. Moreover, on the critical question as to the existence of the "concealed safe," which allegedly contained the cash hoard, Joe T. testified that to his knowledge there were only two safes in the safe office. We conclude that the testimony of Joe T. and the others who allegedly saw the $600,000 on January 1, 1948, is unworthy of belief. We are, of course, cognizant of the fact that both owners of the alleged cash hoard of $600,000 were dead at the time of the instant trial. In evaluating the evidence of record, however, we cannot speculate as to what the testimony of the decedents might have been. In support of the cash hoard theory, Serio claimed that from time to time he withdrew from the concealed safe bundles of cash (each contining $50,000) in the *443 aggregate amount of $200,000 which Sam Maceo put in his compartment in the large safe. Serio further claims that from time to time Sam would give him a part of a bundle ($25,000) to pay for furniture, or to make a deposit of cash (i.e., $27,000) for the benefit of Sam's oil operations. In this connection, Serio further testified that sometime prior to August 14, 1948, he went into the concealed safe and took out two bundles of cash, each containing $50,000. Serio stated that he deposited $43,191 to Rosario's account to cover an invoice from Loomis Construction Company in said amount for work performed on the Varnell Liquor Store building in which Sam Maceo and Rosario each had a one-half interest. Sam Serio then wrote a check in the amount of $43,191 on the account of Rosario Maceo, payable to Loomis Construction Company. Serio also testified that after he had made the deposit of $43,191, half of the balance of the $100,000 was placed in Rosario's lock box in the double door safe, and the other half of the balance was given to Sam Maceo. Serio testified further that on August 27, 1948, he again entered the concealed safe, took out one bundle ($50,000 cash) and gave it to Sam Maceo *444 who put it in his compartment; and that said cash was used to purchase a cashier's check on that date payable to Oil Drilling, Inc., in the amount of $36,576. The check register of City National Bank shows that "Turf" (Maceo and Company) was the purchaser of said check. Serio sought to relate this alleged withdrawal of $50,000 cash to an expenditure by Sam which was recorded as a payment on December 11, 1950, to Sam Maceo Oil Operations. Serio stated that he used cash from two bundles which he took out of the concealed safe in 1950 to make a deposit for Sam Maceo of $27,000 cash to the Sam Maceo Oil Operations. Serio pointed out that a daily cash statement for Sam Maceo Oil Operations for December 1, 1950, showed receipt of $27,000 from Sam, such payment then being included in a deposit made by Sam Maceo Oil Operations. There is no indication from the daily cash statement whether the receipt was in the form of cash or cash plus a check. Serio further testified that a deposit slip of Sam Maceo Oil Operations dated December 2, 1950, in the amount of $33,106.29, was the deposit slip covering the payment of $27,000, which was included as part of the receipts of the oil operations on December *445 1, 1950. Said deposit slip shows a deposit of $3,058 in currency and a deposit of 376 checks totaling $30,048.29, such checks being listed on two adding machine tapes which were attached to the deposit slip. Serio admitted that the aforesaid checks had been received by Maceo and Company. He attempted to explain the use of checks received by Maceo and Company in a deposit to the account of Sam Maceo Oil Operations as part of a policy by which Maceo and Company retained currency received by it or related operations and substituted checks received in various operations for currency when making up deposits. The explanation is different from Serio's first statement that Sam Maceo had given him currency which he deposited in the bank account of Sam Maceo Oil Operations, and ignores the fact that Sam Maceo Oil Operations was a separate business operation in which partners and employees of Maceo and Company and third persons not related to Maceo and Company participated. It should be noted that the cashier's check in the amount of $36,576 does not involve the oil records to which Serio referred in his testimony. The records Serio alluded to were the daily cash statements and deposit slips *446 of Sam Maceo Oil Operations and not a cashier's check purchased in the name of the Turf. Moreover, Serio's testimony does not show with any measure of certainty whether he had any personal knowledge that the cashier's check was actually purchased by or for Sam. Under the circumstances, we find Serio's testimony with respect to the withdrawal of cash from the concealed safe in December 1950 to make a deposit for Sam of $27,000 to the Sam Maceo Oil Operations unconvincing. Serio also testified that he entered the so-called "concealed safe" in November or December 1950 on two occasions and removed a bundle ($50,000 per bundle) each time; that he gave the bundles to Sam who then gave Serio $25,000 cash to pay for the furniture which Sam had purchased from Robijohn-Gibbings. Serio stated that the $25,000 cash was for the purpose of covering checks (three checks Nos. 4356, 350 and 3442) which had been written on bank accounts of Gulf Properties, Inc., Maceo and Company, and Murdoch Bath House totaling $25,000. The records show that three checks were issued on December 6, 1950, payable to Robijohn-Gibbings in the respective amounts of $10,000, $10,000 and $5,000 on the checking accounts of *447 Gulf, Maceo and Company and Murdoch Bath House. Serio testified that he took $25,000 in currency from San Maceo and deposited it in bank accounts of Gulf Properties, Inc., Maceo and Company and Murdoch Bath House. However, the deposit slips covering deposits in the bank accounts of said corporations and partnerships on or about December 7, 1950, do not show the deposits of $25,000 in currency, but rather show deposits consisting primarily of numerous checks and some small amounts of currency. Significantly, said checks (Nos. 4356, 350 and 3442) were removed from the cancelled checks by Serio and turned over to Sam Maceo. Although an explanation of the records pertaining to these deposits is complicated by procedures followed by Serio in handling the deposits, we believe the record clearly reveals the inconsistencies and misrepresentations made by Serio when he attempted to relate the $25,000 furniture purchased to Sam's alleged use of portions of his cash hoard. Petitioners urge that Maceo and Company had a "uniform practice to deposit checks and hold cash" and, hence, Serio would use checks received by Maceo and Company (in the course of its operations) in a deposit and retain currency *448 received from Sam for the purpose of discharging his personal obligations. Thus, the $10,000 deposited in the account of Gulf in respect to check No. 4356 was part of a total deposit of $12,088.02 that was made on December 7, 1950. Said deposit included 136 checks totaling $11,421.16, currency in the amount of $666, and silver in the amount of 86 cents. The 136 checks totaling $11,421.26 were received by Maceo and Company in connection with its various operations. No portion of the total deposit of $12,088.02 was recorded in the cash receipts of Gulf. Said deposit of $12,088.02, included $2,088.02 which was deposited in order to reimburse Gulf's account for two checks drawn on it in December 1950 at the request of Sam Maceo. The checks are No. 4357 payable to Alamo Iron Works in the amount of $1,888.02, and No. 4358 payable to K. E. Crampton in the sum of $200. These two checks were not entered in the cash disbursements journal of Gulf in December 1950. Said checks were prepared by Serio, signed by Sam Maceo and issued in discharge of the latter's personal liabilities. When checks Nos. 4357 and 4358 were returned to Gulf they were withdrawn from the cancelled checks. It is noteworthy *449 that the cash receipts and disbursements journal of Murdoch Bath House Co., Inc., contains no entry, reference or explanation as to the manner in which check No. 3442 in the amount of $5,000 (used as part of the $25,000 payment to Robijohn-Gibbings) was handled on the books of that company. The deposit consisted of currency in the amount of $500 and a check in the amount of $4,500. The entry originally made on the deposit slip was one showing a deposit of $5,000 in currency. Serio changed the deposit slip to show the deposit of currency in the amount of $500 and a check in the amount of $4,500. The check deposited in the account of Murdoch Bath House Co., Inc., was check No. 3483 in the sum of $4,500 which had been issued to Sam by the Equipment Department of Maceo and Company and charged to his drawing account. Said $4,500 check issued to Sam Maceo was part of a partnership distribution of profits. The check contained the endorsements of Sam and Murdoch Bath House Co., Inc. Serio testified that $10,000 of the $25,000 in currency allegedly given him by Sam was deposited in the bank account of Maceo and Company on December 7, 1950, to cover Maceo and Company check No. 350 issued on *450 December 7, 1950, to Robijohn-Gibbings. Admittedly, a $15,061.85 deposit was made to the account of Maceo and Company on December 7, 1950. However, the general ledger, cash receipts journal and daily cash statements of Maceo and Company only show the receipt and the source of $5,061.85 of the $15,061.85 deposited in the bank; that is, a net deposit on December 6, 1950, of $1,892.15 ($1,902.15 minus $10) by the Chili Bowl, and a net deposit on December 6, 1950, of $3,169.70 ($3,205.55 deposit on December 5, 1950, minus $35.85 charge on December 5, 1950) by the Streamline Dinner Club. The deposit slip shows currency in the sum of $5,085, silver in the amount of 88 cents and a list of checks in the aggregate amount of $9,973.97 which totals $15,061.85. Of the $15,061.85 deposit, the amount of $10,000 was not deposited in any of the departmental operations of Maceo and Company. With respect to the aforesaid checks issued on December 6, 1950, payable to Robijohn-Gibbings in the aggregate amount of $25,000 on the checking accounts of Gulf, Maceo and Company and Murdoch Bath House, we find there is no contemporaneous record showing Sam to have given Serio $25,000 in cash as a substitute for *451 the three checks involved. The entire transaction relating to the $25,000 payment to Robijohn-Giddings depends on the testimony of Serio, in whom we have no faith. In view of Serio's lack of credibility, the inconsistencies in his testimony and the inconclusiveness of the documentary evidence relied upon by him, we do not believe that the claimed withdrawals and use of about $100,000 cash on behalf of Sam Maceo from the so-called concealed safe have been established. It is to be noted that the cash hoard story's lack of genuineness is accentuated even more by the fact that the double-door safe in the safe office had ADT protection, but the alleged concealed safe containing the supposed $600,000 lacked this protection. Also, Maceo and Company only carried $10,000 robbery insurance on the entire contents of their safes. We find no merit in petitioners' argument, in this connection, that they did not carry more insurance because the partners did not wish to divulge the total amount of cash they had in their office as an additional security precaution. Of course, we are mindful that the amount of protective insurance carried is not determinative of the full amount kept in the safes. We *452 believe, however, that the minimal amount of robbery insurance carried by Maceo and Company is a material factor to be considered. Examination of several significant events which occurred before and during the taxable years involved support the inference that petitioners did not have the amount of undeposited cash which they claim they had as of December 31, 1947, 1948 and 1950. With respect to the earliest event on November 8, 1941, Jessica Maceo obtained a divorce from Sam and upon the granting of the divorce Sam agreed to pay her $20,000 in consideration of Jessica releasing him of all claims that she may or might assert against him and further agreed that all property vested in his name and belonging either to his separate estate or to the community estate would be and remain his property. Since Texas was a community property state, Jessica was entitled to one-half of the assets of the community property at the time the community was terminated by divorce. In arranging for the property settlement, Sam sold his interest in Gulf and in the Turf for $40,000 and paid Jessica $20,000 in full and final settlement of all of her community rights. We think this property settlement in 1941, *453 which apparently necessitated the sale of Sam's interest in Gulf and in the Turf at a substantial loss, is an indication that Sam had no large hoard of cash at least until after the settlement. We believe that Sam's borrowing of $60,000 in August 1947, at 5 percent interest payable in 36 monthly installments, in order to purchase oil properties so that trusts for the benefit of his three children could be established is inconsistent with the conduct one would reasonably expect from an individual having $300,000 cash on hand. Serio testified that Sam in September 1947 owned $300,000 in cash that was stored in a concealed safe. Serio first learned of the existence of both the safe and its contents in the latter part of the summer of 1947. In our opinion it does not seem reasonable that an individual with $300,000 cash who is seeking to provide for the long-term welfare of his children would borrow $60,000 in cash to finance the trusts he was creating for them. In view of the other facts of record, we believe that Sam used the cash that he had ($16,585) and then borrowed the $60,000 because he did not have sufficient cash himself to complete the establishment of the trusts. It is our *454 opinion that Sam's recurring need to borrow money is inconsistent with the claim to a secret hoard of $300,000. Cefalu v. Commissioner, 276 F. 2d 122 (C.A. 5, 1960); Boyett v. Commissioner, 204 F. 2d 205 (C.A. 5, 1953). Likewise, we believe that the financial statements submitted by Sam to the United States National Bank of Galveston setting forth his cash (on hand and in bank) as well as his net worth as of April 1957, April 1948, January 1, 1949, and December 31, 1949, while not conclusive, constitute significant evidence in support of respondent's position. These statements were made at a time when there was no pending tax liability in mind. Epstein v. United States, 246 F. 2d 563 (C.A. 6, 1957), certiorari denied 355 U.S. 868 (1957). We reject petitioners' argument that Sam's net worth did not increase during the taxable years involved, but that he was merely converting prior accumulated cash into other assets or applying it toward the reduction of his liabilities. The record shows, as reflected by his financial statements, that Sam's net worth was continually increasing during the taxable period. Sam's financial statements show that his net worth increased $103,380.36 between *455 April 9, 1947, and April 7, 1948; $47,823.87 between April 7, 1948, and January 1, 1949; and $73,370.53 between January 1, 1949, and December 31, 1949. Another material factor in support of respondent's determination as to opening cash on hand is the distribution by Maceo and Company of $100,000 in cash on January 14, 1948, to its partners. Significantly, on the same date all the partners purchased cashier's checks to cover the tax payments that they thought would be due from them and their wives in January 1948. Two cashier's checks were purchased on behalf of Sam Maceo on January 14, 1948, totaling $27,000, payable to the collector of internal revenue. On the same date said checks were purchased, Sam had received a $20,000 cash dividend from Maceo and Company which represented his 20 percent share of the $100,000 cash distribution. In the circumstances of the instant case, this cash distribution (a "dividend payment" as it was called by the partners) is evidence that Sam and the other partners all used cash made available by their business interests to pay their income taxes. Further evidence which negates petitioner's contention that Sam had a $300,000 cash hoard is found in the *456 fact that Gulf and related companies borrowed a net amount of $320,000 ($425,000 minus $105,000 indebtedness refinanced) on October 1, 1948. In our view, said loan showed a need for cash by Sam and the other seven partners of Maceo and Company. Gulf disbursed $250,000 directly to the eight partners of Maceo and Company by issuing its checks to the partners of Maceo and Company and debiting Gulf's accounts payable to Maceo and Company. Maceo and Company, by a reciprocal entry on its books, charged the partners' drawing accounts and reduced the amount owed it by Gulf. Sam received $30,000 as his share of the $250,000 disbursement. Apparently the reason Gulf borrowed the money was because the partners of Maceo and Company, and in particular Sam, needed cash. Serio testified that the money was borrowed by Gulf in anticipation of junior partners coming into Maceo and Company. Assuming that there could be a relationship between a distribution of cash to existing partners and the addition of new partners, the lack of substance to the explanation becomes apparent when it is noted that the new (junior) partners came into Maceo and Company two years later. Another factor which militates against *457 petitioners' argument as to cash on hand is the inability of Sam in May 1936 to pay his tax liabilities for 1933 and 1934 in the amount of $4,246.44 because of a shortage of cash. On May 29, 1936, Sam's attorney wrote to the collector of internal revenue, Austin, Texas, requesting that Sam be given additional time to pay the tax and such additional time was needed because Sam and others in the Turf had recently been forced to mortgage practically all of their real estate holdings in order to purchase the Murdoch Bath House of Galveston. Sam's attorney, at that time, enclosed with the letter a cashier's check in the amount of $1,061.61, which was in payment of a quarter of the tax due. On June 23, 1936, Sam's attorney again wrote the collector renewing his request that Sam be given additional time in which to pay the 1933 and 1934 additional taxes. The $3,242.70 balance due on Sam's additional tax for 1933 and 1934 was paid in four installments during 1936. We recognize that none of these facts, standing alone, are determinative of petitioners' financial position as of December 31, 1947. However, absent convincing evidence to the contrary, these indicia represent significant reference *458 points in evaluating subsequent representations or explanations made by the petitioner or his representatives either as to the acquisition of or previous ownership of certain assets. Without further elaboration, we find the foregoing transactions inconsistent with the possession of sizable amounts of cash. See Blackwell v. United States, 244 F. 2d 423, 428 (C.A. 8, 1957) and Bryan v. Commissioner, 209 F. 2d 822, 827 (C.A. 5, 1954) affirming a Memorandum Opinion of this Court. In a further attempt to corroborate their contention that Sam Maceo had a substantial amount of cash on hand as of January 1, 1948, petitioners contend that Sam engaged in joint venture gambling activities which purportedly realized total winnings of $669,920 during the taxable years 1948 through 1950, inclusive. Petitioners argue that Sam engaged in gambling during the taxable period in several different capacities, that is, as a bettor against Maceo and Company, as an independent gambler against other individuals, and as manager of a joint venture syndicate. Petitioner's argument appears to be supported by the facts of record. The evidence shows that Sam Maceo engaged in independent gambling activities during *459 the taxable years in which he had no associates nor joint ventures. This personal gambling was conducted in Galveston and required a substantial bankroll. For a number of years, including the taxable period involved herein, Sam Maceo reported income from bets and wagers on his income tax returns in amounts set forth in our Findings. On his work papers used in the preparation of his income tax returns and on his original returns for 1948, 1949 and 1950, income from bets and wagers is shown in the respective amounts of $11,350, $13,700 and $38,500. A transcript of Sam's account receivable ledger sheet (horse account) indicates that he won a substantial amount of the aforesaid sums from his gambling activities against Maceo and Company in his individual capacity. Also, the record shows that Sam sustained losses from his independent gambling. Thus in December 1949, when Agent Whitaker asked Sam Maceo why he had not reported any income from bets and wagers in 1947, Sam told him that he only had losses in 1947. In addition to his independent betting activities, Sam Maceo also engaged in gambling activities throughout the United States during the taxable years on a joint venture basis with *460 his partners (except Vincent). Manifestly, one of the most critical aspects of the instant proceedings involves Sam Maceo's alleged joint venture gambling activities which purportedly realized winning of $669,920 for the participating partners during the taxable years 1948 through 1950, inclusive. In July 1951, Sam and Edna filed amended returns for 1948, 1949 and 1950, reporting their share of the $669,920, which Sam allegedly won during the taxable period in his joint venture gambling. On Sam and Edna's amended returns, income from bets and wagers for the taxable years, in excess of the amounts reported on their original returns, is shown in the amounts of $100,947, $74,263 and $59,262, respectively. Essentially, petitioners aver that the partners, other than Sam Maceo, did not put up any bankroll with respect to this joint venture; that each of the partners (except Vincent Maceo) took a constant percentage of all bets and the only time they heard from Sam Maceo about this venture was when he decided to distribute some cash to them, which was two or three times a year; that Sam Maceo did not always personally give the winnings to each partner but sometimes left it with Serio and *461 at other times gave it to Rosario for distribution; that no report was made to Serio or to the other partners with respect to said bets and that Serio did not make any notations or any permanent record as to the monies derived from said venture. Petitioners argue further that all of the partners, who are petitioners in the instant case (except Vincent, who did not share in the joint venture), assumed that Serio had included in their respective tax returns their portions of Sam's outside joint venture winnings. Serio testified that all of the partners (except Vincent) relied upon him in that regard, and he accepted responsibility for failing to record the joint venture winnings on behalf of the partners. Petitioners urge that Serio's mistake is excusable because he was responsible for all of the financial activities of Maceo and Company which involved a flow of cash through the company at the annual rate of $15 million dollars, and in the "welter of millions flowing across his desk and in and out of the safes, he neglected to make a note of the winnings ($669,920) received by him and the other partners from the joint venture winnings." Sam Serio testified that he thought Sam Maceo kept *462 a record of the winnings and, therefore, he (Sam Serio) overlooked including these amounts ($669,920) in the returns. Significantly, Serio, who allegedly was charged with full responsibility for the financial activities of Maceo and Company, knew virtually nothing about Sam's outside betting activities. 5 Serio's contention that he knew nothing as to the details of the sundry transactions that produced $669,920 in income from outside betting operations of Sam, except that he shared in the $669,920, is difficult to believe. Its lack of credibility is made more evident by the nebulous and insubstantial testimony of other partners of Maceo and Company. Five of the partners who claimed to have participated in Sam's alleged outside betting operations were alive at the time of the instant trial. *463 Three of the five partners (Adams, Voigt and Vic C.) testified but could say nothing about any of the details of the alleged outside betting of Sam other than to make vague statements acknowledging its existence and admitting that $669,920 had been received from such betting in 1948, 1949 and 1950. We are satisfied by the record that there was a joint venture shared in by Sam, Rosario and Voigt (but not by Vincent) whose cases are before us, and four other partners of Maceo and Company who are not parties to the instant proceeding. We are also satisfied that Sam was the keyman in control of the operation of the joint venture; that there were substantial winnings (not less than the total of $669,920 reported in the amended returns) and that Sam distributed or caused to be distributed by Rosario or Serio to each joint venturer his share of the net winnings in each of the years before us. Notwithstanding the fact that Sam Maceo on several occasions conducted his financial affairs unlike an individual claiming a sizable cash reserve, which is some justification for respondent's position as to opening cash on hand on December 31, 1947, in view of other significant evidence, particularly *464 the joint venture activities, we are satisfied that Sam Maceo did have a substantial amount of cash on hand as of that date. As indicated above, the crucial question is how much. Viewing the record as a whole we believe that the amount of cash on hand claimed on behalf of petitioners is considerably inflated. Manifestly, petitioners' claim of an opening cash on hand in the amount of about $350,000 would dovetail very effectively with theeir effort to demonstrate complete error in respondent's determination. Despite the foregoing, we conclude, in the light of the needs of the types of business in which Sam engaged, that he did have substantial cash on hand prior to and during the taxable years involved and that it is reasonable to infer from all of the circumstances that the amount was $95,000. We are satisfied that it was not in excess of that amount, and, accordingly, find opening cash in that amount as of December 31, 1947. Some of the pertinent evidence considered by us in reaching our conclusion is found in the fact that Sam claimed cash on hand and in banks as of April 9, 1947, on his financial statement submitted to the United States National Bank of Galveston in the amount of *465 $45,000. Respondent, in his net worth reconstruction, gave petitioners credit for $20,153.30 as cash in banks which leaves about $25,000 of undeposited cash. We have also given Sam credit for his 20 percent interest ($20,000) in a $100,000 bankroll in the possession of Maceo and Company. In this connection, respondent now concedes that Sam had a 20 percent interest in the $100,000 bankroll on January 1, 1948. We have concluded that, in addition to said bankroll of $20,000, Sam must have had a substantial bankroll of his own which he used in carrying on the extensive joint venture gambling of which he was the leader. Sam's counsel "guessed" that this bankroll was in the amount of from $50,000 to $100,000. The evidence would indicate that none of the other participants were required to contribute any part of such bankroll. Using our best judgment, based on a study of all the evidence, we have determined that Sam had in his possession a bankroll commensurate with his gambling commitments in the amount of $35,000. Cf. Cohan v. Commissioner, 39 F. 2d 540, 544 (C.A. 2, 1930); Archer v. Commissioner, 227 F. 2d 270, 273-274 (C.A. 5, 1955), affirming a Memorandum Opinion of this Court. Petitioners *466 have not adduced any evidence, however, to show whether said bankroll fluctuated during the taxable period and to what extent, if any. Hence, we conclude that Sam Maceo had a cash bankroll on hand in the amount of $35,000 for joint venture wagers at January 1, 1948, and that said amount remained constant during the taxable years in question. In addition to the alleged cash hoard of $300,000, petitioners contend that Sam had between $50,000 and $100,000 cash on hand on his person at January 1, 1948, which he needed in order to carry on his individual gambling activities (apart from joint venture gambling). Petitioners direct our attention to the fact that Sam's income tax returns for 1948-1950 show bets and wagers totaling $63,550. Respondent, in opposition, notes that out of this $63,550, the sum of $39,050 represents bets and wagers which Sam won from Maceo and Company. Under the circumstances, and particularly since Sam admittedly also sustained wagering losses, we believe that he must have had a substantial amount of cash on his person during the years involved in order to carry on such gambling activities with persons in Galveston in his individual capacity (other than against *467 Maceo and Company) which netted him about $63,550 over a three-year period. Petitioners have not presented any evidence, however, to show whether the bankroll which Sam kept on his person fluctuated during the taxable years and to what extent, if any. Under all of the circumstances, we hold that Sam Maceo had $15,000 cash on his person at January 1, 1948, and that said amount remained constant during the years involved herein. In view of the foregoing, we find opening cash on hand for Sam and Edna in the aggregate amount of $95,000, as of December 31, 1947. See Schedule I, supra. Having determined said amount of cash, it is essential at this point to ascertain the disposition, if any, of said cash which Sam had on hand as of the start of the net worth period, and the particular year in which such disbursements occurred. As stated hereinabove, in addition to two bankrolls in Sam's possession and one kept by Maceo and Company in which Sam had a 20 percent interest, we found that Sam had $25,000 in his personal cash reserve, which is part of the $45,000 cash on hand and in banks set forth on his financial statement submitted to the United States National Bank at Galveston in April 1947. *468 During the taxable year Sam allegedly obtained from his hoard in the so-called "concealed safe" cash in the total amount of $58,171 to pay for his one-half cost of building the Varnell Liquor store in the amount of $21,595.50, and $36,576 for a cashier's check payable to Oil Drilling, Inc. Also, on January 14, 1948, two cashier's checks totaling $27,000 were purchased on behalf of Sam payable to the collector of internal revenue. Assuming that Sam Maceo gave the $58,171 in cash to Serio, who then issued checks drawn on Maceo and Company or obtained cashier's checks to defray the aforesaid obligations, petitioners would have exhausted their cash hoard (i.e., $25,000) kept in the concealed safe during 1948. Although Sam's financial statements filed with his banks show undeposited cash as of December 31, 1949, in the amount of $11,221.08, we do not believe this fact is inconsistent with our conclusion that all of his cash on hand in the concealed safe was exhausted as of December 31, 1948. In the absence of any affirmative evidence presented by petitioners, we may infer that the $11,221.08 represented other forms of currency (i.e., dividends and independent gambling winnings) than the *469 cash hoard ($25,000) which Sam had in his possession during said period. At the same time it is reasonable to infer, in view of Sam's extensive gambling activities during the period in question, that $70,000 of the total cash on hand was in the nature of a revolving "bankroll" which varied little during the taxable period, and we, therefore, attribute the same amount as of December 31st of each of the years 1947 to 1950, inclusive. Respondent, in his net worth statement, gave petitioners credit for "cash advanced to Maceo and Company for bankrolls" in the amount of $20,000 as of December 31st of each of the taxable years involved. In any event, petitioners have offered no acceptable evidence that they had less cash in the bankrolls at the end of each year as the period progressed. We are satisfied that any variation would be reflected in an increase rather than a decrease in each of the years following 1947. Respondent determined Sam and Edna had acquired jewelry in 1949 and 1950 costing $106,469.80 and $558, respectively. Edna testified that $105,970 of the jewelry that the respondent determined to have been acquired in 1949 had been acquired by Sam or Edna in the years prior to 1948. *470 The record shows that Maceo and Company owned an unidentified amount of jewelry, but such evidence has not been related to the $105,970 which was the subject of Edna's testimony. Respondent has now conceded petitioners' contention that $105,970 of the jewelry involved herein was on hand at December 31, 1947, and constitutes an asset at December 31, 1947, through 1950, inclusive. See Schedule I, supra. Respondent contends, however, that in 1949 and 1950 petitioners bought jewelry costing $499.80 and $558 which they continued to own through the year ended December 31, 1950. Petitioners do not contest respondent's contention on this point. Respondent contends further that when petitioners' net worth schedule for 1949 and 1950 is adjusted to reflect their ownership of $105,970 in jewelry at December 31, 1947, their unreported income for 1949 computed on the net worth basis appears to be $34,139.50, which, subject to adjustments not here in issue, is $45,358.33 less than the total amount of additional income from bets and wagers ($79,497.83) reported on their amended 1949 return. While petitioners contest respondent's adjustment to reconcile the unreported income of $34,139.50 with the *471 amount reported in their amended return, petitioners have not explained away the admission that they failed to report additional income of $79,497.83 for 1949. In the absence of some acceptable explanation in the record, we think that petitioners' admission is properly given effect in respondent's computation of net income omitted from the original return. The ultimate treatment of the adjustment on Schedule I, supra, as additional unidentified expenditures merely visualizes a calculation which is necessary in order to implement the admissions in petitioners' amended 1949 return. Cf. Polizzi v. Commissioner, 265 F. 2d 498 (C.A. 6, 1959), reversing a Memorandum Opinion of this Court in which it is to be noted that there was no admitted unreported income in issue as in the instant case. At this point it should be noted that the controversy with respect to the aforesaid adjustment of $45,358.33 arose in connection with respondent's determination that petitioners had acquired jewelry in 1949 and 1950 costing $106,469.80 and $558, respectively. As already stated, respondent has conceded that $105,970 of said jewelry was on hand at the start of the net worth period, and constitutes an asset *472 at December 31, 1947, through 1950, inclusive. Since petitioners, on reply brief, agree that they purchased jewelry costing $499.80 and $558 in 1949 and 1950, respectively, which they continued to own through the year ending December 31, 1950, we sustain respondent as to the latter two jewelry items. For convenience of discussion, we will consider, infra, the capital investment of Sam Maceo in Maceo and Company as of December 31, 1950, to the extent the item appears to be in dispute. We have found, infra, that petitioners' income tax returns filed for the taxable years 1948, 1949 and 1950 were false and fraudulent with intent to evade tax within the meaning of section 276(a) and that a part of the deficiency determined for each of said years was due to fraud with intent to evade tax within the meaning of section 293(b), supra. Computation of Corrected Net Income of Rosario Maceo and Frances Maceo for 1948, 1949 and 1950 (Docket No. 55709) Findings of Fact Rosario Maceo was born in Palermo, Italy, on September 8, 1887. He came to the United States in 1901 and became a naturalized citizen of the United States about 1916. He established his residence in Galveston in 1913, and continued *473 to reside there until the time of his death on March 15, 1954. Rosario married Fances Dispensa in September 1922. Rosario and Frances Maceo (hereinafter sometimes called petitioners) adopted Rose Maceo, Jr., in 1951. Frank Maceo and Vic C. Maceo are brothers and were first cousins of Sam Maceo and Rosario. Sam Serio prepared Rosario's financial statements showing his financial position at December 31, 1947, through 1950, inclusive, for the purpose of securing loans on behalf of Rosario. Serio, in preparing the "cash on hand and in banks" section of the financial statements for Rosario, did not take into account the balances in the bank accounts in the name of Frances. Respondent, in his net worth statement, determined that petitioners owned undeposited cash on December 31, 1947, 1948, 1949 and 1950 in the amounts of $17,395.61, $18,748.77, $32,245.65 and $22,082.95, respectively. Said amounts of cash on hand were determined by subtracting stipulated bank balances of accounts maintained by Rosario from the amount of cash shown in his financial statements submitted to various banks for the same taxable period. The following schedule shows the manner in which respondent computed petitioners' *474 cash on hand for the taxable years involved herein. Financial Statement as of December 311947194819491950Cash (on hand and in banks)per financialstatements$25,000.00$44,382.00$38,476.00$62,007.00Stipulated bank balances7,604.3925,633.236,230.3539,924.05Cash on hand determined by17,395.6118,748.7732,245.6522,082.95respondentDuring the income tax examination of petitioners' 1948, 1949 and 1950 returns, Serio and Garrett had from time to time told respondent's agents that net worth statements could not be prepared and submitted to them because petitioners could not arrive at a cash on hand figure. Rosario and Frances reported total income on their original joint income tax returns for the taxable years 1948, 1949 and 1950 in the respective amounts of $121,065.60, $85,077.90, and $104,602.86. During the taxable years 1948, 1949 and 1950 Rosario engaged in independent gambling activities (apart from his interest in Maceo and Company). On his original income tax return for 1948, he reported income from bets and wagers in the amount of $3,000. His original income tax returns for 1949 and 1950 do not show any income from such gambling activities. During 1951, Garrett, a certified public accountant, *475 was retained by the partners of Maceo and Company to audit the individual partners' returns for the years 1948, 1949 and 1950. On September 12, 1951, Garrett completed his examination of said returns and submitted a written statement to respondent's agents in which he stated that during the course of his audit of partnership records and tax returns of the partners, he discovered that total income of $669,920 inadvertently had been omitted from the individual returns of the partners for 1948 through 1950, inclusive. Garrett stated further that Rosario, who had a 25 percent interest in the $669,920, failed to report $72,105, $53,045 and $42,330 for the taxable years 1948, 1949 and 1950, respectively. On July 19, 1951, amended joint income tax returns for said years were filed by Garrett on behalf of the partners, including Rosario and Frances, with the collector of internal revenue, first district, Austin, Texas. It is stipulated that as of December 31, 1947, Rosario owned an interest in Varnell Liquor Co., a partnership, which cost him $29,107.57. Rosario and Frances purchased cashier's checks payable to the collector of internal revenue during the taxable years 1948, 1949 and 1950 *476 in the total amounts of $63,796.90, $47,894.40 and $17,670.59, respectively. On January 14, 1948, Rosario received a so-called cash dividend of $20,000 from Maceo and Company. On the same day, two cashier checks were purchased for him, each in the amount of $17,445 and payable to the collector of internal revenue. On June 9, 1955, the executors of the Estate of Rosario Maceo filed an "application for determination of tax and discharge from personal liability." In Schedule C (Mortgages, Notes, and Cash), the executors listed "cash on hand" in the amount of $48,375. In the General Information Schedule, the executors stated that decedent owned a safedeposit box and that it was "empty." On May 22, 1947, Rosario loaned W. L. Moody, III, $150,000. On the same day W. L. Moody, III, executed a promissory note to Rosario in which Moody promised to pay Rosario $150,000, together with interest, at the rate of 4 percent per annum on or before one year from May 22, 1947. The $150,000 loaned by Rosario to Moody was delivered by Dibrell, attorney for Rosario, to W. L. Thornton, attorney for Moody. The funds ($150,000) used by Rosario in connection with said loan were obtained from Gulf and San Luis. *477 Rosario obtained $50,000 from Gulf and $100,000 from San Luis on May 22, 1947. Gulf and San Luis obtained $49,926.67 and $100,000, respectively, from American National Insurance Co., hereinafter referred to as ANICO, in connection with loans which they negotiated with said company on May 22, 1947, when ANICO's checks were delivered to Gulf and San Luis. ANICO's check No. 401627 in the amount of $49,926.67 ($50,000 minus interest of $73.33) was endorsed on behalf of Gulf by Rosario. ANICO's check No. 401628 in the amount of $100,000 was endorsed on behalf of San Luis by Rosario. Rosario delivered said checks to Dibrell. Dibrell and Thornton visited the Second National Bank in Houston on May 23, 1947, at which time a cashier's check No. 81515 payable to Rosario in the amount of $150,000 was purchased from such bank. ANICO's checks Nos. 401627 and 401628 were delivered to the Second National Bank of Houston in payment for cashier's check No. 81515 which was obtained from the Second National Bank. On May 22, 1947, the board of directors of Gulf adopted a resolution authorizing the president of Gulf to negotiate a loan from ANICO for the total sum of $80,000, $30,000 of said sum being in *478 renewal and extension of the balance due on a presently existing indebtedness to ANICO and the remainning $50,000 being a new loan. On May 24, 1947, the board of directors of Gulf adopted the following resolution: Mr. Rose Maceo, President of this corporation, is hereby authorized, empowered and directed to endorse, as President, and cash that certain check issued by the American National Insurance Company of Galveston, Texas, payable to the order of this company, drawn on the City National Bank or W. L. Moody and Company, Bankers, both of Galveston, Texas, dated May 22, 1947, for the sum of $49,926.67, and to use the proceeds of such check toward the purchase of Second National Bank of Houston Cashier's Check dated May 23, 1947, No. B81515, for the sum of $150,000, payable to the order of himself, Rose Maceo, and to endorse said Cashier's check "pay to the order of W. L. Moody, III" for the purpose of furnishing, in part, funds to cover a loan from the said Rose Maceo to the said W. L. Moody, III in the amount of $150,000, the terms and conditions of which are known and satisfactory to this Board of directors; and * * * Gulf's loan to Rosario on May 22, 1947, mentioned hereinabove *479 was recorded in its general ledger as an account receivable due from Rosario. Gulf made the monthly payments to ANICO that were required by the loan agreement. On March 6, 1948, a $25,000 payment was made on Rosario's debt to Gulf and a $13,000 payment was also recorded on Sam's account with Gulf. These two payments were recorded in Gulf's cash receipts book and a compensating entry was made in Gulf's cash disbursement journal showing the payment of $38,000 to apply on Gulf's account with Maceo and Company. The $38,000 payment that was received by Maceo and Company from Gulf was recorded in the equipment account cash receipts journal and included in a total receipt of $46,549.92. When said $46,549.92 was deposited in Maceo and Company's bank account, $20,164.87 of the deposit consisted of about 203 checks that had been received by Maceo and Company in the course of its operations. Rosario paid Gulf the $25,000 balance on his account on April 13, 1948. Rosario paid Gulf the interest attributable to his $50,000 loan on April 17, 1948. On April 19, 1948, Gulf deposited $11,838.95 in its bank account. The deposit consisted of a portion ($10,000) of the $25,000 payment received from Rosario *480 plus the $1,777.78 interest received from Rosario and a $61.17 oil royalty. On April 22, 1948, Gulf deposited $15,000 in its account which was the remainder of Rosario's $25,000 payment of April 13, 1948. 373 checks totaling $25,012.21 received by Maceo and Company in the course of its business operations were deposited in Gulf's account in order to provide a part of the $26,838.95 ($15,000 and $11,838.95) involved in Gulf's deposits of April 19, and April 22, 1948. As stated hereinabove, in order to lend Moody $150,000 on May 22, 1947, Rosario borrowed $50,000 from Gulf and $100,000 from San Luis, two subsidiary business operations of Maceo and Company. As in the case of the Gulf loan, the San Luis loan to Rosario was recorded on its books as an account receivable due from Rosario; and San Luis made the monthly payments to ANICO that were required by the loan agreement. San Luis' books record a $100,000 payment from Rosario on April 13, 1948. San Luis' books record a $3,555.55 interest payment from Rosario on April 15, 1948, and/or April 17, 1948. Said $3,555.55 was deposited in San Luis' account on April 19, 1948. The deposit included 63 checks totaling $3,554.35. The $100,000 *481 recorded as being received from Rosario was turned over to Maceo and Company on April 30, 1948, and deposited by Maceo and Company in its account at the Hutchings-Sealy National Bank on May 1, 1948. W. L. Moody, III, delivered cashier's check No. 786043 dated April 8, 1948, in the amount of $150,000 on Mercantile National Bank in Dallas to his attorney, Thornton, in order that he might obtain another cashier's check to repay the loan from Rosario. Thornton obtained a cashier's check No. 122643 from United States National Bank on April 10, 1948, payable to himself. Thornton endorsed this check and cashed it at the Second National Bank, Houston, on April 13, 1948. The $150,000 received by Thornton was delivered to Dibrell on April 13, 1948, at which time Dibrell endorsed on W. L. Moody's original promissory note the following statement: "April 13, 1948, paid in full as to principal. R. Maceo by Louis J. Dibrell." On October 1, 1948, a loan of $425,000 was closed by ANICO with Gulf, San Luis, Murdoch and Trustee, which was secured by eight pieces of property. The loan was designated as Loan No. 8091 and was payable in monthly installments of $5,000 principal, plus interest. Loan No. 8091 *482 refinanced the balance still due on Loan No. 7707 of Gulf Properties, Inc., and Loan No. 7708 of San Luis Corporation which had been made on May 22, 1947. ANICO issued check No. 628272 dated October 4, 1948, to Gulf Properties, Inc., San Luis, Murdoch, and Trustee in the amount of $320,000. The check was paid on October 6, 1948. The cash disbursements journal of Gulf shows the issuance of the following checks on October 5, 1948: CheckPayeeAmountAccount ChargedNo.3845R. Maceo$ 5,000.00Accounts Payable - Maceo & Co.3846R. Maceo20,000.00Accounts Payable - Maceo & Co.3847R. Maceo25,000.00Accounts Payable - Maceo & Co.3848Sam Maceo25,000.00Accounts Payable - Maceo & Co.3849Sam Maceo25,000.00Accounts Payable - Maceo & Co.3850A. J. Adams37,500.00Accounts Payable - Maceo & Co.3851Frank Maceo37,500.00Accounts Payable - Maceo & Co.3852Vic C. Maceo25,000.00Accounts Payable - Maceo & Co.3853O. E. Voigt25,000.00Accounts Payable - Maceo & Co.3854Sam Serio12,500.00Accounts Payable - Maceo & Co.3855Vincent A. Maceo12,500.00Accounts Payable - Maceo & Co.3856W. L. Moody & Co.25,563.89Accounts Payable - Maceo & Co.3857U.S. National Bank50,461.11Accounts Payable - Maceo & Co.$326,025.00 The remaining *483 two recorded disbursements of Gulf for October 5, 1948, showed a charge of $50,000 to notes payable, ANICO, and $55,000 to accounts payable, Maceo and Company, and a credit to Moody Bank $105,000. Gulf's general ledger records a debit on October 31, 1948, to accounts payable, Maceo and Company, of $381,025 which is the total of the charges to accounts payable and Maceo and Company set forth in Gulf's cash disbursements journal as disbursements on October 5, 1948. The cash receipts journal of Maceo and Company reflects receipts recorded in the horse account for October 5, 1948, as follows: DebitCreditGulf Properties, Inc. Accounts Receivable$250,000Gulf Properties, Inc. Accounts Receivable55,000Gulf Properties, Inc. Accounts Receivable76,025Moody Bank$250,000Moody Bank131,025The cash disbursements journal of Maceo and Company records noncheck disbursements from the horse account on October 5, 1948, as follows: AccountDebitCreditR. MaceoDrawing$50,000.00Sam MaceoDrawing50,000.00Frank MaceoDrawing37,500.00A. J. AdamsDrawing37,500.00Vic C. MaceoDrawing25,000.00O. E. VoigtDrawing25,000.00Sam SerioDrawing12,500.00Vincent A. MaceoDrawing12,500.00San Luis CorporationAccts. Rec.55,000.00W. L. Moody & Co.Notes Payable25,000.00W. L. Moody & Co.Interest563.89U.S. National BankNotes Payable50,000.00U.S. National BankInterest461.11Moody Bank$381,025.00*484 San Luis' liability to ANICO on Loan No. 7708 (which had been made on May 22, 1947, supra) was discharged on October 5, 1948. The discharge of San Luis' debt to ANICO was recorded on the same date on Gulf's books as part of the $425,000 loan transaction and upon the books of Maceo and Company and San Luis. Gulf debited its accounts payable to Maceo and Company by the amount of $55,000 and Maceo and Company in turn debited its accounts receivable from San Luis $55,000. San Luis records a receipt from Maceo and Company on October 5, 1948, of $55,000 charging accounts payable, Maceo and Company. (The posting, however, was to the account receivable from R. Maceo.) The foregoing transactions involving the $55,000 payament were recorded in the respective general ledgers of Gulf and Maceo and Company as part of the intercompany transfer of funds derived from the $425,000 ANICO loan. The transaction was also recorded on the books of San Luis. On May 20, 1936, a notice of tax due and demand therefor was issued to Rosario and Frances in respect to their income tax liability for the years 1933 and 1934. On May 29, 1936, Dibrell, acting on behalf of Rosario and Frances wrote the collector of internal *485 revenue, Austin, Texas, that petitioners found it impossible at that time to pay in full the additional income tax due from them for 1933 and 1934 in the amount of $4,684.12. Dibrell requested that petitioners be given additional time in order to pay the balance of the tax due from them. Dibrell informed the collector of internal revenue that such additional time was needed because Rosario and others in the Turf had recently been forced to mortgage practically all of their real estate holdings in order to purchase the Murdoch Bath House of Galveston. Dibrell at that time enclosed with the letter a cashier's check in the amount of $1,171.03, which was in payment of a quarter of the tax due from petitioners. On June 23, 1936, Dibrell again wrote the collector, Austin, Texas, and renewed his request that petitioners be given additional time in which to pay the additional tax they owed for 1933 and 1934. On July 24, 1936, Dibrell was notified by the collector, Austin, Texas, that a warrant for distraint had been issued against petitioners for $921.90, which was the balance of additional tax for 1933 and 1934 which had been assessed on May 20, 1936. The statutory notice of deficiency setting *486 forth Rosario and Frances' liability for income tax and penalties for the years 1948, 1949 and 1950 was issued on September 28, 1954. After the issuance of said notice of deficiency, Serio made statements on two occasions that Rosario and Sam had $300,000 in cash in September 1947. The first statement was made in an affidavit dated January 15, 1955, that was executed by Serio and filed with the Department of Justice in connection with a case involving Adams. The second statement was made in the course of Revenue Agents Ney and Logan's interview with Serio on March 4, 1955. On December 31, 1947, and throughout 1948, 1949 and 1950, the partners of Maceo and Company maintained a cash bankroll for the purpose of financing its gambling operations. The cash bankroll owned by the partners amounted to $100,000 on December 31, 1947, and remained the same throughout the years 1948, 1949 and 1950. Rosario owned 20 percent or $20,000 of said bankroll. Commencing on June 26, 1946, and continuing throughout the years 1948, 1949 and 1950, Frances maintained a savings account in the United States National Bank, Galveston, Texas, Account No. X0981, in the name of Frances Jessica Dispensa (a niece of *487 Mrs. Rose Maceo). Frances was the only person authorized to make withdrawals from said savings account. The title of the account read: "Frances Jessica Dispensa by Mrs. Rose Maceo." Commencing on June 26, 1946, and continuing throughout the years 1948, 1949 and 1950, Frances maintained a savings account in the United States National Bank, Galveston, Texas, Account No. X0552, in the name of Angelo Santo Dispensa. Frances was the only person authorized to make withdrawals from said savings account. The title of the account read: "Angelo Santo Dispensa by Mrs. Rose Maceo." On September 10, 1947, the United States National Bank purchased through the American Express Company, a letter of credit in the amount of $2,000 for Frances. On January 16, 1948, Frances exchanged the letter of credit at the United States National Bank for a cashier's check on the United States National Bank in the amount of $2,000 payable to Frances. Said check was endorsed by Frances and was paid by the United States National Bank on January 21, 1948. Petitioners' increases in net worth in 1948, 1949 and 1950 and their nondeductible expenditures did not come from gifts, inheritances or other nontaxable sources, except *488 to the extent specified above. Sometime around October 1949 Rosario suffered a complete loss of vision in his right eye. During this period he was hospitalized several times, and, on one occasion, submitted to an operation called a bilateral stellate ganglionectomy. Rosario died on March 15, 1954. On May 31, 1951, William L. Marr, M.D., wrote the following letter with respect to the health of his patient, Rosario Maceo. May 31, 1951. TO WHOM IT CONCERNS: Mr. Rose Maceo has been subpoenaed to appear before an investigating committee for questioning. It is my belief that to do so will gravely affect his health. He is, and has been, a seriously sick man for the past several years, and especially so the past year. He has been advised repeatedly to avoid physical exertion and emotional or stress situations. Any of which may provoke an irreversible condition. There have been several hospitalizations during the past several months, and he has consulted many physicians for various troubles, some of which are enumerated below: 1. He has had hypertensive heart disease for many years, recently developing as a result of this, congestive heart failure. 2. Hypertensive encephalopathy, extensive *489 and associated with, (a) thrombosis of the central artery of the right eye with resultant loss of vision in that eye, (b) two subsequent thromboses involving other vessels of the brain resulting in weakness of the right arm and leg. 3. Mental depression in which shock treatment was administered several times, and was discontinued only because his reactions were so severe that his life was considered endangered by such treatments. 4. Later he was operated with removal of both stellate ganglia in hopes of preventing further thrombotic episodes and to help in the care of his depression. The above are cited to emphasize to you why I believe that Mr. Maceo should at all times avoid situations of stress. Furthermore I firmly believe such situations may provoke changes that could result in his death. If I can be of further information or help in any way please call on me. Yours very truly, (Signed) WILLIAM L. MARR, WILLIAM L. MARR, M.D. Schedule II, infra, represents our reconstruction of respondent's computation of increase in net worth for the taxable years beginning December 31, 1947, and ending December 31, 1950. Disputed items are indicated by the letter "d." Items without designation *490 are either stipulated, conceded or uncontested. SCHEDULE IIRosario Maceo and Frances Maceo - Docket No. 55709Reconstruction of Income for the Years 1948, 1949 and 1950 by the Net Worthand Nondeductible Expenditures Method.ASSETSDecember 31, 1947December 31, 1948(d) Cash on hand: Cash on hand and in banks$ 25,000.00$ 44,382.00Less cash in bank accts.7,604.3925,633.23of Rosario$ 17,395.61$ 18,748.77Cash advanced to Maceo20,000.0020,000.00and Company - bankrollsat clubroomsCash - "concealed safe"22,000.00Cash in Banks: City National Bank,Galveston, Texas: ck. a/c - Frances Maceo21.26(481.94)ck. a/c - Rose Maceo723.63723.63ck. a/c - R. Maceo - oilacct.U.S. National Bank -Galveston, Texas: ck. a/c - Frances Maceo1,757.673,855.04ck. a/c - Rose Maceo3,305.733,900.77W. L. Moody & Co.,Bankersck. a/c - Rose Maceo,3,575.0321,008.83PersonalFirst National Bank ofGalveston: ck. a/c - R. Maceo (d)U.S. National Bank,GalvestonSavings a/c No. X0552:257.51568.08Angelo Santo Dispensa byFrances Maceo(d) Savings a/c No.221.20343.40X0981: Frances JessicaDispensa by Frances Maceo9,862.0329,917.81Loans Receivable duefrom: Anthony J. Fertitta12,100.0010,300.00Santo A. Dispensa8,300.00Frank J. Fertitta W. L.150,000.00Moody, III162,100.0018,600.00Accts. receivable duefrom: Johnny Mitchell500.00R. L. Turner500.00Investments: Maceo & Co. (apartnership): Investment per307,964.58324,604.59StipulationInt. in unreportedclubroom receiptsElimination of cashdrawing recorded on booksof Maceo & Co. as of12-1950 and not paiduntil 1951307,964.58324,604.59Varnell Liquor Co.29,107.5612,664.82Gulf Properties (Capital50,000.0050,000.00Stock)Investors Mutual, Inc.3,500.003,500.00U.S. Government Bonds35,300.0035,300.00R. Maceo, Trustee General2,250.002,250.00Crude Oil Co.Oil Properties: Net Investment at211.17211.1712-31-47Net Investment at12-31-48Net Investment at12-31-49Current Year's Additions:Sam Maceo Oil Operations15,411.04Hansen & Scranton #17,192.83Piehl2,121.68Vernon Parish Leases1,500.00Beauregard Parish LeasesGulf Luscher Oil PaymentTotal$ 211.17$ 26,436.72Less: Intangible Payments(16,099.01)Less: Abandonment Losses211.1710,337.71Real Estate: South 70, NE 1/2, SE Blk.10,500.00Outlot 92, GalvestonImprovements - Brick24,902.70Bldg.SW 1/4 of Outlot 42, 240210,500.00Ave. O2406 Ave. O - Apartment34,298.6934,298.69Bldg2406 Ave. O - Furnishings4,373.504,373.502412 Ave. O - Personal20,000.0020,000.00ResidenceLot 485, Sec. 2, Trimble1,000.001,000.00& Lindsay SurveyLot 14, SE Blk. Outlot 709,500.009,500.00Lot 5, W 1/4, Lot 6 NW7,500.007,500.00Blk. Outlot 67Lot 12, NE Blk. Outlot 711,000.001,000.00Lots 13 & 14 NE Blk.Outlot 71 (1528 Blvd.)1/6th Int. in Blks. 10,666.00666.0014, 16, 48 & 49Lots 27-30 Sec. L.800.00Galveston Memorial ParkLots 1 & 2, Blk. 1, Weeks900.00900.00Addition, Dickinson101,038.19104,940.89Automobiles: 1941 Buick284.881948 Cadillac4,693.001940 Cadillac1,200.001,200.001948 Buick Coupe3,382.691950 Buick Estate Wagon1,484.889,275.69Furnishings - AlamoCarpet Co.(d) American Express Co.2,000.00Letter of Credit(d) Cash realized fromconversion of AmericanExpress Co. Letter of2,000.00Credit(d) Jewelry18,100.00TOTAL ASSETS$764,214.02$660,740.28*491 ASSETSDecember 31, 1949December 31, 1950Cash on hand: Cash on hand and in banks$ 38,476.00$ 62,007.00Less cash in bank accts.6,230.3539,924.05of Rosario Maceo$ 32,245.65$ 22,082.95Cash advanced to Maceo20,000.0020,000.00and Company - bankrollsat clubroomsCash in Banks: City National Bank,Galveston, Texasck. a/c - Frances Maceo194.743,412.79ck. a/c - Rose Maceock. a/c - R. Maceo - Oil2,467.6811,465.12AccountU.S. National Bank -Galveston, Texasck. a/c - Frances Maceo3,855.043,855.04ck. a/c - Rose Maceo259.0211,456.18W. L. Moody & Co.,Bankersck. a/c - Rose Maceo,3,503.657,003.65PersonalFirst National Bank ofGalvestonck. a/c - R. Maceo10,000.00U.S. National Bank,Galveston(d) Savings a/c No.X0552: Angelo Santo Dispensa by573.51876.74Frances Maceo(d) Savings a/c No.X0981: Frances Jessica Dispensa346.73550.53by Frances Maceo11,200.3748,620.05Loans Receivable duefrom: Anthony J. Fertitta8,500.006,700.00Santo A. Dispensa7,200.006,000.00Frank J. Fertitta40,000.00W. L. Moody, III15,700.0052,700.00Accts. receivable duefrom: Johnny Mitchell634.30634.30R. L. Turner342.87634.30977.17Investments: Maceo & Co. (Apartnership): (d) Investment per272,567.90224,101.82StipulationInterest in unreported6,640.20clubroom receipts(d) Elimination of cashdrawing recorded onbooks of Maceo & Co. asof December1950 and not paid until15,000.001951272,567.90245,742.02Varnell Liquor Co.Gulf Properties (Capital50,000.0050,000.00Stock)Investors Mutual, Inc.U.S. Government Bonds35,300.0035,300.00R. Maceo, Trustee103,904.98105,869.53General Crude Oil Co.2,250.002,250.00Oil Properties: Net Investment at12-31-47Net Investment at10,337.7112-31-48Net Investment at52,197.8812-31-49Current Year's Additions:Sam Maceo Oil Operations63,057.0859,465.02Hansen & Scranton #1PiehlVernon Parish LeasesBeauregard Parish Leases8,000.00Gulf Luscher Oil Payment2,083.34Total$ 83,478.13$111,662.90Less: Intangible Payments(31,280.25)(37,127.92)52,197.8874,360.43Less: Abandonment LossesReal Estate: South 70, NE 1/2, SE Blk.Outlot 92, GalvestonImprovements - Brick24,902.7024,902.70Bldg.SW 1/4 of Outlot 42, 2402Ave. O2406 Ave. O - Apartment34,298.6934,298.69Bldg.2406 Ave. O - Furnishings4,373.504,373.502412 Ave. O - Personal20,000.0020,000.00ResidenceLot 485, Sec. 2, Trimble1,000.001,000.00& Lindsay SurveyLot 14, SE Blk. Outlot 709,500.009,500.00Lot 5, W 1/4, Lot 6 NWBlk. Outlot 67Lot 12, NE Blk. Outlot 711,000.001,000.00Lots 13, & 14 NE Blk.,Outlot 71 (1528Blvd.)16,000.0016,000.001/6th Int. in Blks. 10,666.00666.0014, 16, 48 & 49Lots 27-30 Sec. L,800.00800.00Galveston, Memorial ParkLots 1 & 2, Blk. 1, WeeksAddition, Dickinson112,540.89112,540.89Automobiles: 1941 Buick1948 Cadillac4,693.004,693.001940 Cadillac1948 Buick Coupe3,382.691950 Buick Estate Wagon3,768.108,075.698,461.10Furnishings - AlamoCarpet Co.(d) American Express Co.Letter of Credit(d) Cash realized fromconversion of AmericanExpress Co. Letter of2,000.002,000.00Credit(d) Jewelry21,030.0021,030.00TOTAL ASSETS$739,647.66$806,711.18LIABILITIES and RESERVESLoans Payable: First National Bank of$ 1,914.21$ 3,256.78GalvestonCity National Bank of14,000.00GalvestonGulf Properties, Inc.San Luis Corp.$ 1,914.21$ 17,256.78Accounts Payable: Gulf Properties, Inc.Maceo and CompanyReserves: Depreciation15,136.8724,446.76Depletion6,051.0211,082.8721,187.8935,529.63Total Liabilities$ 23,102.10$ 52,786.41Net Worth at End of Year$716,545.56$753,924.77Net Worth at Beginning of646,163.98716,545.56YearNet Worth Increase$ 70,381.58$ 37,379.21Net Worth Increase$ 70,381.58$ 37,379.21Brought ForwardAdd nondeductibleexpenditures: Stip. V; Exh. L(32nd)$ 13,451.00$ 11,982.53Stip. VI, $ 11320.305,809.20Stip. VI, [*] 13; Jt.19,295.8217,902.12Exh. 133-R(35th), pp. 2,4Stip. V & VI; Exhs.1,342.316,104.43L(32nd); Jt. Exh. 133R(35), p. 1Stip. VI, [*] 4916.09871.02Stip. VI, [*] 560.00Pennington Buick Co.85.60126.57Wimberly Insurance Co.590.80260.90Clark & Martin Garage113.1036,115.0243,116.77Income Tax PaymentsStip. VII; Jt. Exh.$ 46,883.6517,670.59164-E(39th)Gift670.83Nondeductible loss on1,764.01sale of autoNontaxable portion of(185.42)capital gainsCorrected Net Income$153,865.66$ 99,930.58Net income per original37,299.0752,071.95returnsNet income omitted from$116,566.59$ 47,858.63original returns*492 Rosario Maceo and Frances Maceo - Docket No. 55709 LIABILITIES and RESERVESDecember 31, 1947December 31, 1948Loans Payable: First National Bank ofGalvestonCity National Bank ofGalvestonGulf Properties, Inc.$ 50,000.00San Luis Corp.100,000.00$150,000.00Accounts Payable: Gulf Properties, Inc.880.50Maceo and Company264.791,145.29Reserves: Depreciation15,261.0311,483.11Depletion2,481.023,093.1917,742.05$ 14,576.30Total Liabilities$168,887.34$ 14,576.30Net Worth at End of Year$595,326.68$646,163.98Net Worth at Beginning of595,326.68YearNet Worth Increase$ 50,837.30Net Worth Increase -$ 50,837.30Brought ForwardAdd nondeductibleexpenditures: Stip. V; Exh. L(32nd)$ 11,681.97Stip. VI; [*] 111,434.48Stip. VI, [*] 13; Jt. Exh.23,013.08133-R(35th), pp. 2, 4Stip. V & VI; Exhs.1,824.58L(32nd); Jt. Exh.133-R(35th), p. 1Stip. VI, [*] 4755.92Stip. VI, [*] 5Pennington Buick Co.450.65Wimberly Insurance Co.349.00Clark & Martin Garage532.15$ 40,041.83Income Tax PaymentsStip. VII; Jt. Exh.$ 63,796.90164-E(39th)GiftNondeductible loss on saleof autoNontaxable portion of(577.50)capital gainsCorrected Net Income$154,098.53Net income per original96,473.37returnsNet Income omitted from$ 57,625.16original returns*493 Computation of Corrected Net Income of Rosario Maceo and Frances Maceo for 1948, 1949 and 1950, (Docket No. 55709) Opinion Respondent, in his notice of deficiency, determined deficiencies in income tax and additions to tax against the Estate of Rosario Maceo, Deceased, and Frances Maceo, Independent Executrix, for the taxable years 1948 through 1950, inclusive, as follows: Additions to Tax,I.R.C. 1939Sec.Sec.YearDeficiency293(b)294(d)(2)1948$ 5,042.98$28,17.264$3,307.10194923,682.4829,734.671,783.61195036,196.2222,818.81By use of the net worth method, respondent determined that net income was omitted from petitioners' original income tax returns during the taxable years ending December 31, 1948, 1949 and 1950 in the amounts of $79,625.16, $116,566.59 and $47,858.63, respectively. In his reconstruction of petitioners' income for the taxable period involved herein, respondent determined that Rosario and Frances owned undeposited cash on December 31, 1947, 1948, 1949 and 1950 in the amounts of $17,395.61, $18,748.77, $32,245.65 and $22,082.95, respectively. See Schedule 11, supra. Petitioners contend that they did not have unreported income in excess of the income shown on their amended *494 returns for the taxable years involved. Essentially, it is their position that respondent's determination is arbitrary and excessive because he failed to establish with reasonable certainty their net worth as of January 1, 1948; failed to prove that the net worth increases and expenditures were derived from unreported income as opposed to cash on hand as of January 1, 1948, and failed to track down all relevant leads. Petitioners contend that they had cash on hand (not deposited in banks) in the amount of $385,000 on January 1, 1948. Alternatively, petitioners urge, on brief, that the testimony of Sam Serio, A. J. Adams and Joe T. Maceo established that if petitioners did not have $385,000 undeposited cash they had at least $50,000 cash on hand as of January 1, 1948, and that said amount would be sufficient to account for respondent's computation of petitioners' increase in net worth. As already stated, it is a cardinal principle in the use of the net worth method that the opening calculation reflect the value of the taxpayer's assets at the beginning of the period, including whatever coin and currency there might be in the taxpayer's possession. Holland v. United States, 348 U.S. 121 (1954). *495 Petitioners have advanced a possible source for Rosario's claimed accumulation of the cash hoard of $385,000 on hand as of December 31, 1947, but in view of all the facts of record, to be discussed, infra, we find that the testimony with respect to such alleged hoard cannot be accepted as sufficient to establish the existence of a cash reserve in the amount claimed. Unquestionably, Rosario did keep substantial funds on hand prior to and during some of the critical years involved herein. The significant question is how much of said personal cash funds were on hand on December 31, 1947. In our discussion of Sam Maceo's alleged cash hoard of $300,000, we pointed out that Serio attempted to bolster the cache story by claiming the withdrawal of several bundles of cash (each containing $50,000) from time to time during the taxable years from the concealed safe to give to Sam Maceo or to disburse in his behalf. It was contended that by December 31, 1950, Sam had used his entire $300,000 cash in defraying various nondeductible expenditures and acquiring his net worth involved in his case. In the same vein, petitioners contend that substantial amounts of cash flowed out of the concealed safe; *496 that part of such flow went directly into expenditures on behalf of Rosario and part was placed in his compartment in the double-door safe. The only significant difference in Rosario's position from that of Sam is that it is claimed on behalf of Rosario that he only used $100,000 of his hoard in acquiring assets and in various nondeductible expenditures, and had $200,000 still on hand at December 31, 1950. In support of petitioners' position that expenditures were made during the taxable period by Rosario from his undeposited cash, and not from unreported income, they direct our attention to Serio's testimony that about August 14, 1948, when Rosario and Sam Maceo were building the Varnell Liquor Store and were making periodic payments to the contractor for the construction costs, he took two bundles of cash ($50,000 per bundle) out of the concealed safe totaling $100,000. Serio testified further that Rosario had received an invoice from Loomis Construction Co. for $43,191 and on August 4, 1948, Serio deposited $43,191 of the aforesaid $100,000 cash to the account of Rosario, and wrote a check in the amount of $43,191 on the account of Rosario Maceo payable to Loomis Construction Co. *497 Serio further testified that after he had made this deposit of $43,191, half of the balance of the $100,000 was placed in Rosario's lock box in the double-door safe, and the other half of the balance was given to Sam Maceo. He also stated that sometime during 1949 and 1950, he removed another $50,000 bundle of cash from the concealed safe and gave it to Rosario. He further testified that at the time he put the bundles of money into Rosario's lock box, he saw packages of money in Rosario's lock box. Assuming arguendo that Serio's testimony is correct, the only portion of Rosario's bundle that was actually spent would be $21,595.50 since Serio testified that he took the cash for the deposit ($43,191) from Rosario's and Sam's respective bundles because each of them had a one-half interest in the liquor building. This one-half interest is fully demonstrated by the stipulation of the parties that the improvements on the liquor building in 1948 cost Rosario and Sam $24,902.70 each. We have carefully considered Serio's testimony in respect to alleged withdrawals from the concealed safe on behalf of Rosario during the years 1948 through 1950. Inconsistencies and vagueness are apparent. 6*499 As *498 to the alleged $50,000 withdrawal in 1949 or 1950, petitioners offered no testimony as to the use of the amounts allegedly withdrawn. Manifestly, Serio's obvious want of credibility raises serious doubts as to the truth of any of his testimony in the absence of reliable supporting circumstances. In any event, his testimony has not established the fact of the withdrawals in particular taxable years or the use of the cash allegedly withdrawn. In resolving the particular issue confronting us, we have given heed, of course, to the fact that Serio was testifying as to events which purportedly occurred 13 or more years in the past. Petitioner calls our attention to Fontaine v. Patterson, 305 F. 2d 124 (C.A. 5, 1962), and urges that Serio was not subject to call as a witness by the respondent for impeachment purposes. We think that the circumstances in the instant case differ widely from the issue in Fontaine v. Patterson, supra, and we cannot accept petitioner's view. Analysis of several significant events which occurred before and during the taxable years involved support the view that petitioners did not own the amount of undeposited cash which they claim they had *500 as of December 31, 1947, 1948 and 1949. Thus, various representations by Rosario in financial statments to Galveston banks as to the total amount of cash that he owned during the taxable years as well as the nine years preceding December 31, 1947, are in conflict with petitioners' contentions in the instant proceeding. Respondent in his net worth statement determined that of the total "cash on hand and in banks per financial statements" the actual cash on hand owned by petitioner as of December 31, 1947, through 1950, inclusive, was $17,395.61, $18,748.77, $32,245.65 and $22,082.95, respectively. Contesting respondent's reliance on said statements in his determination of cash on hand for the years under review, petitioners contend that Serio's testimony shows that these financial statements are inaccurate and should not be relied upon because they do not represent a complete list of Rosario's assets during the period involved, but were intended to establish only that Rosario had sufficient assets to support the loan he was requesting. Petitioners emphasize, in this connection, that Serio testified that in preparing the aforesaid financial statements he used the balances shown on the *501 check stubs in making his calculations, but did not include undeposited cash in petitioners' possession. We find petitioners' position inconsistent with the facts. The record shows that the bank balances in all of Rosario's bank accounts between January 1 and March 9, 1949, never exceeded $30,979.01. Hence, it was impossible for Serio to have used only Rosario's bank balances between January 1 and March 9, 1949, and come up with a balance of $44,382 as cash on hand and in banks as of December 31, 1948. Obviously, Serio must have made a separate calculation as to the amount of cash that petitioners owned which was not on deposit in banks and then added that amount to Rosario's bank balances to arrive at the amount shown on the financial statement. Serio also testified that he put down a round figure for cash on hand and in banks on Rosario's financial statements in order to show the banks that Rosario had some cash. However, the only round figure Serio used in the financial statements prepared for the periods ending December 31, 1947, through December 31, 1951, was a $25,000 figure set forth in the financial statement for December 31, 1947. In the remaining financial statements for *502 the periods ending as of December 31, 1948, 1949, 1950 and 1951, the figures used for cash on hand and in banks was $44,382, $38,476, $62,007 and $27,716, respectively. Hence, we believe that Serio must have made some calculation in order to arrive at these figures listed as "cash (on hand and in banks)." In our opinion, these are not round figures nor are they figures that Serio would have been likely to "pull out of the air." Apparently, they are calculated figures made in the regular course of Rosario's business affairs. Likewise, with respect to Serio's computation of Rosario's investment in real estate, as reflected on said financial statements, Serio again attempted to create the impression that he had given no particular or careful thought to the accurate preparation of Rosario's financial statements by stating that he thought he had just copied the amount of real estate investments "off year to year." However, the real estate listed in Rosario's financial statements did not remain constant as Serio would imply. Contrariwise, the value of said real estate as of December 31, 1939, through 1951, inclusive, ranged from $73,000 to $105,000. To further minimize the accuracy and probative *503 value of the financial statements, Serio testified that Rosario never questioned him about the matters contained therein or about the matters in his income tax returns. The inherent unlikelihood of this is apparent when these remarks are considered in the light of Serio's testimony as to how Rosario questioned him closely about the affairs of Macco and Company, for example, questions in respect to the monthly profit and loss statements as well as the receivables due from partners and employees of Maceo and Company. We believe that Rosario's financial statements are factors to be considered in weighing petitioners' contention that Rosario's net worth did not increase during the taxable period involved. Petitioners argue that Rosario's net worth did not increase, but rather that use of his prior accumulated cash hoard ($385,000) accounts for the assets acquired or liabilities discharged during the taxable years involved. However, Rosario's financial statements show his net worth increased continually over the years ended December 31, 1947, through December 31, 1950, from $528,121.38 to $672,978.31. Rosario's stated "cash (on hand and in banks)" and his net worth per his financial statements *504 for the years December 31, 1948, 1949 and 1950 were in excess of the amount of net worth and cash on hand and in banks shown in the financial statement for December 31, 1947. It is just as likely that Rosario's cash on hand increased during the years involved as to say it decreased. We believe that these financial statements, made for Rosario's benefit, constitute material contemporaneous representations by him of his financial position at times when he had no ulterior motives for misrepresenting facts such as might exist if he had been concerned about a pending income tax case. We find no merit in petitioners' argument that they did not indicate large amounts of undeposited cash on the financial statements as a precautionary measure to insure the security of the cash hoard and to prevent robbery attempts. While the financial statements are not conclusive of the issue, we believe they constitute significant evidence to be taken into consideration in unraveling the mystery presented with respect to the amount of the alleged cash hoard. Epstein v. United States, 246 F. 2d 563, 570 (C.A. 6, 1957), certiorari denied. 355 U.S. 868 (1957). We reject petitioners' contention that respondent's *505 method for determining cash on hand by subtracting the "stipulated bank balances" from "cash (on hand and in banks) per financial statements," as reflected in Rosario's financial statements as of December 31, 1947, 1948, 1949 and 1950, is arbitrary. It is petitioners' view that respondent erred in not using the balances appearing on the check stubs instead of the stipulated bank balances shown on the financial statements prepared by Serio because Serio used figures that appeared on the check stubs in preparing said statements. We have carefully considered Serio's testimony in this connection and find that he used the balances on Rosario's check stubs sometimes when he would make up the financial statements and sometimes he used a "round figure" without regard to "bank balance or anything, just in order to have some cash on hand, round figures." Under the circumstances, since the bank balances shown on the financial statements are stipulated, we find that respondent was warranted in using them in computing the amount of cash on hand as of December 31 of the taxable years involved. Respondent is not required to establish that a separate determination of cash on hand was made by Serio *506 every time a statement was prepared. Moreover, the fact that Rosario may not have examined these financial statements before they were submitted to the banks by Serio is of no consequence in the context of this case. We do not believe that Rosario's conduct with respect to several financial matters which occurred during the taxable years was consistent with what one would expect of an individual who had an alleged cache of $385,000 at the start of the net worth period. Assuming arguendo that Rosario had undeposited cash of $385,000 in the summer of 1947, we find it difficult to understand why it was necessary for Gulf Properties, Inc., and San Luis Corporation to borrow $150,000 from the American National Insurance Company to lend to Rosario so that he could, in turn, lend said amount to W. L. Moody, III. Petitioners claim that Rosario made said loan for a "chuckle" to be able to lend money to Moody's son from Moody's own company. We find this explanation untenable. Rosario had informed J. Dibrell, his attorney, that he would lend the $150,000 to W. L. Moody, III, only if he could borrow the funds from ANICO. The fact that Rosario had to borrow $150,000 from these two corporations *507 to lend said amount to Moody is inconsistent with the actions one would expect of an individual who possessed in excess of $300,000 of undeposited cash. Cefalu v. Commissioner, 276 F. 2d 122. (C.A. 5, 1960). Viewing the loan transaction in the context of Rosario's overall financial background, the reasonable inference is that Rosario did not have sufficient funds in May 1947 to lend to Moody, and hence had to borrow $150,000 himself. Further evidence supporting respondent's view that Rosario did not have $300,000 cash on hand is shown by the fact that on October 1, 1948, Gulf Properties, Inc., et al., borrowed $425,000 from ANICO, of which $105,000 was used to pay off two loans from ANICO. Of the remaining $320,000 proceeds of the loan, Gulf Properties, Inc., disbursed $250,000 of it to the eight partners of Maceo and Company. Rosario received three checks (Nos. 3845, 3846 and 3847) in the aggregate amount of $50,000. We find no merit in the explanation offered on behalf of Rosario as to why it was necessary for him and his partners to cause their controlled corporations to borrow a net of $320,000 even though he allegedly had a cash hoard of $300,000. Serio testified that the reason *508 the money was borrowed was for the purpose of settling intercompany accounts in anticipation of the junior partners acquiring interests in Maceo and Company; that is, to minimize the obligations of Maceo and Company to make it easier for the junior partners to come into the business. The record shows, however, that the junior partners came into Maceo and Company at least two years after the loan by Gulf Properties of $425,000. Under the circumstances, we believe the reason why the loan was made by Gulf Properties, Inc., was because the partners of Maceo and Company needed cash and this need of cash applied to the four partners involved in the instant proceeding. A further indication tending to refute petitioners' contention of a large amount of undeposited cash is found in Rosario's inability to pay his delinquent taxes in 1936. On May 29, 1936, Rosario's attorney wrote the collector of internal revenue, Austin, Texas, that Rosario found it impossible at that time to pay in full the additional income tax due for 1933 and 1934 in the amount of $4,684.12. The attorney requested Rosario be given additional time in order to pay the tax for the alleged reason that such additional time was *509 needed because Rosario and others in the Turf had recently been forced to mortgage practically all of their real estate holdings in order to purchase the Murdoch Bath House of Galveston. Apparently Rosario, in 1936, did not have sufficient cash to pay deficiencies totaling $4,684,12 which had been asserted against him for the years 1933 and 1934. We believe that his request for an extension of time is inconsistent with petitioners' claim of a large cash hoard. Blackwell v. United States, 244 F. 2d 423, 428 (C.A. 8, 1957) and Bryan v. Commissioner, 209 F. 2d 822 (C.A. 5, 1954), affirming a Memorandum Opinion of this Court. The fact that cashier checks were purchased on Rosario's behalf on January 14, 1948, in the total amount of $34,890, payable to the collector of internal revenue, does not establish that he had at least this much cash on hand at January 1, 1948. Nevertheless, it is a factor to be considered in determining opening cash. The record, however, shows that on the same date the cashier checks were purchased on behalf of Rosario (January 14, 1948) he received a $20,000 cash dividend from Maceo and Company. While no express evidence was adduced by respondent to establish that *510 said $20,000 was actually used to pay Rosario's taxes, circumstances of record appear to support that view. In any event, petitioners have not presented any material evidence to the contrary. Rosario's financial statement as of December 31, 1947, lists cash on hand and in banks of $25,000. Rosario's bank accounts as of December 31, 1947, showed a balance of $7,604.39. The difference between cash on hand and in banks per the financial statement and the cash in bank accounts at December 31, 1947, was $17,935.61. When the $17,396.61 is added to the cash distribution to Rosario on January 14, 1948, it totals $37,395.61, which is slightly in excess of the cashier's checks purchased on January 14, 1948. Under the circumstances, it is reasonable to infer that the cash dividends were withdrawn from Maceo and Company by the partners because they needed it to pay their income taxes. In the same vein, petitioners urge that the purchase of a cashier's check in the sum of $18,321.48 for Rosario on January 15, 1949, payable to the collector of internal revenue, corroborates the existence of a cash hoard of $385,000 on January 1, 1948. Respondent, in opposition, contends that Rosario's income in *511 1948, plus the cash he had on hand on January 1, 1949, fully explains the funds used to purchase said check. Rosario's net income per his original income tax return for 1948 was $96,473.37, and he had unreported additional net income for the year 1948 of $79,625.16. A financial statement for Rosario as of December 31, 1948, listed cash on hand and in banks of $44,382. His cash in bank accounts on December 31, 1948, totaled $25,633.23. The difference between the $44,382 and the $25,633.23 is $18,748.77, which respondent avers was Rosario's actual cash on hand and not on deposit on December 31, 1948. The $18,748.77 is slightly in excess of the cashier's check purchased on January 15, 1949, and supports respondent's contention that Rosario's cash on hand at December 31, 1948, was $18,748.77. Likewise, the fact that a cashier's check in the amount of $5,000 was purchased for Rosario on March 14, 1950, payable to the collector of internal revenue, does not corroborate the existence of a cash hoard on January 1, 1948, of $385,000, and a cash hoard on December 31, 1949, of $348,446.91, as petitioner urges. The $5,000 cash need not necessarily have come from cash on hand at January 1, 1948. *512 Petitioners' original income tax returns for 1948 and 1949 showed net income of $96,473.37 and $37,299.07, respectively. Rosario and Frances had additional unreported net income in 1948 and 1949 of $79,625.16 and $116,566.59, respectively. Clearly the income reported and unreported for the years 1948 and 1949 was a sufficient source of funds to account for the $5,000. Financial statements of Rosario's position as of December 31, 1949, listed cash on hand and in banks of $38,476. Rosario's cash in his bank accounts at December 31, 1949, totaled $6,230.35. The difference between the $38,476 and the $6,230.35, i.e., $32,245.65 (which respondent avers is the actual amount of cash not on deposit that Rosario had at December 31, 1949) is a sufficient amount of cash to account for the funds used to purchase the $5,000 cashier's check on March 14, 1950. Similarly, we find no merit in petitioners' contention that the reporting of undeposited cash in the amount of $96,750 on Rosario's estate tax return corroborates the existence of a cash hoard on January 1, 1948, in the amount of $385,000. Frances testified that after Rosario's death on March 15, 1954, she opened his compartment box in the *513 safe at Maceo and Company and counted approximately $100,000. The opening of said safe about March 15, 1954, was over six years subsequent to the critical date of January 1, 1948, and has little probative value. In addition, there is no showing as to when the $96,750 was accumulated. Moreover, petitioners' original income tax returns for the years 1948 through 1952 showed income in the following amounts: 19481949195019511952Net income per$96,473.37$37,299.07$52,071.95$54,851.04$20,238.00return Petitioners had unreported additional net income in 1948, 1949 and 1950 of $72,105.00, $53,045.00 and $42,330.00, respectively. There is no evidence as to the amount of income Rosario earned during 1953 through March 14, 1954, or the amount of money, if any, petitioners borrowed after 1950. However, Rosario had $22,085.95 undeposited cash on December 31, 1950, which accounts for a portion of the cash on hand at the date of his death. When this amount is coupled with the income of petitioners subsequent to 1950, the total is more than enough to account for the undeposited cash ($96,750) in the safe at his death. Petitioners contend that Rosario's ownership of substantial amounts of cash at January *514 1, 1948, is further demonstrated by the fact that Maceo and Company was engaged in large scale gambling operations requiring the possession of sizeable amounts of cash. It is petitioners' position that Rosario, as managing partner of Maceo and Company, would individually need a large amount of cash for his gambling activities. No convincing evidence was adduced, however, to show that Rosario individually engaged in extensive gambling activities during the period involved which would require a substantial bankroll. Since the situs of virtually all of the gambling operations was Maceo and Company, including the various locations it had established in and around Galveston, we believe that it was largely Maceo and Company that needed the substantial bankroll for these operations rather than the individual partners. In addition to other undeposited cash receipts, the record shows that during the taxable period, petitioners had a 20 percent interest in a $100,000 bankroll in the possession of Maceo and Company. It is to be noted here that respondent's determination, as set forth in his notice of deficiency, did not include Rosario's proportionate interest in said bankroll, which was reflected *515 on the win and loss books of Maceo and Company. Respondent, has, however, accepted Serio's testimony with respect to said bankroll, and on his net worth statement respondent has given Rosario credit for "Cash advanced to Maceo and Co. - bankrolls at Club Room;" in the amount of $20,000 as of December 31, 1947, through December 31, 1950, inclusive. See Schedule II, supra. Petitioners, on brief, also urge that there is evidence that Rosario had a substantial net worth during the early part of his financial history which was not taken into account by respondent in computing their net worth for the taxable years involved. We are mindful O. E. Voigt testified that Rose and Sam Maceo had invested $40,000 in the Hollywood Dinner Club in 1926. Also, we note the master card of the Greater Galveston Credit Bureau of Galveston, Texas, states that on September 20, 1937, Rosario bought out the Crystal Palace Company for $140,000 cash, and that Rosario had made other investments during these early years. Assuming that Rosario had made such substantial investments, we cannot conclude in the face of the other material facts before us that his economic status remained intact during the ensuing years. *516 The same may be said with respect to the records of the Bureau to the effect that Rosario was worth $150,000 on June 7, 1926. Petitioners maintain that none of respondent's agents asked Rosario or Frances whether they had any cash on hand as of January 1, 1948, and therefore, that respondent could not make a fair investigation of their opening net worth. We find this argument without merit. Serio, in his capacity as spokeman for Rosario and other partners of Maceo and Company, specifically requested respondent's agents not to interview Rosario on the ground that such an interview might jeopardize Rosario's health. Serio supported his request by medical statements from doctors who treated Rosario. Respondent's agents accepted the representations that were submitted to them as to Rosario's health and acceded to the specific request that Rosario not be interviewed. The agents abided by the request from the time that it was made to the time of Rosario's death, almost two and one-half years later. Under the circumstances, petitioners are hardly in a position to claim that respondent's failure to interview Rosario was arbitrary. Such an argument would necessarily be predicated upon a belief *517 that Rosario had in fact been in sufficiently good health during the course of the examination to have been interviewed. If this be true, it follows that petitioners intentionally misrepresented the state of Rosario's health during the course of the examination in order to avoid the possibility of his disclosing information prejudicial to him and to the other partners of Maceo and Company. Such a situation would indeed be further evidence of activity on the part of the petitioners to conceal their avoidance of their income taxes. Petitioners, while urging that respondent's determination in these cases was arbitrary, have not directed our attention to specific instances where respondent or his agents knowingly failed to verify items which were taken into the determination. In this contention, petitioners have not at any time claimed that Frances had knowledge of cash owned by her husband other than the knowledge with respect to the cash that was found in his lock box in the double-door safe at Maceo and Company at the time of his death on March 15, 1954. The failure of respondent's agents to interview Frances as to the amount of undeposited cash that she and Rosario might have owned *518 at January 1, 1948, was in no manner detrimental to petitioners. This fact is clearly revealed by Frances's categorical disclaimer at the trial of any knowledge of her husband's business affairs. Frances's testimony demonstrates that asking her questions as to cash on hand would have been a useless gesture. On consideration of all relevant parts of the record, we think it reasonable to infer that petitioners' contention about their cash hoard at the start of the net worth period is based on hindsight and was designed to dovetail effectively with the deficiency involved for the three taxable years. The amount of $300,000 was first mentioned in an affidavit by Serio dated January 15, 1955, which was after petitioners had received the notice of deficiency. Up to the time of the issuance of the notice of deficiency on September 28, 1954, Serio and Garrett repeatedly claimed they could not give financial statements to respondent's agents for Rosario or the other partners because they could not figure out their cash positions. Despite the fact that Rosario on several occasions conducted his financial affairs unlike an individual claiming a sizeable cash reserve, which is some justification *519 for respondent's position as to petitioners' cash on hand, in the light of all of the relevant circumstances we are satisfied that Rosario did have a substantial amount of cash on hand prior to and during the taxable years involved. We think it reasonable to infer that the amount of cash on hand as of December 31, 1947, was $60,000. Some of the material evidence considered by us in reaching our conclusion is found in the fact that Rosario claimed "cash on hand and in banks" as of December 31, 1947, through December 31, 1950, inclusive, in the respective amounts of $25,000, $44,382, $38,476 and $62,007, on his financial statements submitted to banks in Galveston. Based on these statements, respondent in his net worth computation, gave petitioners credit for undeposited cash as of December 31, 1947, in the amount of $17,395.61. In our revised net worth statement, supra, we have given Rosario credit for his 20 percentum interest in the aforesaid $100,000 bankroll. As in the case of Sam Maceo, respondent concedes that Rosario had said interest in the $100,000 bankroll as of January 1, 1948. Since this bankroll was made known to respondent for the first time during the trial, we believe *520 his failure to include this asset (i.e., $20,000) in petitioners' net worth was reasonable under the circumstances. Petitioners have not adduced any evidence to show whether said bankroll fluctuated during the taxable period and to what extent, if any. Hence, we hold that Rosario had a $20,000 interest in a cash bankroll in the possession of Maceo and Company as of January 1, 1948, and that said amount remained constant during the taxable years involved. As mentioned hereinabove, about August 14, 1948, Serio allegedly obtained from Rosario's cash hoard in the "concealed safe" cash in the amount of $21,595 to pay for his one-half interest in the Varnell Liquor Store. While Serio testified that he also withdrew $50,000 cash from said safe on behalf of Rosario in 1949 or 1950, we found his testimony in this respect nebulous and unconvincing. Considering Serio's testimony in the light most favorable to petitioners, we believe that the maximum amount of cash withdrawn from the concealed safe and the maximum amount spent from the cash withdrawn on behalf of Rosario was $21,595.50 (rounded out to $22,000 on our net worth schedule). Said amount of cash is in addition to the $17,395.61 of undeposited *521 cash, which is part of the total amount of $25,000 "cash on hand and in banks" set forth in his financial statements for the taxable years. Thus, all of Rosario's cash hoard in the "concealed safe" was exhausted by the end of the taxable year 1948. With respect to Rosario's remaining cash on hand, the record shows that on January 14, 1948, cashier's checks were purchased on Rosario's behalf in the aggregate amount of $34,890. On the same date Rosario received a $20,000 cash dividend from Maceo and Company. We have concluded that said $20,000 was used to pay his taxes and that the additional amount required, $14,890, was taken from his undeposited cash of $17,395.61. We are mindful that the record shows Rosario had $20,000 undeposited cash as of December 31, 1948, as part of the $44,382 "cash on hand and in banks" set forth on his financial statements. However, we do not believe this fact is inconsistent with our conclusion that all of his cash on hand in the "concealed safe" was exhausted as of December 31, 1948. Petitioners, on reply brief, also dispute respondent's treatment in his net worth statement of the $2,000 American Express Letter of Credit which was on hand as of December *522 31, 1947, and converted to cash during the taxable year 1948. Respondent takes the position that the cash was not spent but remained constant during the three-year period involved herein. See Schedule II, supra. Petitioners aver that the $2,000 cash was spent when the aforesaid letter of credit was converted to cash in 1948 or, in any event, in 1949. As no affirmative evidence to support petitioners' contention was presented by them, we sustain respondent on this issue. See Rushing v. Commissioner, 214 F. 2d 383 (C.A. 5, 1954), affirming a Memorandum Opinion of this Court. Petitioners, on reply brief, contend that respondent erred in including increases in Savings Account No. X0552 (an account established by Frances Maceo for Angelo Santo Dispensa) and Savings Account No. X0981 (an account established by Frances Maceo for Frances Jessica Dispensa) in their net worth statement on the ground that respondent failed to introduce any evidence showing that the increases in these accounts were derived from petitioners. We think there is sufficient evidence to establish the fact that the increases in the two savings accounts during the years in issue are attributable to Frances (Mrs. Rose) *523 Maceo. We find no evidence to the contrary. Under the circumstances, we need not consider the issue of burden of proof impliedly raised by petitioners. See Rushing v. Commissioner, supra. Petitioners, on reply brief, dispute respondent's determination that their interest in jewelry increased from $18,100 at December 31, 1948, to $21,030 on December 31, 1949. See Schedule II, supra. It is petitioners' position that the increase in jewelry in the amount of $2,570 did not take place until 1950 and they rely upon Stipulation VI, paragraph 16. They conclude, therefore, that the increase in net worth which respondent had computed in 1949 should be in 1950. Examination of said stipulation shows, however, that petitioners acquired jewelry from Harry Winston during 1949 in the amount of $2,570 $360and worth of jewelry from Jules R. Schubot which increased their interest in jewelry from $18,100 on December 31, 1948, to $21,030 on December 31, 1949, as respondent determined. Accordingly, we reject petitioners' contention as to this item. Petitioners, on reply brief, contend that their income for the taxable year 1950 was arbitrarily and erroneously increased in the amount of $21,640.20 as a *524 result of respondent's attempt to increase petitioners' stipulated interest in Maceo and Company by $6,640.20 as petitioners' interest in unreported clubroom receipts and the attempted elimination of the $15,000 cash dividend received by Rose Maceo on December 21, 1950. For the reasons expressed in our discussion of "Capital Investments (Sam Maceo, Rosario and Vincent) in Maceo and Company at December 31, 1950, in the amounts of $245,742.02, $245,742.02 and $80,792.31, respectively," infra, we reject petitioners' contention as to this item. As in the case of Sam Maceo, respondent has requested extensive findings of fact relating to the corrected net income of Rosario and Frances under the available funds method, but has not discussed these findings on brief. In reaching our conclusions with respect to petitioners' case, we have not relied upon the aforesaid findings or the correlative computations. We have found, infra, that petitioners' income tax returns filed for the taxable years 1948, 1949 and 1950 were false or fraudulent with intent to evade tax within the meaning of section 276(a) and that a part of the deficiency determined for each of said years was due to fraud with intent *525 to evade tax within the meaning of section 293(b), supra. Corrected Net Income of O. E. Voight for 1948, 1949 and 1950 under the Net Worth Method (Docket No. 63933) Findings of Fact O. E. Voigt was born in Brenham, Texas, on November 18, 1888. Voigt started in the gambling business around 1910 and continued in that activity for about 50 years. About 1912 he went into the gambling business with O. J. Quinn and they ran several clubs including the Greek American Club, Mexican Joe's and the Little Club. They remained in this business until Quinn went into the Army during World War I, and went back into this business when Quinn returned from the Army around 1920. Around 1926 Voigt contributed $20,000 to acquire a 25 percent interest in the partnership called the Hollywood Club and loaned Quinn $20,000 so that Quinn could also acquire a 25 percent interest therein. Quinn paid him back the $20,000. In 1937 Voigt put up a $40,000 bankroll for a club located in Houston, Texas, called the Villa Rosa, in which he had a 50 percent interest. For eight or ten years during the 1920's, Voigt was in the bootlegging business with Sam and Rose Maceo until the sale of liquor was made legal. Voigt married *526 Bessie Downey and they were divorced sometime during the period 1923 to 1925. Voigt and Bessie had three children. The married names of Voigt's three children during 1948, 1949 and 1950 were Bessie Cripps, Estelle Maceo Parmer and Margaret Williams. On May 20, 1936, a notice of tax due and demand therefor was issued to Voigt in respect to his income tax liability for the years 1933 and 1934 in the amounts of $730.71 and $2,421.01, respectively, plus $250.24 interest. On May 29, 1936, Louis Dibrell, acting on behalf of Voigt, wrote the collector of internal revenue, Austin, Texas, and stated Voigt found it impossible at that time to pay in full the additional income tax due from him for 1933 and 1934. Dibrell requested Voigt be given additional time in order to pay the balance of tax due from him. Dibrell also informed the collector the additional time was needed because Voigt and others in the Turf had recently been forced to mortgage practically all of their real estate holdings in order to purchase the Murdoch Bath House of Galveston. Dibrell at that time enclosed with the letter a cashier's check in the amount of $850.49 which was in payment of a quarter of the tax due from Voigt. *527 The $850.49 payment was allocated by the collector as follows: 1933 - additional tax $730.71; interest $91.70; 1934 - tax $28.08. On June 23, 1936, Dibrell again wrote the collector at Austin, Texas, and renewed his request that Voigt be given additional time in which to pay the additional tax he owed for 1933 and 1934. On July 24, 1936, Dibrell was notified by the collector, Austin, Texas, that a warrant for distraint No. 52486 had been issued against Voigt in the amount of $500. The $2,551.48 balance on the additional tax and interest for 1934 ($2,421.01 tax plus $158.55 interest, minus $28.08) was paid by Voigt at the following times: July 27, 1936$ 500.00August 26, 1936500.00October 26, 19361,551.48$2,551.48On January 7, 1938, Voigt was notified by the Internal Revenue Bureau (now Service) that since he had executed an agreement, Form 870, in respect to his liability for deficiencies in income tax for the years 1935 and 1936, together with interest applicable thereto, as provided by law, the deficiencies in income tax and the interest applicable thereto for such years would be assessed immediately. The deficiencies in income tax for the years 1935 and 1936 assessed against Voigt *528 were $1,043.72 and $633.66, respectively. A second notice and demand for income tax (Form 7659) dated January 25, 1938, was sent to Voigt in respect to his income tax liability for 1935. The second notice made demand for the payment of income tax for the year 1935 in the amount of $1,043.72 and interest thereon to January 21, 1938, in the amount of $115.84. The total tax and interest demanded in respect to the year 1935 amounted to $1,159.56. On February 4, 1938, Voigt wrote the collector and stated it was impossible for him to pay more than one-quarter of the tax shown to be due from him in the amounts of $1,159.56 and $665.95, respectively. Voigt enclosed with the letter a check in the amount of $456.38 which was one-fourth of the liability involved. The collector applied the foregoing payment of $456.38 against Voigt's additional liability for 1936. On March 12, 1938, a second notice and demand for taxes for 1936 was sent to Voigt. Said notice demanded the payment of $211.55 ($209.58 tax and $1.97 delinquent interest) which was the balance of Voigt's 1936 income tax liability, i.e., $633.66 plus $32.30 interest, minus $456.38 payment credited on February 8, 1938. The $209.58 balance *529 of Voigt's 1936 tax liability was paid on May 13, 1938. Voigt's liability of $1,159.56 for additional tax and interest thereon for the year 1935 was paid in two installments during June 1938. In 1939 Voigt agreed to a deficiency determination proposed in a revenue agent's report covering the year 1937 in the amount of $1,774.90 plus interest of $128.33. Voigt's payment of his additional liability of $1,903.23 for 1937 took place over a 10-month period commencing September 8, 1939, as shown by the following schedule: Date of PaymentAmount9-18-39$200.0010-11-39200.0011- 7-39200.0012- 4-39200.001-10-40200.002- 7-40200.003- 6-40200.004- 2-40200.005- 4-50 [sic 40]200.006- 4-40103.23Since March 25, 1942, Voigt has maintained a safe-deposit box (No. 394) in the Hutchings-Sealy National Bank of Galveston. Voigt also maintained a compartment in the large double-door safe at Maceo and Company until sometime in 1946 when he sold part of his interest in said company to his son-in-law, Vincent Maceo. Voigt transferred a 5 percent interest in Maceo and Company and in the stock of related corporations to Vincent Maceo on July 1, 1946. Voigt's daughter, Margaret Williams, was a bookie operating in *530 Houston, Texas, and from time to time during the taxable years 1947 through 1950, inclusive, Voigt loaned cash varying in amounts from $3,500 to $10,000 to his daughter and son-in-law, Margaret and Shelby Williams. Voigt obtained this cash from his pocket or from the cash he maintained in his home. Said loans were always repaid shortly. On a number of occasions W. J. Mihoval carried money in amounts varying from $3,500 to $12,000, from Voigt to Margaret in Houston. Margaret would repay the money to Voigt in person. Mihoval stopped carrying money to Houston for Voigt in June or July of 1948, when Voigt's daughter married Shelby Williams. About July 11, 1946, Voigt loaned W. J. Mihoval $5,000 and received a check from him dated July 11, 1946, in the amount of $5,000 payable to O. E. Voigt to hold as evidence of the loan. During 1947 Mihoval repaid Voigt $2,500 of said loan. In 1948, Mihoval repaid the remaining portion of the loan. Voigt retained the check which evidenced the loan. On September 12, 1947, Voigt loaned C. E. Wade $5,000 and received a promissory demand note from him evidencing said loan. During 1948 Wade paid Voigt $2,500 on the $5,000 loan. Wade sent Voigt a letter postmarked *531 August 9, 1949, in which he enclosed a $1,500 payment on his account. At the time the balance of the note was paid, Voigt did not return the promissory note to Wade. During 1946, O. E. Voigt made a loan to his son-in-law, C. L. Cripps, in the amount of $10,600 in order for the latter to purchase a home from Albert P. J. Voigt. Cripps repaid O. E. Voigt $5,000 during 1947 and $5,600 in 1948. On September 19, 1951, Voigt was questioned about the status of his books and records by respondent's agents. Voigt stated he had no personal records. On January 24, 1954, Voigt told respondent's agents he had no records of loans made and outstanding at January 1, 1948, and no records of repayments of the loans in 1948. Voigt told respondent's agents, however, that he had made loans to Wade, Mihoval and Cripps. At no time during the investigation of Voigt's income tax returns for the taxable years did Voigt offer to respondent's agents the records, documents and letters that evidenced the aforesaid loans to C. E. Wade, W. J. Mihoval and C. L. Cripps. During the year 1948 Voigt provided food for himself and his housekeeper, Millie Howell, at an average expense of $25 per week or an actual cost of *532 $1,200 for the year. During the year 1948 Voigt paid his housekeeper, Millie Howell, $40 per month or $480 for the year. During the Christmas season of 1948 Voigt made a cash gift of $500 to Vincent and Estelle Maceo. During the year 1948 Voigt made gifts of rental income to Vincent and Estelle totaling $900. During the year 1948 Voigt made cash gifts to Vincent four or five times during the year averaging between $200 and $300 each. During the year 1948 Voigt made cash gifts to Estelle totaling between $1,200 and $1,500. On August 13, 1948, Voigt entered his safe-deposit box at the Hutchings-Sealy National Bank and withdrew U.S. Government bonds in order to redeem them. The proceeds received on the redemption of the bonds were deposited in Voigt's checking account at the Hutchings-sealy National Bank. The bonds redeemed and the amounts received in redemption thereof were as follows: Amount received onDateredemption and de-InterestDue dateType of Bonds or NotesRedeemedposited in bankRealizedJune 1952Series E #C12264648E8-13-45$ 84.00$ 9.00Sept. 1953Series E #D5880470E8-13-48405.0030.00June 1952Series E #D2905278E8-13-48420.0045.001971 **533 5 M USA Treas. 2 1/28-13-405,070.0670.061972 *4 M USA Treas. 2 1/28-16-484,020.8420.841970 *2 M USA Treas. 2 1/28-16-482,035.9235.92Totals$12,035.82$210.82On August 13, 1948, Voigt deposited in his checking account in said bank interest in the amount of $900.74 received on the redemption of his coupons on three U.S. Treausry 2 1/2 percent notes. The $1,111.56 (i.e. $210.82 and $900.74) in interest received by Voigt upon the redemption of said bonds and coupons, and the sale of U.S. Treasury notes was not reported as income in Voigt's original or amended income tax return for 1948. On October 4, 1948, Voigt deposited $1,898 realized from the redemption of United States bonds, Series G. Voigt received a $10,000 cash dividend from Maceo and Company on January 14, 1948. On the same date, Voigt drew a check on his bank account payable to cash in the amount of $4,500. On January 14, 1948, O. E. Voigt paid $17,000 to the collector of internal revenue on his 1947 estimated taxes by a cashier's check (No. 101651) issued by the Hutchings-Sealy National Bank of Galveston. In the early part of 1948 Voigt purchased property on 57th Street in Galveston for a total consideration of $21,900 for which he paid $1,900 by check as a down payment, with the balance of approximately $20,000 being paid *534 by a cashier's check (No. 102548) drawn on the Hutchings-Sealy National Bank of Galveston, dated February 24, 1948, in the amount of $17,000 and the balance of $3,000 in cash. On October 1, 1948, Gulf Properties, Inc., borrowed a net of $320,000 from ANICO, and Gulf disbursed $250,000 of that amount on October 5, 1948, to the partners of Maceo and Company which eventually was charged to the respective partners' drawing accounts on the books of Maceo and Company. Voigt received a check from Gulf Properties, Inc., dated October 25, 1948, in the amount of $25,000, which he cashed at the Hutchings-Sealy National Bank on October 18, 1948. During the entire years of 1948, 1949 and 1950 the partners of Maceo and Company maintained a $100,000 cash bankroll for the purpose of financing gambling operations carried on within the partnership of Maceo and Company. Voigt owned 10 percent or $10,000 of the cash bankroll. During the entire year 1948 Voigt carried $3,000 cash in his pocket. During the entire year 1948 Voigt had $15,000 in cash at his home. In addition to the foregoing, Voigt had $2,500 "cash on hand" as of January 1, 1948. Voigt received no gifts or inheritances during the taxable *535 years 1948, 1949 and 1950. During the examination of Voigt's 1948, 1949 and 1950 income tax returns, both Serio and Garrett from time to time told respondent's agents that net worth statements could not be prepared and submitted to respondent's agents on behalf of Voigt because they could not arrive at a cash on hand figure for Voigt. Schedule III represents our reconstruction of respondent's computation of increase in net worth for the taxable year 1948 for O. E. Voigt. Disputed items are indicated by the letter "d." Items without designation are either stipulated, conceded or uncontested. SCHEDULE III.NET WORTH - VOIGTASSETSDecember 31, 1947December 31, 1948(d) Cash on hand$ 2,500.00Cash in pocket3,000.00$ 3,000.00Cash advanced to Maceo &Co. forbankrolls10,000.0010,000.00Cash at home15,000.0015,000.00Cash in banks: U.S. Nat. Bank of$ 13,945.93$ 7,245.93GalvestonHutchings-Sealy Nat. Bank17,761.9831,707.9110,373.2517,619.18Loans Receivable: (d) C. L. Cripps$ 5,600.00Vincent A. Maceo50,000.00$ 45,000.00Willie Mihoval2,500.00C. E. Wade5,000.0063,100.002,500.0047,500.00Investments: Maceo & Co.$154,307.28$162,627.28Gulf Properties, Inc.25,000.0025,000.00U.S. Govt. bonds2,825.00U.S. Treas. notes11,000.00Voigt Bros. Lead Plant235,517.1541,491.97229,119.25Oil Properties: Current years' additions:Sam Maceo Oil Operations$ 840.40Piehl No. 1109.21Vernon Parish leases1,500.00Total$ 2,449.61Less: Intangible payments383.232,066.38Real Estate: Lot 12, Blk. 65, SSBB$25,000.00$ 25,000.00HoustonLots 13 & 14 N. W. Blk.14,052.8214,052.82Outlot 161Lots 4 & 5 S. E. Blk.9,000.009,000.00Outlot 114Lots 10 & 11 N. W. Blk.30,164.0830,164.08161Lots 6-14 Blk. 1, Johnson22,000.00Addn.Improvements78,216.9034,556.05134,772.95Furniture and Fixtures2,215.75$ 2,215.75Furniture and Fixtures10,810.0013,025.75Automobiles: 1940 Buick$ 1,250.00$ 1,250.001947 Frazier2,949.504,199.502,949.504,199.50TOTAL ASSETS$445,457.21$476,303.01LIABILITIES AND RESERVE: Reserves: Depreciation$ 7,711.45$ 14,412.45Depletion1,864.74$ 9,576.192,224.65$ 16,637.10NET WORTH$435,881.02$459,665.91Net Worth beginning of435,881.02yearNet Worth increase$ 23,784.89Add: Nondeductibleexpenditures: Maid expense480.00Food expense1,200.00Gifts3,750.00Income taxes paid29,796.14Personal expenditures as7,386.16stipulatedCorrected net income$ 66,397.19Net income original46,736.35returnIncome omitted from$ 19,660.84original return*536 Corrected Net Income of O. E. Voigt for 1948, 1949 and 1950 under the Net Worth Method (Docket No. 63933) Opinion Respondent, using the net worth method, calculated O. E. Voigt's unreported income to be in the amount of $27,760.84 for the taxable year 1948. See Schedule 5, Appendix Schedules of respondent's brief. In his statutory notice of deficiency, respondent determined that petitioner owed a deficiency in tax for 1948 in the amount of $8,364.60; that there was an overassessment of $0.54 in tax for 1949; a deficiency of $4,649.36 for 1950; and additions to tax for fraud for said years in the aggregate amount of $16,787.87. The parties stipulated that there is an overassessment in tax for 1949 in the sum of $0.54 and that there is no deficiency in tax for 1950, but there is a dispute as to the additions to tax for fraud for 1949 and and 1950 in the amounts of $3,679.36 and $2,324.68, respectively. Petitioner's net income for the calendar year 1948, as disclosed by the original return, was $46,736.35. Upon an examination by a revenue agent, this net income was increased to $49,016.35. In connection with respondent's determination of additional income for 1948 in the amount of $26,250.84, *537 petitioner has reported in his amended return for that year the sum of $14,421, representing unreported income, and paid additional tax on the basis of such amended return. Petitioner contends that the determination of additional unreported income of $11,421 set forth in the notice of deficiency is erroneous. With respect to respondent's reconstruction of petitioner's taxable income for the years in controversy by the net worth method, respondent determined that O. E. Voigt did not have an appreciable amount of cash on hand in his safe-deposit box on December 31, 1947. In his net worth schedule, respondent gave Voigt credit for undeposited cash of $28,000 (i.e., $3,000 "cash in pocket"; $15,000 for "cash at home"; and $10,000 share of Maceo and Company "bankroll") for the years ending December 31, 1947 and 1948. Respondent avers that this cash on hand remained constant during the taxable year 1948. Petitioner urges that he did not have unreported income in 1948 in excess of the amount shown on his amended return for that year ($14,421); and, further, that respondent's determination is arbitrary and erroneous since Voigt had approximately $145,000 cash on hand as of January 1, 1948, *538 and, in any event, at least $16,000 to $20,000 of undeposited cash. In essence, petitioner argues that if he had been given credit by respondent for various loans which he had made to others prior to the start of the net worth period, he would only need about $16,000 to $20,000 cash on hand as of January 1, 1948, to account for his net worth increases and nondeductible expenses. As already stated, it is a fundamental principle in the use of the net worth method to determine, with reasonable accuracy, an opening net worth to serve as a starting point from which to calculate future increases in the taxpayer's assets. Holland v. United States, 348 U.S. 121 (1954). Initially, we note that on several occasions during 1955 when revenue agents Ney and Logan interviewed Sam Serio and Garrett, the spokesman and the appointed representative, respectively, of Voigt and the other partners of Maceo and Company, and asked them about the cash that the several partners had on hand during the years under examination, the agents were told that the partners could not arrive at a cash on hand figure and, hence, they could not give the agents any net worth statements. 7 Ney testified that whenever he *539 and other agents attempted to talk to the seven partners of Maceo and Company about their tax liability they would invariably refer them to Sam Serio. We find no reason to discredit Ney's testimony in this respect. Voigt's claim of a large cash hoard as of January 1, 1948, is based to a substantial degree upon his own testimony and that of Sam Serio. For reasons expressed elsewhere in this opinion we do not find Serio to be a credible witness. As to Voigt's testimony, his individual bias is evident as well as his close relationship to the other partners. It is noteworthy that Voigt did not, until 1954, acknowledge the existence of his cancelled checks, check stubs and bank statements which he then turned over to respondent's agents. Serio *540 and Garrett stated Voigt could not give respondent's agents a financial statement because Voigt could not arrive at the cash on hand figure. However, at the trial Voigt testified unequivocally with respect to cash in his pocket, at his home, and in his safe-deposit box at January 1, 1948. Under the circumstances, and based upon the record as a whole, including the discussion, infra, we find no substance in petitioner's argument that the revenue agents failed to track down significant leads in considering the problem of cash on hand. Petitioner insists that he had approximately $165,000 in his safe-deposit box during the middle of 1946 and about $145,000 at December 31, 1947. However, the circumstantial evidence before us shows convincingly the improbability of such a cash accumulation in his safe-deposit box. The record reveals, as set forth in our findings, that prior to the taxable years in question Voigt on several occasions conducted his financial affairs unlike an individual claiming a substantial cash reserve. During 1936 through 1939, inclusive, Voigt had considerable difficulty in paying his delinquent income taxes to the collector of internal revenue. Dibrell, Voigt's attorney *541 during that period and for earlier years, informed the collector of internal revenue that additional time was needed because Voigt and others in the Turf had recently been forced to mortgage practically all of their real estate holdings in order to purchase the Murdoch Bath House of Galveston. Thereafter, Voigt made periodic payment to discharge his income tax liability. His last payment on his additional 1937 tax liability was made on June 4, 1940, which was about six years previous to his alleged cash hoard of $165,000. While the aforesaid tax liability of Voigt of approximately $3,400 and his installment method of payment is not determinative of the issue, we believe it is some evidence that Voigt lacked available cash in the amount alleged prior to the start of the net worth period. That Voigt did not have a substantial amount of cash on hand in his safe-deposit box during 1948 can also be inferred from the cashing of his Defense Savings Bonds prior to their maturity and the disposition of other Government bonds. Voigt testified that there was no need to cash the bonds, but that he "just got tired having it in bonds * * * just wanted to put it into cash." In our view petitioner's *542 explanation is untenable and militates against belief in his cash hoard story. Moreover, the improbability of Voigt having a substantial amount of cash in his safe-deposit box can also be inferred from the fact that on October 1, 1948, Gulf Properties, Inc., borrowed a net of $320,000 from ANICO and Gulf disbursed $250,000 of that amount on October 5, 1948, to the partners of Maceo and Company which eventually was charged to the respective partners' drawing accounts on the books of Maceo and Company. Voigt received $25,000 as his share of the $250,000 disbursed to the partners. As in the case of Sam and Rose Maceo, the disbursement of $250,000 to the partners indicates that the partners, including Voigt, were in need of cash and tends to negate any contention that petitioner had substantial amounts of undeposited cash in excess of that determined by respondent as of December 31, 1947. See Blackwell v. United States, 244 F. 2d 423 (C.A. 8, 1957) and Bryan v. Commissioner, 209 F. 2d 822 (C.A. 5, 1954), affirming a Memorandum Opinion of this Court. In his net worth schedule for the years ending December 31, 1947, and 1948, respondent gave Voigt credit for a total of $28,000 cash on hand, *543 consisting of cash in pocket ($3,000), cash at home ($15,000), and cash advanced to Maceo and Company for bankrolls ($10,000). Respondent urges that said amounts remained constant during the taxable year 1948. As far as it goes, petitioner's view does not vary greatly from the foregoing. Voigt testified that he had approximately $3,000 to $4,000 cash on his person during the year 1948, and that he had $10,000 to $20,000 at his home during that year. Voigt's housekeeper, Millie Howell, confirmed the fact that Voigt had large sums of cash at his home throughout the years 1948, 1949 and 1950. Voigt does not deny that the cash on his person and at his home remained relatively constant throughout the year 1948. The evidence also supports the conclusion that Voigt's $10,000 interest in the bankroll of Maceo and Company remained relatively constant during 1948. Petitioner contends, however that he had approximately $145,000 cash on hand as of January 1, 1948. We find no acceptable support for this contention, and we do not believe it to be true. Petitioner further claims that, in any event, he had at least $16,000 to $20,000 of undeposited cash in addition to the $28,000 constant aggregate *544 figure allowed by respondent. In support of this view petitioner makes reference to several transactions consummated in the early part of 1948. One contention is that the purchasing of a cashier's check (No. 101651) on his behalf on January 14, 1948, in the amount of $17,000 payable to the collector of internal revenue, establishes that he had said amount of cash on hand in his safe-deposit box on January 1, 1948. The record, however, shows that Voigt received a $10,000 cash dividend from Maceo and Company on January 14, 1948. Also, on January 14, 1948, Voigt drew a check on his bank account for $4,500 payable to cash. Petitioner argues that, even if the cash dividend of $10,000 is deducted (since it was received after January 1, 1948) the payment to the collector of internal revenue would establish that Voigt had at least $7,000 cash on hand as of January 1, 1948 in addition to the amounts of cash allowed by respondent. Upon the evidence, we are satisfied that petitioner had $2,500 cash on hand as of January 1, 1948, (but not $7,000) in addition to the amounts of cash allowed by respondent. While we have repeatedly stated our unwillingness to accept Voigt's testimony in the absence *545 of some reliable corroborating factors, we think there is sufficient circumstantial support in the record to warrant our finding that he had $2,500 in cash on January 1, 1948, in addition to the constant items allowed by respondent, and we so hold. In reaching our conclusion, we have considered the fact that on January 14, 1948, the date Voigt purchased the aforesaid cashier's check for $17,000, he required $2,500 in cash in addition to the cash dividend ($10,000) and the check drawn on his bank account ($4,500). In this connection, we note that the tax payment was made on January 14, 1948, (shortly after the first of the year). In further support of his claim that he had substantial cash on hand as of December 31, 1947, Voigt also urges that he took $17,000 in cash from his safe-deposit box in the Hutchings-Sealy National Bank of Galveston, to buy a cashier's check as part of the total funds to be used to pay the purchase price of real estate on 57th Street in Galveston, Texas. The transaction occurred on February 24, 1948, and the bank records show an entry in the box on that date. Voigt paid earnest money of $1,900 by check and the balance was paid by a cashier's check of $17,000 *546 and $3,000 in cash. There is nothing (other than Voigt's testimony which we here find unconvincing) to support the view that he took $17,000 out of the box, or that he had $17,000 in cash, either in the box or elsewhere, on January 1, 1948, in excess of the $28,000 allowed by respondent and the additional amount of $2,500 which we have allowed hereinabove. As to the $3,000 paid in cash as a part of the purchase price of the 57th Street property, we find no support for the fact (other than the testimony of Voigt) that he had this cash on January 1, 1948, in addition to the cash allowances already made. After adjusting respondent's net worth computation as of December 31, 1947, to reflect additional cash on hand of $2,500 (disbursed on January 14, 1948, as part payment for a cashier's check) and the balance of the Cripps' loan of $5,600, to be discussed infra, petitioner has a net worth increase during the taxable year 1948 in the amount of $23,784.89 and "income omitted from his original return" in the amount of $19,660.84. (See Schedule III). With respect to loans in dispute, petitioner contends that respondent failed to give him any credit for loans which were outstanding at the start *547 of the net worth period and which were repaid to him during 1948. The only loan receivable now disputed is the Cripps item which we have allowed in petitioner's net worth as of December 31, 1947. Our review of the record on this item, including Cripps' testimony, satisfies us that the balance of the loan receivable did exist in the amount of $5,600 as of the date of opening net worth and that it was paid during 1948. We therefore hold for petitioner in this respect. We note that respondent gave petitioner credit with respect to the loans to Mihoval and Wade and their subsequent repayment during 1948. On his net worth schedule respondent shows loans receivable as of December 31, 1947, in the amount of $57,500, consisting of $50,000 loaned to Vincent Maceo; $2,500 to Willie Mihoval and $5,000 to C. E. Wade. On his net worth schedule for the taxable year 1948, respondent shows repayment of $10,000 consisting of $5,000 from Vincent Maceo and $2,500 from Mihoval and Wade respectively. Recognizing the fact that petitioner frequently made loans to various individuals prior to the taxable years and was repaid, we think that there is enough circumstantial corroboration to support a conclusion *548 in favor of Voigt on the Cripps issue. We have found, infra, that Voigt's income tax return filed for the taxable year 1948 was false or fraudulent with intent to evade tax within the meaning of section 276(a) and that a part of the deficiency determined for said year was due to fraud with intent to evade tax within the meaning of section 293(b). Computation of Net Income of Vincent A. Maceo and Estelle Maceo Parmer for 1948, 1949 and 1950 by Net Worth Method. (Docket No. 63934) Findings of Fact and Opinion Respondent, in his stautory notice, determined deficiencies in income tax and additions to tax for the calendar years 1948 through 1950, inclusive, for Vincent A. Maceo and Estelle Maceo Parmer, (hereinafter sometimes called petitioners) as follows: Additions to TaxSec.Sec.YearDeficiency293(b)294(d)(2)1948$2,129.22$1,084.91$ 83.9419495,815.703,100.89273.8719504,811.682,405.84Petitioners' net income for the years 1948 through 1950, inclusive, as disclosed by their original returns, and the amounts of additional income determined by respondent (in his notice of deficiency) for said period is as follows: OriginalAdditionalYearReturnIncome1948$28,527.41$ 5,298.23194916,851.9816,291.75195016,601.6714,113.36Respondent, *549 by use of the net worth method, reconstructed unreported income of petitioners (making allowance for oral concessions, stipulations and newly discovered data at the trial) in the following amounts for the taxable years 1948, 1949 and 1950, respectively: $879.83, $9,509.10 and $18,582.17. See Schedule 6, Appendix Schedules of respondent's brief. In said reconstruction respondent allowed no cash on hand as of the last day of each of the years 1947 through 1950. Petitioners, in opposition, maintain that Vincent had $3,500 cash on hand on January 1, 1948. In essence, petitioners contend that respondent's reconstruction of their net income was erroneous in that it did not correctly account for petitioners' cash on hand at January 1, 1948; borrowed amounts by Vincent from Vic Maceo and from Maceo and Company; gifts received by petitioners during the taxable years, and by including items that are possible duplications. The net worth of the taxpayer must be arrived at carefully but not necessarily with mathematical certainty. Clark v. Commissioner, 253 F. 2d 745 (C.A. 3, 1958), affirming in part a Memoranrandum Opinion of this Court dum Opinion of this Court. The primary essential is the *550 establishment with reasonable accuracy of an opening net worth to serve as a starting point from which to calculate future increases in the taxpayer's assets. Holland v. United States, 348 U.S. 121 (1954). Preliminarily, we note that during the examination of petitioners' income tax returns for the taxable years involved, both Serio and Garrett told respondent's agents that net worth statements could not be prepared and submitted to respondent's agents on behalf of petitioners because they could not arrive at a cash on hand figure. It is also to be noted that Vincent makes no claim that he had accumulated the alleged cash hoard (i.e., $3,500) out of his own earnings during the years prior to the net worth period involved herein. During the years under review, petitioners were in need of funds which they obtained by borrowing from friends and relatives and through the medium of gifts from relatives. Petitioners spent all of the money given to them during the taxable years involved. See discussion of gifts, infra. With respect to the cash on hand in dispute, Vincent urges that as a result of liquidating material and equipment of Maceo Sheet Metal Company in the latter part of 1947, *551 he accumulated "some $3,000." The facts of record do not support petitioner's contention. In 1943 when Vincent became a partner in a roofing business, his father-in-law Voigt, made the investment for him. Apparently, Vincent did not have the funds to make the investment himself. Vincent testified that he sold the assets of the roofing business late in 1947 and received about $3,000 which he offered to Voigt who told him to keep it. Vincent, however, could not recall any transaction wherein he sold the materials from the roofing business, or the name of any individual to whom he allegedly sold the property. Moreover, although Vincent claims he completely liquidated the roofing business during 1947, his 1946 tax returns show no inventory at January 1, 1947. In our view, Vincent has not established that he actually owned assets in 1947 sufficient to realize $3,000, nor has he proved that he sold assets sufficient to realize $3,000 to $3,500. Even if Vincent realized any cash on the sale of his assets in the roofing business, it is quite probable that a portion of it was used for the purchase of real estate in Christopher Square in 1946. On September 25, and October 8, 1946, Vincent paid *552 $825 and $1,957.36, respectively, to Schlankey and Sons for real estate in Christopher Square. Vincent also made a $3,000 payment to Voigt in September 1946 on the liability resulting from the purchase of a five percent interest in Maceo and Company from Voigt. Assuming arguendo that Vincent received $3,500 from the sale of the roofing business assets, it is unlikely that he would have any of said amount left as of January 1, 1947, after making these two payments in 1946. Further indications that Vincent did not have $3,000 cash after liquidating the roofing business is shown in the manner in which he paid for his partnership interest in Maceo and Company. After Vincent gave up the roofing business on July 1, 1946, he acquired a five percent partnership interest in the Turf Club (Maceo and Company) at a price of $52,136. Vincent executed a promissory note for $52,136 payable to O. E. Voigt and made payments of $3,000, $5,000 and $5,000 in September 1946, October 1948, and December 1950, respectively. This note called for annual payments of $5,000, but Vincent made none in 1947 or in 1949. He likewise made no down payment on the purchase of the partnership interest. Another factor which *553 negates petitioner's argument that he had $3,500 cash on hand is found in the fact that during the taxable years Vincent sometimes would obtain merchandise or services from gas stations, groceries, and department stores, and request the vendor to hold the bill and agreed to pay within two or three days. Similarly, Voigt's cash gifts on several occasions to petitioners during the taxable years indicate that Vincent was in need of financial assistance and did not have cash readily available. Likewise, Vincent's loan record with the United States Bank of Galveston for the period May 1945 through 1950 shows that it is is unlikely he had $3,500 cash on hand December 31, 1947. Thus, on January 4, 1947, Vincent borrowed $1,400 from said bank at 6 percent interest payable in three months. It took Vincent approximately 14 months to pay off this loan which had to be renewed on four occasions. In our opinion, if Vincent had $3,500 at December 31, 1947, as he urges, it is unlikely that he would have to renew a loan for $200. In the absence of any convincing explanation we believe his conduct in this matter is inconsistent with that of an individual who is supposed to have $3,500 of cash on hand *554 on December 31, 1947. Also, we note that Vincent traded with Foley's Department Store in Houston and a review of the payment records made by Vincent is inconsistent with what would be expected from a person who has substantial cash available. From February 16, until after July 16, 1949, Vincent made no payments on a $177.54 debt, and then between July 16 and August 16, 1949, he made a payment of $40. On May 5, 1950, Vincent owed Foley's Department Store $108.18 and received monthly statements requesting payment of the $108.18 up to January 16, 1951, which was the last statement of account introduced into evidence. This poor payment record, in our opinion, tends to negate Vincent's claim that he had a $3,500 cash hoard. Another factor indicating that Vincent did not have substantial cash on hand as of December 31, 1947, is that he borrowed $125 on his life insurance policy on October 29, 1941, and by October 1948, the accrued interest and the principal amounted to $141.65. From the date of the loan until the date he repaid said loan on October 8, 1948, or approximately seven years, Vincent made no payments on the principal of the loan. In our view, it is unlikely that an individual *555 with $3,500 cash would let a debt of this amount continue unpaid for seven years. Moreover, the improbability of Vincent having a substantial amount of cash on hand at December 31, 1947, or during the years 1948, 1949 and 1950, can be inferred from a set of circumstantial facts which have been previously discussed in detail in our treatment of Sam and Rosario. As stated hereinabove, on October 1, 1948, Gulf Properties, Inc., borrowed $320,000 from ANICO and ANICO disbursed $250,000 of said amount on October 5, 1948, to the partners of Maceo and Company which eventually was charged to the respective partners' drawing accounts on the books of Maceo and Company. Vincent received $12,500 as his share of the $250,000 disbursed to the partners. As in the case of Sam and Rosario, the disbursement of $250,000 to the partners, including Vincent, shows that they were in need of cash as of December 31, 1947, through 1950, inclusive. Further evidence supporting respondent's position is found in the fact that petitioners purchased two cashier's checks totaling $5,200 on January 14, 1948, payable to the collector of internal revenue for the payment of their income taxes. On the same day, Vincent *556 received a $5,000 cash dividend from Maceo and Company. Apparently, Vincent needed this $5,000 cash dividend to meet his income tax payments. As in the case of the other petitioners in these consolidated cases, and without further elaboration, we find the foregoing transactions inconsistent with the possession of sizeable amounts of cash. Blackwell v. United States, 244 F. 2d 423 (C.A. 8, 1957) and Bryan v. Commissioner, 209 F. 2d 822, 827 (C.A. 5, 1954). In addition to the foregoing facts, it is also noteworthy that Vincent received no inheritances during the years 1948, 1949 and 1950 and received cash gifts during those years only from O. E. Voigt, Frank Maceo and Margaret Williams in amounts as set forth hereinabove. Moreover, we note Estelle testified that on January 1, 1948, she knew of no accumulated cash on hand of $3,000 or any amount unless it was borrowed because her husband borrowed quite a lot. She also testified that it was only after Vincent went to work at Maceo and Company that the amount of cash they had to spend increased. Vincent submitted financial statements to the First National Bank of Galveston which stated his financial position at December 31, 1948, 1949 *557 and 1950. The financial statements claimed "cash on hand and in banks" of $1,078, $1,000 and $1,000 at December 31, 1948, 1949 and 1950, respectively. It is stipulated that Vincent had cash on deposit in banks of $634.63, $1,003.95 and $97.81 at December 31, 1948, 1949 and 1950, respectively. If Vincent's cash in banks as of said years is excluded from the "cash on hand and in banks" as stated in the financial statements, he would have had cash on hand (and not in banks) of $443.37, ($3.95) and $902.19 at the end of each of the taxable years. While financial statements such as those under discussion are not of themselves necessarily conclusive evidence of the facts reported therein, under all of the circumstances before us (including the fact that the statements were voluntarily presented to the bank prior to the emergence of any tax issue), we believe that it would be realistic in the instant case to credit petitioners with cash on hand at the end of 1948 and 1950 in the respective amounts of $450 and $900. In the light of the foregoing discussion, and the record as a whole pertaining to Vincent and Estelle, we hold that they did not have any cash on hand as of December 31, 1947, *558 and December 31, 1949; but that they had $450 and $900 cash on hand at the end of 1948 and 1950. See Schedule IV, infra. With respect to the loans in controversy, we first consider petitioners' contention that respondent failed to give them credit for amounts borrowed from Vic C. Maceo, Vincent's uncle. Vincent testified that he borrowed $4,000 from Vic in 1949 and $1,500 in 1950, and that he repaid $5,000 of the loan in 1952 when he sold some real estate on 53rd Street in Galveston. Vic, while not too clear as to the years involved, corroborated Vincent's testimony in substance. On this issue, we are frankly somewhat in doubt because of the lack of credibility of Vincent and Vic. Nevertheless, the story does not impress us as a concocted one. Moreover, Vincent appears to have been a consistent borrower from relatives whether by blood or marriage. In addition, we are impressed by the testimony of Estelle with respect to this issue. Our observation of her on the witness stand satisfied us that she was truthful but at the same time quite antipathetic to Vincent personally. It was apparent that she did not know the details of all of Vincent's activities, but she did know that Vincent *559 borrowed "some" money from Vic. After careful consideration, we conclude that Vincent did borrow $4,000 from Vic in 1949 and $1,500 in 1950, and that no part of the loan was repaid until after the years in issue. Our net worth statement will reflect this adjustment, infra. Vincent also claims that on October 20, 1950, he borrowed $6,000 from Maceo and Company (out of the $100,000 bankroll in the company safe), as evidenced by an "IOU" on a slip of paper signed by him. A notation on the slip of paper (3 x 5 in size) states that Vincent borrowed said amount "to pay First National note." It also shows that $2,500 was repaid on June 18, 1951, and that the IOU was ultimately paid in full in 1952. It is Vincent's position that he used the $6,000 loan from Maceo and Company to pay off a loan from the First National Bank in the amount of $6,100 on October 20, 1950, and that the IOU was retained in the safe of Maceo and Company until the loan was repaid. We are mindful, as respondent urges, that Maceo and Company had an account set up on its books to which Vincent could charge various items which he acquired through Maceo and Company, and that no loan receivable of $6,000 was set up to reflect *560 the alleged loan to Vincent. We agree that the loan should have been formally reflected on the books of Maceo and Company, and that the failure to so record it requires careful scrutiny. It appears from the record as a whole, however, that numerous cash transactions were handled by Maceo and Company without being recorded on the books and evidenced only by slips of paper or memoranda (see discussion infra). Under the circumstances, in passing upon the particular item now in question, we do not think that the failure to enter the transaction on the books is determinative. More significant, we believe, is the fact that the liability sheet of the First National Bank shows that on October 20, 1950, Vincent paid off a note in the amount of $6,100. Furthermore, a careful examination of the IOU which Vincent claims was made out to Maceo and Company on the same day as the aforesaid payment to the bank discloses nothing on its face which casts doubt on its authenticity. Viewing the record as a whole with respect to this item, we hold that Vincent borrowed the $6,000 in question from Maceo and Company during 1950 and that no part of the loan was paid off during that year. The loan of $6,000 *561 will be reflected in our net worth computation. See Schedule IV, infar. We now come to the question of gifts of money received during the taxable years. Petitioners contend that they received cash gifts totaling about $19,450 for which they claim respondent failed to give them full credit in his net worth computation. Respondent, in his net worth computation, gave petitioners credit for "gifts from O. E. Voigt" and "gifts from Frank Maceo" in the respective amounts of $3,750 and $500 for each of the years ending December 31, 1948, 1949 and 1950. Included in respondent's computation of said gifts were the following separate gifts: (a) Rent in the amount of $900 collected during each of the taxable years on property owned by Voigt, which amount petitioners were allowed to retain; (b) Christmas gifts to petitioners from Voigt of $500 in each of the taxable years; (c) cash gifts to Vincent from Voigt of $1,000 in each of said years; (d) gifts to his daughter, Estelle, from Voigt of $1,350 in each of the taxable years, and (e) Christmas gifts to Vincent from his father, Frank Maceo, in the amount of $500 in each of the taxable years. Petitioners contend respondent failed to credit them *562 in his net worth schedule with a cash gift in the form of rental income of $80 per month which they received from Voigt during the taxable years involved. With respect to this item, suffice it to note that as part of the aforesaid amount of $3,750 in "Gifts from O. E. Voigt" set forth on his net worth schedule, respondent has included $75 per month or $900 annually in each of the taxable years as rent on property owned by Voigt, which petitioners had collected and were allowed to keep as a gift. Under the circumstances, we deem it unnecessary to adjust respondent's net worth computation with respect to the rental income in dispute. Petitioners also aver that on or about June 22, 1949, Voigt gave his daughter, Estelle, $500 to pay a medical bill of Dr. Blocker for which no credit was given to petitioners on respondent's net worth statement. Estelle's testimony on this item was vague. She testified that she thought her father had paid said bill, but that she didn't "know if he did or if he didn't." Vincent testified that Estelle had written the check for $500 but that Voigt had given her the cash for it. Assuming that Voigt gave Estelle $500 to pay the doctor bill (although we are not *563 satisfied that this is established by the meager evidence presented), there is nothing to show that the amount in question was not included in the annual $1,350 gifts to Estelle. Under the circumstances, we make no separate adjustment for this item in our net worth computation. Petitioners maintain that Estelle's sister Margaret Williams, gave her $100 for each of her two children every Christmas during the taxable years; that Margaret gave Estelle $50 for each child on their birthdays; and that Margaret also gave her additional amounts to buy clothes for the children during said period for which respondent failed to give petitioners credit in his reconstruction of unreported income. On the basis of Estelle's testimony pertaining to these gifts, we are satisfied that petitioners in fact received them. We hold, therefore, that petitioners received $300 in gifts from Margaret during each of the taxable years. Our net worth schedule will reflect this adjustment, infra. Petitioners further contend that Frank Maceo gave them $5,000 in 1949 for which respondent failed to give them credit in his net worth computation. The claim is based entirely on the testimony of Estelle. No corroborating *564 circumstances were presented and an examination of Estelle's testimony demonstrates that she did not recall the year of the gift, although she did limit herself to 1948 or 1949. Assuming arguendo that the gift was made, we, nevertheless, cannot arbitrarily select a year for petitioners. Under all the circumstances, we must hold that petitioners have failed to establish their contention on this issue. Petitioners urge that their unreported income should be reduced by "additional incidental gifts" made to them by Frank Maceo of $100 during 1950, for which no credit was given to them in respondent's net worth computation. The amount in controversy is trifling and there is no convincing evidence in the record to support petitioner's position. Under the circumstances, we make no adjustment for "incidental" gifts. With respect to the "silver set," listed as an asset of petitioners in respondent's net worth statement, petitioners contend that respondent erred in increasing the cost of the silver set in 1949 from $462.40 to $716, or an increase of $253.60. We reject petitioners' contention that no competent evidence was presented to show that such increase actually occurred, or that it took *565 place in 1949. Estelle testified that during the taxable years Vincent purchased 27 to 30 sterling silver place settings of "Grand Baroque" pattern from a jewelry store; and that six to eight of these place settings were on hand prior to January 1, 1948. Vincent testified that he purchased the silver place settings "a piece at a time" during the taxable years, but he could not recall the cost thereof. The retail price list - January 1, 1949 - of Wallace Silversmiths shows the cost of a 6-piece place setting of Grand Baroque at $34.80, including Federal tax. Since the record shows Vincent purchased 27 to 30 place setting in a piecemeal fashion during the taxable years involved at a cost of about $34.80 per setting, we have accepted respondent's view and have allocated the number of settings in question over the taxable period, assigning the acquisition of seven place settings to each of the years 1948, 1949 and 1950 at $34.80 per setting. Accordingly, we hold that the investment in sterling silver at December 31, 1947, 1948, 1949 and 1950 was $208.80, $462.40, $716 and $969.60, respectively. On the basis of these purchases, respondent did not err in increasing the cost of the silver *566 sets from $462.40 to $716 during the year 1949. See Schedule IV, infra. Respondent determined that Vincent and Estelle incurred nondeductible expenditures exclusive of Federal income tax payments for the years 1948, 1949 and 1950 of $11,351.03, $15,108.56 and $13,238.01, respectively. Of the foregoing amounts six items of expenditures are disputed by the petitioners as follows: (1) Petitioners' Checks Made Payable to Cash During the taxable years petitioners wrote numerous checks payable to cash. The checks to cash in dollar amounts totaled $1,862.62, $3,491.38 and $804.55 for 1948, 1949 and 1950, respectively. Petitioners were in the habit of writing checks payable to cash for paying personal bills and for other personal expenses. The proceeds of the checks payable to cash were used for personal expenditures. Some of the proceeds were used to pay bills which tradesmen had agreed to hold for two or three days, or for payments on charge accounts, or for day-to-day expenses. Respondent's and petitioners' counsel stipulated certain personal nondeductible expenditures made by Vincent to named vendors. However, no agreement was reached as to the treatment of the amount of checks payable *567 to cash. Respondent proposes to resolve the problem by determining that 25 percent of the total amount of checks to cash will be excluded from nondeductible expenditures to allow for the possibility that some of the proceeds of the checks to cash may may have duplicated amounts stipulated to have been paid to various vendors. The remaining 75 percent of the checks to cash are considered by respondent as nondeductible expenditures. The evidence shows that the proceeds of the checks to cash were used for personal matters. The only business Vincent was engaged in was with Maceo and Company which maintained accounts on its books for the business expenditures of its partners. The record shows that it was a frequent practice of Vincent and his wife to cash checks in order to defray their expenses and sometimes a check in a substantial amount was cashed in order to pay several bills. Respondent, in our view, has taken a reasonable approach, at least in principle, to resolve the issue of duplication of expenditures. Nevertheless, in our own judgment, we think that the amount deleted should be 40 percent of the dollar amount of the checks payable to cash from nondeductible expenditures determined *568 by respondent, and our conclusion will be reflected in our net worth statement. See Schedule IV, infra. (2) Charges on Bank Statements of Bank Accounts of Vincent A. Maceo and Estelle Maceo Parmer During the years 1948, 1949 and 1950 certain charges appeared on the statements of banks with which petitioners maintained checking accounts. The amounts of these charges for 1948, 1949 and 1950 were $527, $42 and $252.65, respectively. Said charges were not reflected on the banks' recordak film by copies of checks or copies of documents showing the purpose of the charges. The original checks were not available either because of their destruction or because they had been misplaced. From the record we are satisfied that the only business in which Vincent was engaged was with Maceo and Company during 1948, 1949 and 1950; that any expenses which Vincent would have incurred while working for Maceo and Company would be reflected on the records of Maceo and Company and that Vincent would have been reimbursed by the company for such expenses. Petitioners urge that there is a possibility of duplication of some of these items with those stipulated, and argue that they be disregarded in toto. Recognizing *569 that there is a possibility that some of the proceeds represented by the charges could have been included among the stipulated payments to the vendors, respondent, in an attempt to eliminate the likelihood of the occurrence of such a circumstance, has deleted 25 percent of the amount of charges from nondeductible personal expenditures. Again we agree with respondent in principle, but also conclude in our judgment, that the amount deleted should be 40 percent. This conclusion also will be reflected in our net worth statement. See Schedule IV, infra. (3) Checks Payable to Named Payees, the Proceeds of Which Could not be Traced as a Credit to Petitioners' Account with Such Payees During the years 1948, 1949 and 1950, petitioners issued checks payable to named payees, the proceeds of which could not be traced as credits to petitioners' account with such payees. Said checks were used in making cash purchases at the payee's business or were cashed and the proceeds used in the payment of personal bills or living expenses. Checks payable to named payees which could not be traced as credits to petitioners' account for the years 1948, 1949 and 1950 amounted to $1,284.15, $1,401.43 and $1,192.19, *570 respectively. In practically all of the instances the evidence has shown either through oral testimony, stipulation, or documentary evidence that petitioner Estelle did business with the named payees. As an example in 1948, petitioners made four checks payable to Robert I. Cohan, Inc., in the amount of $100. Testimony has developed the fact that the symbol "ACC" or "ACCT" which appears on the checks means that they were payments on account. The only business that Vincent was engaged in was with Maceo and Company and Maceo and Company handled the business expenses of the partners. Under the circumstances, we conclude that the checks involved were used to make cash purchases or were cashed and the proceeds used for other personal expenses since they were not reflected as credits on petitioners' charge accounts. We, therefore, sustain respondent's determination that the checks in question represented nondeductible expenditures. See Schedule IV, infra. (4) Payments to Maids Petitioners had one full-time maid during the taxable years. The maids were paid approximately $20 per week or a total of $1,040 each year. Since petitioners stipulated payments to maids of $68, $143 and $488.50 in *571 1948, 1949 and 1950, respectively, these amounts have been subtracted from the yearly payments of $1,040 to maids, and the difference treated as nondeductible expenditures. See Schedule IV, infra. (5) Other Nondeductible Expenditures Respondent determined that petitioners made payments to Daniel Wilson of $20 in 1948; to City National Bank of $75 in 1949; to Belluomini Grocers $840 during each of the yeards 1948, 1949 and 1950, and to Butterowe Sheet Metal of $550 in 1950. With respect to the payment to Butterowe Sheet Metal, the record shows that on October 31, 1950, said company mailed Invoice No. 1213 to Vincent, 5013 Avenue O, Galveston, Texas, billing him in the amount of $550 for labor and material to install a heater, sheet metal ducts and insulation for heater system at said address. On December 11, 1950, Vincent paid said bill with a cash payment of $550. No agreement was reached by the parties as to the aforesaid expenditures. In our view the evidence amply demonstrates that the expenditures were made and that they were personal in nature. In the absence of evidence to the effect that said expenditures were of a deductible nature, we sustain respondent's determination on *572 this item. See Burnet v. Houston 2, 283 U.S. 223 (1931). We also conclude, upon the evidence, that petitioners made the payments to Daniel Wilson in 1948 ( $20); City National Bank in 1949 ( $75); and Belluomini Grocers ( $840) in each of the years 1948, 1949 and 1950, referred to above. In the absence of evidence to the contrary, we find these items to be nondeductible personal expenditures. We note, for completeness, that petitioners conceded at the trial that they incurred additional nondeductible personal expenditures for livestock expense during 1948, 1949 and 1950 in the respective amounts of $118.55, $241.27 and $239.48. See Schedule IV, infra. (6) Trips by Vincent and Estelle Vincent testified as to making vacation trips to Mexico in 1948 and 1949 and to New York in 1950 but stated in effect that he could not estimate the cost of these trips. John Arena who made the trips with Vincent to Mexico estimated the cost to be between $105 and $175 in 1948 and $350 in 1949. Respondent has estimated the New York trip to cost $480 for meals, lodging and entertainment, based upon an estimate of $40 per day for 12 days. The train fare to New York and back was stipulated to be $284.20. *573 Since the testimony established the fact that vacation trips were made, and since Vincent appeared unable to testify as to the cost of the trips, we sustain respondent's estimate of $480 as the cost of the New York trip (exclusive of train fare) and Arena's estimate of $175 in 1948 and $350 in 1949 for the Mexico trips. There are two groups of items on respondent's net worth schedule (Docket No. 63934) that are in controversy with respect to the amount of Vincent's capital investment in Maceo and Company at December 31, 1950. Specifically these items are "Interest in unreported clubroom receipts" and "Elimination of cash drawing recorded on books of Maceo and Company as of December 1950 and not paid until 1951." See Schedule IV, infra. Essentially, said items relate to Vincent's share (with Sam and Rosario) of $33,201 of unreported net winings of clubrooms operated by Maceo and Company at September 30, 1950, which should have been included in each partner's investment in Maceo and Company as of that date, and thus become part of his investment in Maceo and Company at December 31, 1950. For convenience, we discuss these disputed items under the caption "Capital Investments (Sam Maceo; *574 Rosario and Vincent) in Maceo and Company at December 31, 1950," infra. We add for completeness at this point that we have found, infra, that respondent has failed to meet his burden of proving that Vincent and Estelle filed false and fraudulent returns with intent to evade taxes, or that any part of the deficiencies in taxes of Vincent and Estelle for any of the years of Vincent and Estelle for any of the years in issue was due to fraud with intent to evade taxes. Schedule IV, infra, represents our revision of increases in net worth for the taxable years 1948, 1949 and 1950 and the ultimate resulting understatements. Disputed items are indicated by the letter "d." Items without designation are either stipulated, conceded, or uncontested. SCHEDULE IV *Vincent A. Maceo and Estelle Maceo Parmer - Docket No. 63934 Reconstruction of Income for the years 1948, 1949 and 1950 by theNet Worth and Nondeductible Expenditures Method.ASSETSDecember 31, 1947December 31, 1948(d) Cash on hand$ 450.00Cash in banksU.S. National Bank,Galveston, Texas: ck. a/c - Vincent A. Maceo$ 269.37101.70Savings a/c No. X141719.64First Natl. Bk., ck. a/c Mr.$ 289.01532.93$ 1,084.63& Mrs. Vincent A. MaceoInvestments: Maceo & Co., Investment perStip. V.,Exh. H(33rd)$76,211.13$80,241.14(d) Int. in unreportedclubroom receipts(d) Elimination of cashdrawing recorded on books ofMaceo & Co. asof December 1950 and not paid76,211.1380,241.14until 1951Gulf Properties, Inc.12,500.0012,500.00U.S. Gov't. Bonds225.00112.50R. Maceo, Trustee,PartnershipReal Estate: Lots 5 & 6, Blk. 90, Denver$ 7,900.00$ 7,900.00ResurveyBlks. 22 & 23, Moore Addition607.50607.50Lots 23 & 26, Christopher9,250.0017,757.509,250.0017,757.50SquareAutomobiles: 1942 Buick$ 1,600.001948 Plymouth$ 1,723.211949 Oldsmobile1,600.001,723.21Boat (or jewelry)(d) Silver set208.80462.40TOTAL ASSETS$108,791.44$113,881.38*575 Reconstruction of Income for the years 1948, 1949 and 1950 by theNet Worth and Nondeductible Expenditures Method.ASSETSDecember 31, 1949December 31, 1950(d) Cash on hand$ 900.00Cash in banksU.S. National Bank,Galveston, Texas: ck. a/c - Vincent A. Maceo$ 115.5839.60Savings a/c No. X1417First Natl. Bk., ck. a/c Mr.888.37$ 1,003.9558.21$ 997.81& Mrs. Vincent A. MaceoInvestments: Maceo & Co., Investment perStip. V.,Exh. H(33rd)$67,371.97$74,132.26(d) Int. in unreported1,660.05clubroom receipts(d) Elimination of cashdrawing recorded on books ofMaceo & Co. asof December 1950 and not paid67,371.975,000.0080,792.31until 1951Gulf Properties, Inc.12,500.0012,500.00U.S. Gov't. Bonds150.00187.50R. Maceo, Trustee,25,976.2526,467.48PartnershipReal Estate: Lots 5 & 6, Blk. 90, Denver$ 7,900.00$ 7,900.00ResurveyBlks. 22 & 23, Moore Addition607.50607.50Lots 23 & 26, Christopher9,250.0017,757.509,250.0017,757.50SquareAutomobiles: 1942 Buick1948 Plymouth1949 Oldsmobile$ 3,608.003,608.00$ 3,608.003,608.00Boat (or jewelry)1,700.001,700.00(d) Silver set716.00969.60TOTAL ASSETS$130,783.66$144,980.10 -2 DecemberDecemberDecember31, 194831, 194931, 1950Increase in Net Worth Brought Forward$ 9,315.55$ (87.95)$11,540.09Add Nondeductible ExpendituresPersonal nondeductible expenditures5,271.487,108.747,994.43stipulatedNondeductible medical expenses486.591,219.48489.10Drug store expenses - stipulated personal522.64expensesPersonal nondeductible expenses,118.55241.27239.48livestock expense(d) Checks of Vincent & Estelle payableto cash (1948- $1,862.62; 1949 - $3,491.38; 1950 -1,117.572,094.83482.73$804.55) 60% nondeductible and 40% ofdollar amount of checks deleted to avoidduplication(d) Checks payable to named payees which1,284.151,401.431,192.19cannot be traced as a credit topetitioners' account with such payee(d) Amounts of withdrawals from checking316.2025.20151.59account for which checks are unavailable.(1948 - $527; 1949 - $42; 1950 - $252.65)60% nondeductible and 40% deleted toavoid duplicationOther nondeductible payments to: Named vendors as shown in Exh. E(33rd)729.29523.52356.01(d) Butterowe Sheet Metal Works550.00Schiankey & Sons6.7512.48(d) Daniel Wilson20.00(d) City National Bank - Kovovich75.00*576 -3 SCHEDULE IV LIABILITIES AND RESERVESDecember 31, 1947December 31, 1948Loans Payable: First National BankNote No. 32771$ 2,000.00Note No. 39783U.S. National BankNote No. 1952$ 500.00Note No. 5715Schlankey & Sons5,280.00Great Southern Life Ins. Co.118.44Loans Payable: O. E. Voigt50,000.0045,000.00R. Maceo, Trustee(d) Vic C. Maceo(d) Maceo and Company$55,898.44$47,000.00Reserve for Depletion124.48247.31Total$56,022.92$47,247.31Net Worth52,768.5266,634.07Net Worth Beginning of Year$52,768.52Net Worth Increase13,865.55Deduct Nontaxable Receipts(d) Gifts from O. E. Voigt$ 3,750.00(d) Gifts from Frank Maceo500.00(d) Gifts from Margaret300.00Williams$ 4,550.00Increase in Net Worth after$ 9,315.55taking gifts into accountLIABILITIES AND RESERVESDecember 31, 1949December 31, 1950Loans Payable: First National BankNote No. 32771Note No. 39783$ 7,000.00$ 1,168.81U.S. National BankNote No. 1952Note No. 57151,500.00Schlankey & SonsGreat Southern Life Ins. Co.Loans Payable: O. E. Voigt45,000.0040,000.00R. Maceo, Trustee4,663.59(d) Vic C. Maceo4,000.005,500.00(d) Maceo and Company1,854.716,000.00$59,354.71$57,332.40Reserve for Depletion332.83461.49Total$59,687.54$57,793.89Net Worth71,096.1287,186.21Net Worth Beginning of Year$66,634.07$71,096.12Net Worth Increase4,462.0516,090.09Deduct Nontaxable Receipts(d) Gifts from O. E. Voigt$ 3,750.00$ 3,750.00(d) Gifts from Frank Maceo500.00500.00(d) Gifts from Margaret300.00300.00Williams$ 4,550.00$ 4,550.00Increase in Net Worth after($ 87.95)$11,540.09taking gifts into account*577 DecemberDecemberDecemberLIABILITIES and RESERVES31, 194831, 194931, 1950Other Nondeductible Payments: (d) Maid expense at $20 per week$ 972.00$ 897.00$ 552.50Trip to New York764.20(d) Trips to Mexico175.00350.00(d) Belluomini Grocers $70 per mo. X 12 *495.00119.44294.82Nontaxable portion of capital gains(1.87)Income taxes paid8,890.666,592.343,505.74Corrected Net Income$29,198.79$21,081.07$28,125.36Net income per original returns28,527.4116,851.9816,601.67Unreported Income$ 671.38$ 4,229.09$11,523.69Capital Investments (Sam Maceo, Rosario and Vincent) in Maceo and Company at December 31, 1950, in the amounts of $245,742.02, $245,742.02, and $80,792.31, respectively Findings of Fact and Opinion Maceo and Company maintained win and loss books in which were recorded the net winnings derived from gambling operations carried on in its clubrooms. At the close of its fiscal years (September 30), it was the duty of Joe T. to analyze the winnings of each clubroom as reflected by the win and loss books and the surplus cash funds in his possession to ascertain whether all of the winnings of the clubrooms had been transferred to the general *578 books of account of Maceo and Company. If there were winings that had not been transferred to the general books, it was the function of either Joe T. to cause such winnings to be drawn from the safe in the safe office and transferred to the bank accounts of Maceo and Company, or of Serio to deliver the money directly to the partners of Maceo and Company as partnership distributions. Ordinarily, appropriate entries would be made on the books of Maceo and Company to reflect these year-end clubroom winnings. The win and loss books allegedly accounted for the entire net winnings of all the clubrooms operated by Maceo and Company. As of September 30, 1950, Joe T. did not cause the accumulated net winnings of the clubrooms in the amount of $33,201, as shown by the win and loss book, to be transferred to the general books of Maceo and Company. However, the $33,201 accumulated winnings were recorded on the books of Maceo and Company in its next fiscal year which ended September 30, 1951. The win and loss book showing that $33,201 in clubroom winnings had not been recorded on the general ledger of Maceo and Company was produced by the petitioners for inspection by respondent for the first time *579 on August 24, 1960. On August 22, 1960, the parties stipulated that the ownership interest in Maceo and Company (partnership) of the Estate of Rosario Maceo and of Vincent and Estelle Maceo Parmer as of December 31, 1950, was $224,101.82 and $74,132.26, respectively. In computing the aforesaid ownership interests of Rosario and Vincent, respondent relied on their investment in the partnership as shown on the books of account, including the general ledger, of Maceo and Company for each of the years involved. Respondent did not know on August 22, 1960, the date on which Exhibit H (33rd) was stipulated, that Vincent and Rosario's investment in Maceo and Company at December 31, 1950, was in excess of the amounts set forth in the stipulation. The understatement of investment arose out of two circumstances as follows: (1) The clubroom receipts recorded on the general ledger of Maceo and Company for the year ended September 30, 1950, did not include $33,201 of clubroom receipts which were reflected in a subsidiary win and loss book maintained by Maceo and Company for the year ended September 30, 1950. The $33,201 omission of income from the books of Maceo and Company resulted in an understatement *580 of Vincent's investment in the amount of $1,660.05 (5 percent of $33,201) and an understatement of Rosario's investment in the amount of $6,640.20 (20 percent of $33,201), respectively, in Maceo and Company as of September 30, 1950, and (2) the recording as of December 21, 1950, of a cash withdrawal of $5,000 by Vincent (representing his 5 percent share in a $100,000 cash distribution to the partners); and the recording as of December 21, 1950, of a cash withdrawal of $15,000 by Rosario (representing his 15 percent share of a $100,000 cash distribution to the partners), both of which withdrawals were actually made in 1951. The actual date of these withdrawals was not discovered by respondent until after the filing of Stipulation V on August 22, 1960. Respondent filed a motion to correct the stipulated investments in Maceo and Company of Rosario and Vincent as of December 31, 1950. In said motion respondent calculated the total investment of Rosario to be $245,742.02 as of December 31, 1950. This figure was arrived at by adding to the stipulated investment of $224,101.82, the sum of $6,640.20 (Rosario's share in unreported clubroom receipts) and $15,000 (resulting from elimination of *581 cash withdrawal recorded on books of Maceo and Company as of December 1950 and not paid until 1951.) Respondent calculated the total investment of Vincent to be $80,792.31 as of December 31, 1950, which he computed by adding to the stipulated investment of $74,132.26 the sum of $1,660.05 (Vincent's share in unreported clubroom receipts) and $5,000 resulting from elimination of cash withdrawal recorded on books of Maceo and Company as of December 1950 but not paid until 1951. For reasons expressed in our Opinion, infra, respondent's motions to modify the stipulation will be granted. The stipulation with respect to the Estate of Sam Maceo was executed after the respondent disovered that the amount of $33,201 of net winnings had not been reported as part of the petitioners' investment in Maceo and Company. In his net worth statement for the Estate of Sam Maceo, respondent included $6,640.20 as Sam's "interest in unreported club receipts," as of December 31, 1950. See Schedule I, supra. There appears to be no doubt that respondent's computations of the shares of Rosario and Vincent in unreported clubroom winnings were correct and that the share of Rosario and Vincent should have been *582 taken into account in 1950 unless prevented by Stipulation V. Since we hold, infra, that said Stipulation must be set aside to the extent necessary to give proper effect to the allocation of the shares of Rosario and Vincent, we need not discuss the issue further at this point. With respect to the distribution of $15,000 to Rosario and $5,000 to Vincent, purporting to have been made in December 1950 as their respective shares of an over-all distribution of $100,000 to partners, we conclude, after a painstaking re-examination of the appropriate parts of the record, that the records of Maceo and Company were altered some time after December 31, 1950, and that the actual distributions were made in April or May of 1951. It would serve no useful purpose to further protract this discussion by a detailed analysis of the material to be found in the record which, in the end, could only bring the same result as the ultimate finding we have just made. Accordingly, without further discussion, we have given effect in our net worth statements (Schedules II and IV) to the elimination in 1950 of the items of $15,000 and $5,000 here considered, and as considered infra, Stipulation V will be set aside *583 to the extent necessary to give effect to our conclusions. With reference to Sam Maceo's case, we note that respondent, on brief, avers that a stipulation question does not exist therein since the stipulation made in his case states that it reflects Sam's investment in Maceo and Company as shown by the general ledger of Maceo and Company after taking into account revenue agents' adjustments for earlier years. Counsel for the Estate of Sam Maceo concedes that respondent properly included Sam's share of unreported net winnings of clubrooms operated by Maceo and Company in the amount of $6,640.20 in his net worth statement as of December 31, 1950. This concession is reflected in our net worth statement. See Schedule I, supra. With respect to the treatment of the $15,000 cash distribution to Sam, we are frankly perplexed as to whether the parties are in accord or not as to the treatment of said distribution. If they are in accord, we suggest that they stipulate the disposition of this item. We have already ruled with respect to Rosario and Vincent that the distribution was actually made in 1951 and we have reflected the same view in our net worth statement in Sam's case. The materials *584 before us with respect to the consideration of the $15,000 distribution to Sam are not entirely satisfactory. We, of course, wish to be sure that there is no factor of duplication of treatment in his case. In any event, if such a problem does exist and no accord is reached, it should be possible to dispose of the issue under Rule 50 because, after our holding as to Rosario and Vincent, it would appear to be a mere matter of analysis of the computation. Having decided that the investment in Maceo and Company as of December 31, 1950 of Rosario and Vincent as stipulated was erroneous, we consider whether Stipulation V should be modified to reflect the actual facts. Stipulations of fact are to be encouraged and are not lightly to be set aside. Our own Rule 31(b)(1) states that the Court expects the parties to stipulate evidence to the fullest extent to which complete or qualified agreement can be reached including all material facts that are not or fairly should not be in dispute. Rule 31(b)(5), 8 however, states, that the Court may set aside a stipulation in whole or in part where justice requires. In other words, a stipulation presupposes a meeting of the minds covering the facts which *585 are the subject of consideration, and, under ordinary circumstances, a stipulation of facts is taken as true unless there is a substantial reason to set it aside in whole or in part. See William Ernest Seatree, 25 B.T.A. 396, 401 (1932). Upon the facts before us, we hold that there was no meeting of the minds with respect to those parts of Stipulation V reflecting upon the $33,201 unreported net clubroom winnings and the respective shares of Rosario and Vincent in the amounts of $15,000 and $5,000 representing their interests in the $100,000 distribution to the partners made in 1951 but recorded as of December 1950. We have no doubt that respondent would not have entered into the stipulation in these respects had he been aware of the actual facts. We conclude in the light of the foregoing discussion that justice requires that we set aside Stipulation V to the extent here in issue and we so hold. Fraud General We now consider the question of whether or not a part of the deficiency due from each of the petitioners for each of the years 1948 to 1950, inclusive, was due to fraud with intent to evade tax within the meaning of *586 section 293(b) of the 1939 Code. The burden of proof with respect to fraud is upon the respondent and he must establish fraud on the part of each petitioner by clear and convincing evidence. Cefalu v. Commissioner, 276 F. 2d 122 (C.A. 5, 1960), affirming a Memorandum Opinion of this Court and Potson v. Commissioner, 22 T.C. 912 (1954), affd. sub nom., Bodaglau v. Commissioner, 230 F. 2d 336 (C.A. 7, 1956). Our conclusion with respect to the issue of fraud for the taxable years 1947 through 1950, inclusive, are based upon consideration of the entire record properly before us, and we are not limited to a consideration of respondent's affirmative evidence. Frank Imburgia, 22 T.C. 1002, 1014 (1954); Wallace H. Petit, 10 T.C. 1253, 1257 (1948); L. Schepp Co., 25 B.T.A. 419, 440 (1932). We also recognize that in this, as in many fraud cases, proof of fraud if it is to be established must depend in some respect upon circumstantial evidence. Fraudulent intent can seldom be established by a single act or by direct proof of the taxpayer's intention. It is usually found by surveying his whole course of conduct and is to be adduced as any other fact from all the evidence of record and inferences *587 properly to be drawn therefrom. M. Rea Gano, 19 B.T.A. 518, 532 (1930). Our findings of an understatement in taxable income for each of the petitioners for each of the years in question for the purposes of the deficiencies involved was based in some respects upon petitioner's failure to meet his burden of proof. We are mindful that respondent cannot meet his own burden of establishing fraud on the basis of petitioner's failure to discharge the burden of proving error in the determination of deficiencies, and we do not, of course, rest our findings on that basis. We have held that a mere understatement of income does not establish fraud. James Nicholson, 32 B.T.A. 977 (1935), affd. 90 F. 2d 978 (C.A. 8, 1937). The existence of fraud with intent to evade tax must be affirmatively established. Drieborg v. Commissioner, 225 F. 2d 216, 218 (C.A. 6, 1955), affirming in part a Memorandum Opinion of this Court. There must be independent evidence which shows a willful intent to evade tax. In that connection, the Supreme Court in Spies v. United States, 317 U.S. 492 (1943), said at p. 499: Congress did not define or limit the methods by which a willful attempt to defeat and evade might be *588 accomplished and perhaps did not define lest its effort to do so result in some unexpected limitation. Nor would we by definition constrict the scope of the Congressional provision that it may be accomplished "in any manner." By way of illustration, and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices, or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal. If the taxevasion motive plays any part in such conduct the offense may be made out even though the conduct may also serve other purposes such as concealment of other crime. In evaluating respondent's evidence, it is also essential to bear in mind that increases in net worth standing alone cannot be assumed to be attributable to currently taxable income. Holland v. United States, 348 U.S. 121 (1954). Where the taxpayer's increase in net worth is substantially in excess of his *589 reported income, and where the discrepancy cannot be reasonably explained as being attributable to gifts, inheritances, or other nontaxable receipts, the net worth method furnishes persuasive evidence of unreported income. Proof by the respondent of a likely source of taxable income is sufficient to enable the Court to conclude that unreported income shown by either the net worth or available funds method is unreported taxable income. Dupree v. United States, 218 F. 2d 781, 784 (C.A. 5, 1955). After a painstaking analysis of all of the evidence in this case, and bearing in mind the above-stated principles, we are convinced that petitioners other than Vincent and Estelle received substantial taxable income during each of the years 1948 through 1950, inclusive, from their gambling enterprise in excess of that reported on their individual returns for those years, and that, except as to Vincent and Estelle, in each of said years, a part of each deficiency here involved was due to fraud with intent to evade taxes. It is well settled that respondent, in sustaining his burden of proof of fraud, need not prove the precise amount of the deficiency attributable to such fraud, but only that *590 a part of the deficiency is attributable thereto. United States v. Chapman, 168 F. 2d 997 (C.A. 7, 1948), certioari denied 335 U.S. 853. The understatements of income in each of the years 1948 to 1950, inclusive, were both substantial in amount and substantial in proportion to reported income (except as to Vincent and Estelle) of which we have no doubt that petitioners were fully aware. We reject petitioners' testimony to the effect that their returns were honest, correct, and complete because analysis of the record demonstrates the contrary. Even if this case were devoid of the usual indicia of fraud, the courts have held that consistent understatements of income in substantial amounts over a number of years by knowledgeable taxpayers, standing alone, are persuasive evidence of fraudulent intent to evade taxes. Cefalu v. Commissioner, 276 F. 2d 122 (C.A. 5, 1960); Shahadi v. Commissioner, 266 F. 2d 495 (C.A. 3, 1959); Schwarzkopf v. Commissioner, 246 F. 2d 731 (C.A. 3, 1957), affirming on this point a Memorandum Opinion of this Court; Bryan v. Commissioner, 209 F. 2d 822, 828 (C.A. 5, 1954), certiorari denied 348 U.S. 912; Jack M. Chesbro, 21 T.C. 123, 131 (1953), affd. 225 F. 2d 674*591 (C.A. 2, 1954), certiorari denied 350 U.S. 995; Rogers v. Commissioner, 111 F. 2d 987 (C.A. 6, 1940), affirming 38 B.T.A. 16; W. A. Shaw, 27 T.C. 561, 570 (1956), affd. 252 F. 2d 681 (C.A. 6, 1958). In Epstein v. United States, 246 F. 2d 563 (C.A. 6, 1957), certiorari denied 355 U.S. 868, the Court stated (p. 933): The consistent understatement of large amounts of income for a number of years is evidence of willful intent to evade. Kurnick v. Commissioner, supra, 232 F. 2d 681; Drieborg v. Commissioner of Internal Revenue, 6 Cir. 225 F. 2d 216. In Holland v. United States, supra, 348 U.S. 139, * * * the Supreme Court declared that "evidence of a consistent pattern of underreporting large amounts of income" will support "an inference of willfulness." As indicated above in the instant case, the correct net income for each of the years 1948 to 1950, inclusive, greatly exceeded the amount reported by petitioners. Their understatements of income (except Vincent's) were so large, regular and frequent, extending over a period of at least three years, 1948 to 1950, inclusive, that there is no escape from the inference of a deliberate intention to defraud the Government of the taxes lawfully *592 due it. While the net worth method is not so precise as to preclude the possibility of minor inaccuracies, facts for each of the years 1948 through 1950, inclusive, preclude the possibility of any inaccuracies of sufficient size to explain away or successfully refute the otherwise obvious inference of deliberate fraud. In addition to the consistent pattern of substantial understatements, the record is replete with facts and convincing circumstantial evidence which sustain the view that respondent has met his burden of establishing that the petitioners knowingly and intentionally evaded their taxes during the taxable years 1948 through 1950, inclusive. Without suggesting that the following discussion is at all complete, we merely advert to the following indicia of fraud. Preliminarily, we note that failure to cooperate on the part of a taxpayer during an investigation of his tax liability which has the effect of misleading or attempting to conceal facts is a circumstantial fact indicative of fraud. J. S. McDonnell, 6 B.T.A. 685, 693 (1927); May E. Kaderly, 21 B.T.A. 582-583 (1930); Joseph Calafato, 42 B.T.A. 881, 890 (1940). Here, the record shows that petitioners' conduct during respondent's *593 investigation was designed to mislead, obstruct and hinder respondent's agents for the purpose of concealing facts. In this connection, we note that on September 17, 1951, respondent's agents requested from Serio, the appointed spokesman of the partners of Maceo and Company, the cancelled checks, bank statements and check stubs of all the petitioners involved in these cases. Serio subsequently informed respondent's agents that these records were not available because they had been destroyed. As a result of Serio's statements regarding the destruction of petitioners' bank records, respondent's agents found it necessary to prepare detailed schedules known as "check spreads" by reviewing the voluminous bank records of various banks in Galveston in which petitioners maintained accounts. At the time Serio told respondent's agents that the bank records of petitioners had been destroyed, he actually had in his possession the cancelled checks, bank statements and check stub books of Rosario for the period involved. At the trial the bank records relating to the accounts of Frances Maceo were produced. After the agents had gone through the task of preparing schedules showing the bank transactions *594 of the petitioners, Voigt produced his bank records. Bank records of Sam were produced in 1960. In 1952, Serio told respondent's agent that no daily win and loss book showing gambling receipts of Maceo and Company was maintained. Later, 1955, he told respondent's agents that a win and loss book was maintained and it would be given to respondent's agents when located. The win and loss books were finally produced pursuant to respondent's subpoena issued in these cases. On January 24, 1954, Voigt told respondent's agents that he had no records of loans made and outstanding at January 1, 1948, and had no records of repayments of loans in 1948. However, at the trial Voigt produced records evidencing loans outstanding at January 1, 1948, and evidence of repayments of loans during 1948. We consider the foregoing attempt by the several partners concerned to hinder respondent's investigation, while not determinative of the issue, is a persuasive indication of fraud. Spies v. United States, 317 U.S. 492 (1943). We reject petitioners' contention that the filing of amended returns for the years involved is entitled to substantial weight as evidence of a lack of intent to evade payment of their *595 income taxes. Petitioners' argument might have carried some weight if the taxpayers involved or their representatives had made a full disclosure of all relevant and material facts pertaining to the income that was reported on the amended returns prior to the time that Serio was alerted by the activities of the Texas Crime Investigating Committee and by the inquiries made by revenue agents in relation to Salvato. It is true that Sam died on April 16, 1951, but he signed joint timely returns with Edna for 1948, 1949 and 1950 and made no disclosure of his joint venture earnings in his returns for any of said years although it is obvious that he must have been aware of them. It is equally obvious that Sam had nothing to do with the amended returns and the argument that the amended returns evidence lack of intent cannot be applicable to him. It is noteworthy that Serio and Garrett shifted their version as to the manner in which $669,920 of unreported income for the years 1948, 1949 and 1950 had been computed. Serio stated on August 25, 1952, that the income reported on the amended returns represented a figure that had been grabbed out of the air. On August 26, 1952, Serio stated that the *596 income shown on the amended returns was based upon his computation of the amount of money he had invested in the oil business plus an additional amount to be on the safe side. Later, on March 4, 1955, Serio stated that the income reported on the amended returns had been computed by Rosario and Serio after discussions with Adams, Vic C. and Frank. Garrett testified at the trial that in June 1951 Serio had given him a schedule showing a computation of omitted income which had been based upon figures Rosario had given Serio. The record shows that the partners of Maceo and Company and those acting on behalf of the estate of Sam attempted to cloak the filing of the amended returns with an aura of good faith by having Garrett, a CPA, examine their records to see if there were any errors and ultimately prepare amended returns. The CPA, when questioned as to the work that he performed for Maceo and Company, testified that he did not make an effective examination of either partnership or individual records to determine the unreported income of the partners reported on the amended returns. Instead, Garrett relied solely upon a statement by Serio and Rosario as to the source and amount of the *597 unreported income which the partners decided they would concede that they had omitted from their original 1948, 1949 and 1950 returns. While the payment of the correct tax by means of an amended return after the investigation has started is a factor to be considered on the issue of willfullness, it must likewise be kept in mind that the very act of filing the amended return of admittedly unreported income may be decisive in the absence of satisfactory explanation of the delinquency, on the issue of fraudulent omission of taxable income from the original return, United States v. Rosenblum, 176 F. 2d 321, 330 (C.A. 7, 1949). In the instant case it is our view that the amended returns filed herein are not satisfactory evidence of a lack of intent to evade tax, but instead constitute persuasive evidence in the posture of this case of the intent of Sam, Rosario and Voigt to evade portions of their 1948, 1949 and 1950 income taxes. We add for completeness that Vincent did not share in the joint venture winnings nor did he and his wife, Estelle, file amended returns for the years under review. We find no merit in petitioners contention in Docket Nos. 55709 and 63933 that additions to tax *598 for fraud, if any, should apply only to a deficiency determined after the amounts paid by them on their original and amended returns are taken into account. The voluntary filing of amended returns and payment of the greater amount disclosed thereby after the investigation has started will not mitigate or avert the fraud penalty if otherwise properly asserted on the basis of the original return. Harry Sherin, 13 T.C. 221, 229-230 (1949); Garden City Feeder Co., 27 B.T.A. 1132, 1148 (1933), reversed on other grounds, 75 F. 2d 804 (C.A. 8, 1935). Indeed, the payment of a tax by a defrauding taxpayer and the filing of an amended return does not bar the respondent from determining a deficiency consisting only of additions to tax for fraud. Henry Naples, 32 T.C. 1090, 1097 (1959); Aaron Hirschman, 12 T.C. 1223, 1229 (1949). We think there can be no doubt, in the context of this case, that the failure to keep records of all earnings, particularly illicit gambling receipts, is significant evidence of fraud. To hold otherwise would, as the Supreme Court stated in United States v. Johnson, 319 U.S. 503, 518 (1942), "be tantamount to holding that skillful concealment is an invincible barrier *599 to proof. * * *" Moreover, as was stated by the Court of Appeals for the District of Columbia in O'Laughlin v. Helvering, 81 F. 2d 269-270 (1935) at page 270: Taxation is not only practical - it is vital. The obligation of good faith and fair dealing in carrying out its provisions is reciprocal and, as the government should never be overreaching or tyrannical, neither should a taxpayer be permitted to escape payment by the concealment of material facts. * * * See also Anderson v. Commissioner, 250 F. 2d 242 (C.A. 5, 1957), affirming a Memorandum Opinion of this Court. During each of the years involved herein petitioners failed to maintain records of all of their business receipts, as required by law and kept the accountant they employed to prepare their returns for the period involved uninformed of their total receipts. 9*601 We find no merit in petitioners' insistence that the books and records of Maceo and Company adequately and accurately reflect the total income of the partnership during the taxable period in question. Without attempting to discuss in detail all of the inadequacies apparent in the books and records of Maceo and Company, we will allude to some of the more obvious defects. *600 Examination of the operations of Maceo and Company reveals the existence of two separate and distinct standards of accountability in respect to company income. As set forth in our Findings the first standard involves a company policy that all employees who received monies belonging to the partnership in nongambling operations were required to account for them in meticulous detail. In sharp contrast, the second standard involves a policy that no detailed or informative records would be disclosed to internal revenue officers as to the company's gambling operations, and those records which were maintained would be prepared and handled in such a way that no effective examination could be made by an internal revenue agent of the underlying transactions represented by such records other than by a resort to a reconstruction of the income of the partnership or the individual partners who controlled it. In essence, the record shows an unbroken sequence of accounting procedures that characterize the accounting for the nongambling operations of Maceo and *602 Company as distinguished from the interrupted series of accounting procedures which characterize the accounting for its gambling operations. Unlike nongambling activities, the net win or net loss from each gambling location would be combined and recorded in a simple entry. The slips of paper from the betting operations would then be destroyed thereby making it impossible to verify in any manner the entry showing net winnings or losses. The same type of accounting procedure was used in the clubrooms. The net win or loss from the separate clubrooms would be sent daily to Joe T. who at some indeterminate time would take a portion of the receipts and record them on a daily cash statement in order that they could be reported as clubroom receipts on the books or account of Maceo and Company. Said receipts were usually recorded on the books of Maceo and Company at a time when they were needed to pay expenses or make partnership distributions. The daily records from the clubrooms were destroyed thereby making it impossible to audit or substantiate in any manner the clubroom receipts recorded in the win and loss books or in the general books of account of Maceo and Company. Generally, Maceo *603 and Company's use of the interrupted sequence of accounting procedures for recording gambling receipts resulted in records that appeared to have been prepared in the regular course of business and which appeared to be in balance. On occasion, however, the details of the system apparently became too voluminous to handle and the system broke down. At that time Joe T. or Serio allowed income to be recorded on the books of Maceo and Company that cannot be traced to Maceo and Company operations or related to entries of gambling income that Maceo and Company admittedly received. Clubroom winnings were accumulated for several weeks before being posted in the win and loss books and in the general ledger. Petitioners urge that despite such "delayed posting" the win and loss books "tied into the general books of Maceo and Company one hundred percent." We must disagree. We are mindful that delayed posting, without evidence of failure to report, is not determinative of the issue of fraud. We are concerned here with the proper technique of reporting receipts only insofar as it evidences a plan to conceal any of the gambling income earned by Maceo and Company. The record shows several instances *604 where there were omissions of substantial net winnings from the win and loss books in each of the Company's fiscal years ended September 30, 1948, 1949 and 1950. With respect to the Silver Moon, a gambling casino, there is an absence of detailed records of its operation for the years 1948 and 1949 and a lack of explanation of the clubroom receipts which appeared on the general books of Maceo and Company. In addition, clubroom receipts were recorded for operations which are not separately identified on the general books of account of Maceo and Company. Thus, in the fiscal years ended September 30, 1948, and 1949, clubroom receipts were recorded applicable to the Silver Moon of $55,744.47 and $58,938.15, respectively. But there are no underlying records showing the dates and circumstances under which such amounts were received at the Silver Moon in 1948 and 1949. In the fiscal year ended September 30, 1949, clubroom receipts were recorded in the amount of $10,069.19, without indication of source but accompanied by a pencil notation indicating that the money was being used to defray some sort of tax. Also, in the fiscal year ended September 30, 1948, clubroom receipts and salaries of *605 $21,946.18 were recorded applicable to an unidentified operation. As already noted, no win and loss books for the fiscal years ending September 30, 1948, and 1949, respectively, were produced for the Silver Moon. Petitioners contend that even though the detailed records relating to the Silver Moon have been lost or misplaced, the general books reflected the reporting of substantial income from "these sources." Suffice if to say that the taxpayer is obliged by law to keep complete records of his income producing activities for inspection by internal revenue agents and petitioners cannot expect us to speculate as to the underlying facts. Cefalu v. Commissioner, 276 F. 2d 122 (C.A. 5, 1960), affirming a Memorandum Opinion of this Court. With respect to the gambling records of the Studio Lounge, during the fiscal year ended September 30, 1959, the win and loss books of Maceo and Company account for what is alleged to be all of the daily win or loss sustained at the Lounge. However, the general ledger shows clubroom receipts of the Studio Lounge totaling $62,413.88 which were not included in the win and loss books. Another perspective of the aforesaid problem is demonstrated by the way *606 Maceo and Company handled its transactions with O. J. Quinn in the operation of the Home Plate Cigar Stand. In those transactions, expenses were recorded on the books of Maceo and Company as reductions of the income from horse race betting but there are no records showing that income from the Home Plate Cigar Stand was actually recorded on the books of Maceo and Company. In the fiscal years ended September 30, 1948, 1949 and 1950, the cash disbursements journal of Maceo and Company shows payments to O. J. Quinn which were designated as commissions. Serio testified that Maceo and Company operated the Home Plate Cigar Stand under either a 2/3-1/3 or 1/2-1/2net profits arrangement with Quinn. The following schedule shows the minimum net income which cannot be specifically accounted for by reference to the general ledger of Maceo and Company or any known subsidiary records: Maceo and Company's unaccountedYear endedPaymentsfor share of Home Plate ProfitsSeptember 30to Quinn1/2 of profits2/3 of profits1948$31,616.90$31,616.90$63,233.80194919,309.9119,309.9138,619.82195012,897.8612,897.8625,795.72 In this connection, Joe Maceo testified that he kept track of the Home Plate operation in a *607 "little booklet"; that he recorded the profit or loss therein for each day; and that he would start a new book each month when the net winnings were split with O. J. Quinn. None of these booklets were produced at the trial. Joe Maceo testified further that the income derived from the Home Plate Cigar Stand, Turf, Murdoch's and the Chili Bowl was grouped together and a "single figure" was placed on a report sheet, representing the net result of horse race betting at all locations in Galveston at which Maceo and Company had an interest. While the loose manner in which receipts from the Home Plate operation were allegedly accounted for may not of itself conclusively demonstrate intentional concealment, the failure to keep adequate records is a factor to consider on the issue of fraud. Contesting respondent's contention that the books and records of Maceo and Company were incomplete and inaccurate for the years under review, petitioners argue, on brief, that the admitted lack of records showing the dates and circumstances under which clubroom receipts of $55,744.47 and $58,938.15 were received at the Silver Moon in 1948 and 1949; the lack of data in 1949 as to the particular clubroom and *608 circumstances under which $10,069.19 was received and utilized by Maceo and Company to pay expenses which were designated as "taxes;" the acknowledged lack of records identifying the source of the $21,946.18 in clubroom recepts that were used in 1948 to pay salaries of clubrooms operated by Maceo and Company in that year; the admitted failure to record in the win and loss book $62,413.88 in clubroom winnings that were recorded on the general ledger of Maceo and Company as net winnings of the Studio Lounge during the months of June, July and August 1950 and the inability to explain the circumstances under which the clubroom winnings of $2,129.94 and $170,458.12 in the year ending September 30, 1949, and 1950 would exactly equal the salaries paid in respect to the operations of the Streamline Dinner Club in the same year are all "nit picking" on the part of the respondent since all of said amounts were actually reported and reflected on the books of Maceo and Company. Assuming arguendo (but not so deciding) that petitioners' contention is founded in fact, a "coincidence" that defies our imagination is how the net wins of the Streamline Dinner Club for two consecutive years exactly equal, *609 to the penny, the salary expense sustained by the gambling operation. The Streamline Dinner Club's records showed net winnings for the fiscal years ending September 30, 1949, and 1950 in the respective amounts of $2,129.94 and $170,458.12, and salaries paid to employees of the Streamline Club in the identical amounts for the same period. Neither Serio nor Joe T. or any of the employees of Maceo and Company could effectively explain this "coincidence." Another inaccuracy in the records of Maceo and Company which is acknowledged by petitioners is that in many instances amounts recorded in the win and loss books were expressed in a round amount figure. Joe T. endeavored to explain this as an "adjustment" made by him to the amount of a day's win or loss at a gambling location so that the accumulated balance at the clubroom would be expressed in a round amount figure. While this form of "adjustment" standing alone is not evidence of fraud, it shows that such loose accounting practices could easily result in defalcations. Likewise, it is to be noted that transactions recorded in the cash receipts and disbursement journals of Maceo and Company did not always occur in the manner indicated *610 by the entries recorded in such journals. Matters actually handled by Maceo and Company as cash transactions were written in such a way that they appeared to have been handled as check transactions which passed through the bank accounts of Maceo and Company. For example, entries would be made showing the deposit of funds in a bank account and the simultaneous crediting of such funds to an appropriate account. Concurrent entries would be made in the cash disbursements journal showing the withdrawal of the same funds from the bank and the use of such funds to discharge certain obligations of Maceo and Company. Similarly, clubroom winnings were entered on the general books of Maceo and Company in order that funds could be made available for an operation needing money. The clubroom receipts were shown in the cash receipts book of the horse account as a deposit into and withdrawal from the horse checking account and the monies were then entered as a deposit in the bank account of the operation needing the money. Likewise, at the time Joe T. made entries in the win and loss books, the balance that appeared on the daily report submitted by the Balinese Room was not the same as the balance *611 that appeared in the win and loss book for the reason that the Balinese Room was not advised of the withdrawal and use of surplus funds by Joe T. Petitioners' explanation of the unorthodox method of accounting for wagering receipts on the ground that gambling was illegal under state law, and as a "security device" to prevent outsiders from knowing the extent of their business in order to avoid robberies clearly fails of justification under the income tax laws, and opens the door to techniques tending to mislead internal revenue officers. Moreover, the alleged objective of concealing illicit gambling under state laws is a transparency long since repudiated by the Supreme Court. Spies v. United States, 317 U.S. 492, 499 (1943). We reject petitioners' explanation that the win and loss books were rewritten because they had been mutilated by a child. Said books were kept in a desk at the offices of Maceo and Company and there is no evidence that the books were ever taken home by te partners or their employees. In the same vein, we cannot accept as true the explanation of the rewriting of the books offered by Joe T. who testified that the win and loss books were rewritten so that they would *612 be in an "orderly fashion" in case the internal revenue agents ever requested them. Another unusual accounting technique employed by Maceo and Company is that Joe T. or Serio, whenever possible, used checks which came into the possession of Maceo and Company in lieu of cash in making deposits to its various accounts. In other words, if cash had been received in some of its operations and if Joe T. had checks in the safe, he would replace the cash with the checks. If there were no affirmative evidence of manipulation of such funds, Joe T.'s method of depositing checks in lieu of cash might appear innocuous. The record shows, however, that on March 6, 1948, a payment of $25,000 was made on Rosario's debt to Gulf with checks that had been received by Maceo and Company in the course of its business operations. On the same day a payment was made of Sam's $13,000 debt to Gulf with checks that had been received by Maceo and Company in the course of its business operations. Also, on April 13, 1948, a payment was made to Gulf in satisfaction of Rosario's $26,777.78 debt to it ($25,000 balance on loan and $1,777.78 in terest) with checks that had been received by Maceo and Company in the course *613 of its various business operations. Similarly, we note that 13 "AJA" type checks had been used in making the combined $38,000 payment that was recorded on Gulf's books on March 6, 1948, as payments from Sam and Rosario, instead of having said checks cashed and the proceeds returned to the clubrooms that had sent the checks to the safe office. No records were maintained showing the manner in which checks of Maceo and Company were used to pay debts owned by Sam and Rosario to Gulf and owed by Sam to Maceo and Company. We have in mind, of course, that the issue of fraud must be decided on the particular facts of each case. As background for the consideration of the issue of fraud in the instant case, we think that the failure of Maceo and Company to maintain detailed records showing the use of company checks to pay the personal obligations of some of its partners is a factor to be considered on the issue of fraud. Anderson v. Commissioner, 250 F. 2d 242 (C.A. 5, 1957), affirming a Memorandum Opinion of this Court. We also note that Serio was unable to effectively explain the methods Maceo and Company used in handling its "lay-off" betting operations. Records of Maceo and Company showed *614 several lay-off transactions with "Boston" Smith during the taxable years, but they failed to account for checks of $1,500 and $1,000 received and cashed by Maceo and Company in December 1948 and January 1949, respectively. Maceo and Company maintained subsidiary accounts receivable to which were charged amounts owed it by Smith and to which were credited amounts received from Smith in payment of his debts to Maceo and Company. All lay-off transactions between Maceo and Company and Smith were reflected by checks. Neither Serio nor Joe T. could give any plausible explanation as to the location of the records which would show details of the lay-off transactions relating to the aforesaid checks of $1,500 and $1,000 received and cashed by Maceo and Company in December 1948 and January 1949, respectively. Petitioners urge that these transactions did not have to be reflected on the company books since Maceo and Company was merely acting as an agent for Smith in these lay-off transactions, Since explained that when Smith lost a lay-off bet, a tab was placed in the safe representing Smith's share of the loss for which cash was paid out, and when Smith sent Maceo and Company a check for the *615 amount of his loss, the check would be cashed and the cash placed in the safe in substitution for the tab. Thus, cash paid out of the safe for Smith was allegedly replaced when his check was cashed. Petitioners argue that said check was merely the repayment of a loan, that it had no effect on income of the partnership whatsoever, and that, therefore, no entry of the transaction was required on the books of Maceo and Company. We disagree. Regardless of whether a particular business transaction results in reportable income in the opinion of the taxpayer, if it is part of the over-all operation of an enterprise, and involves a substantial amount of money, as here, a clear record of the underlying facts should be kept for possible verification by internal revenue officers. Section 54 of the 1939 Code. To hold otherwise would permit a taxpayer to escape payment of his tax by the concealment of material facts. Bryan v. Commissioner, 209 F. 2d 822, 828 (C.A. 5, 1954), certiorari denied 348 U.S. 912. Likewise, the records of Maceo and Company fail to account for monies received by it in 1948 and 1949 from C. H. Alexander for a gambling loss. On September 18, 1948, Maceo and Company received *616 four post-dated checks totaling $5,630, three of which it agreed to hold and cash over a specified period of months. Similarly, on January 22, 1949, Maceo and Company received three $1,500 checks from C. H. Alexander subject to an agreement that they would be held several months before they were cashed. Two of the seven checks totaling $2,630 were cashed in 1948. The remaining five checks totaling $7,500 were cashed in 1949. Records of Maceo and Company reveal neither the original receipt of the checks nor the recording of the proceeds therefrom at the time the checks were cashed. Petitioners urge that when the aforesaid checks were paid off, a tab representing the winnings was placed in an envelope and when the post-dated checks were paid off the tab was then removed and the payment of the check was treated as a cash winning for the particular day on which the check was actually cashed. Petitioners argue that every such win and loss transaction could not be recorded on its books because of the magnitude or volume of its operations. Again, we must disagree. In our opinion, it is incumbent upon the taxpayer to keep clear records of gambling transactions involving substantial amounts *617 of money, such as the total receipts from C. H. Alexander in the amount of $5,630. Harold E. Harbin, 40 T.C. 373, 377 (1963). We further note the failure of Maceo and Company to maintain records showing the source of cash or other funds used to purchase cashier's checks during the taxable period totaling $807,826.79. Of said amount, the partners bought cashier's checks in the aggregate amount of $525,332.34 during said years to make payments on their income tax liabilities. Petitioners contend that said checks were purchased by the partners from their own individual cash reserves maintained by them in their lock boxes in the double door safe at Maceo and Company. Although petitioners may have used a portion of their individual earnings to purchase some of these cashier's checks, it is our view that records showing the source of such huge amounts of cash ($807,826.79) should have been kept by petitioners individually and in any event by Maceo and Company. We have only the word of Serio and the surviving petitioners as to the underlying facts. The record being as it is, we do not find their word on this issue deserving of belief, unless we can find credible supporting evidence therefor. *618 We do not believe that all of the cashier's checks purchased to pay the partners' income taxes for the taxable period involved in the total amount of $525,332.34 were bought with their own cash on hand and it was incumbent upon petitioners as well as Maceo and Company to maintain proper records of such purchases for inspection by internal revenue officers. Section 54 of the Code of 1939, section 29.54-1, Regulations 111. Further evidence of the inadequacy of the books and records of Maceo and Company during the taxable years involved is found in the fact that the account which it maintained in the name of Galveston Novelty Company in the Hutchings-Sealy Bank, Galveston, Texas, was not recorded on the books of Maceo and Company. Monies received by Galveston Novelty Company in respect to loans to individuals operating establishments into which Maceo and Company had placed its slot machines and victrolas, and from other sources, were deposited in the Hutchings-Sealy Bank, Galveston. Such deposits in said bank account during the period December 6, 1948, through December 30, 1950, were made in the aggregate amount of $517,607.22. We have found as a fact that Sam Maceo engaged in joint venture *619 gambling activities during the taxable years involved and had shared in the net winnings therefrom, the total net winnings of the venture for the years in question being $669,920. When Sam's outside wagering activities are considered in connection with the issue of fraud, it is significant that neither he nor Serio maintained any records to support a proper accounting to the other joint venturers. Petitioners explain the failure to keep records of this huge amount of winnings during three consecutive years as an "oversight" on the part of Serio in the "rush of business." Serio stated that during the three taxable years involved he failed to keep any records of the joint venture winnings because he was so busy working that it "completely slipped his mind" whenever he received distributions. Suffice it to say at this point that we do not believe these "explanations" and we point out further that petitioners were required by law to keep a complete record of such winnings. In the context of this case, moreover, they cannot escape their responsibility by attempting to shift the blame to another. Dorothy L. Sutherland, 32 T.C. 862, 866, 868 (1959); Cefalu v. Commissioner, 276 F. 2d 122*620 (C.A. 5, 1960); M. Rea Gano, 19 B.T.A. 518, 533 (1930); Sol H. Goldberg, 36 B.T.A. 44 (1937) and Russell C. Mauch, 35 B.T.A. 617 (1937), affd. 113 F. 2d 555 (C.A. 3, 1940). In view of the foregoing facts and upon consideration of the record as a whole, it is clear that the books and records of Maceo and Company did not fully and accurately reflect all of the income producing activities of the partnership, and this failure is persuasive evidence of fraud. Anderson v. Commissioner, 250 F. 2d 242 (C.A. 5, 1957), affirming a Memorandum Opinion of this Court. Having discussed the issue of fraud generally with respect to all of the petitioners in the instant case, we turn now to consider the issue with respect to each of them for the taxable years under review. Fraud Sam and Edna Respondent determined additions to tax for fraud with respect to the Estate of Sam Maceo, Deceased, and Edna Maceo, Individually, for the years 1948, 1949 and 1950 in the amounts of $107,705.60, $39,268.77 and $23,009.13, respectively. In our general discussion of the fraud issue hereinabove as it pertains to Sam and Edna, we found, inter alia, that there was a consistent pattern of substantial understatements *621 of income in their returns for the taxable period; that they failed to maintain records of all of their business receipts and that they failed to keep their accountant who prepared their returns for the years fully involved informed of their total gambling receipts. In addition to the foregoing indicia of fraud, a clear badge of fraud is found in the singular circumstances in which the amended returns were filed. For the years 1948, 1949 and 1950, Sam and Edna reported a net loss in income of ($2,629.67), ($14,579.53) and ($30,743.68), respectively, on their original returns. On their amended returns, they reported additional wagers and commissions in the respective amounts of $100,947, $74,263 and $59,262, which Sam claimed to be his aliquot share of joint venture winnings. Sam and Serio claimed that they had inadvertently failed to report these additional amounts. The original returns of Sam for 1948, 1949 and 1950 specifically account for Sam's income from his individual gambling. The record shows that in each of said years a separate computation was made of Sam's wins with Maceo and Company and with outsiders. Sam Maceo would give Serio information as to the amounts he had won *622 on personal bets that had not been made with Maceo and Company, and Joe T. or Serio would check the records of Maceo and Company to ascertain whether there were any additional bets that Sam had made with Maceo and Company. As afore-mentioned, after Sam died and after the other joint venturers learned of an investigation of the income tax returns of Joe Salvato, Jr., on July 10, 1951, they decided to file amended returns in which total additional gambling income in the aggregate amount of $669,920 was reported. We think it clear that Sam Maceo did engage in outside gambling on a joint venture basis with the other partners of Maceo and Company (except Vincent). It is our view that Sam Maceo's failure to keep any records or to report in his original returns for 1948, 1949 and 1950 the joint venture winnings is convincing evidence of fraud. Cefalu v. Commissioner, supra; Bryan v. Commissioner, 209 F. 2d 822, 828 (C.A. 5, 1954), affirming a Memorandum Opinion of this Court. Sam and Edna Maceo filed their original 1948 return on March 14, 1949. Sam is supposed to have given the amount of his outside wagers to Joe T. who combined these bets with the wagers that Sam won from Maceo and Company. *623 Sam reported wagers on his original 1948 income tax return in the total amount of $38,500. Of this amount, $25,250 was won from Maceo and Company. The difference of $13,250 represented the outside bets reported by Sam Maceo. Since Sam Maceo won about $49,000 in November 1948 (his 35 percent share of $140,000 winnings on the Truman election), it is difficult to understand how he could have told Joe T. that he only won $13,250 on outside bets and still believe that his 1948 income tax return was true and correct. Sam and Edna's amended return for 1948 reported additional income from bets and wagers in the amount of $100,947. Under the circumstances, we must conclude that Sam Maceo, when he gave the $13,250 figure to Joe T., knew that the amount was false. The record also shows that Revenue Agent Whittaker examined Sam and Edna's 1947 and 1948 returns simultaneously. The agent's report for said years was dated December 16, 1949. Whittaker testified that while he was examining Sam and Edna's 1948 and 1949 returns (which would be between March 14, 1949, the date on which Sam and Edna filed their 1948 returns, and December 16, 1949, the date of the revenue agent's report), he asked Serio *624 about the correctness of Sam's bets and wagers. Serio referred Whittaker to Sam and Sam told Whittaker that he had only losses in 1947 and that he had no knowledge and could not remember about the 1948 bets, but that when he gave the figures to Serio they were correct. The same pattern is discernible with respect to the tax years 1949 and 1950. Sam is supposed to have given his outside bets and wagers to Joe T. who combined them with the bets and wagers which Sam won from Maceo and Company. Sam and Edna's original 1949 and 1950 income tax returns reported income from bets and wagers of $13,700 and $11,350, respectively. Of said amounts, they won bets and wagers during 1949 and 1950 from Maceo and Company in the respective amounts of $11,200 and $2,600. Their outside bets and wagers reported for said years were in the respective amounts of $2,500 and $8,750. Amended returns were filed on behalf of Sam's estate and Edna for the years 1949 and 1950 on July 19, 1951, in which additional bets and wagers were reported for 1949 and 1950 in the respective amounts of $74,263 and $59,262. Again we find that when Sam Maceo gave his outside bets and wagers to Joe T. for 1949 and 1950 he knew that *625 they were incorrect and he thereby knew that his original returns for 1949 and 1950 were false. Under all of the circumstances, we have no doubt that he filed them with the intent to avoid payment of a substantial amount of his tax. Charles E. Mitchell, 32 B.T.A. 1093, 1129 (1935), affd. sub. nom. Helvering v. Mitchell, 303 U.S. 391 (1936). The good faith and genuineness of the joint venturers' explanation as to the circumstances under which they failed to report their prorata portion of unreported joint venture income totaling $669,920 can be further tested by reference to petitioners' conduct in respect to their 1949 return. On March 12, 1951, Sam and Edna executed Forms 870 agreeing to the assessment of additional taxes against them in respect to 1949. No mention was made by them to the agents as to the omission of their share of the joint venture winnings for that year although such omission or understatement must have been known by Sam at that time. Petitioners in Docket No. 55506 (Estate of Sam Maceo) as well as in Docket Nos. 55709 and 63933, citing Mitchell v. Commissioner, 118 F. 2d 308-309 (C.A. 5, 1951), reversing 40 B.T.A. 424 (1939), attempt to exonerate themselves *626 for failure to report their share of the $669,920 of income which was omitted from their original 1948, 1949 and 1950 returns on the ground that they relied upon Serio to keep the records and that it was Serio who overlooked said income. Petitioners argue thatserio had attended school only up to the eighth grade, that he was in complete charge of the books and records of Maceo and Company during the taxable period and that during the taxable period he worked seven days a week with little time off. We do not believe that Serio "inadvertently" failed to report the share of the distribution of the joint venture winnings on the individual returns of the partners for the three taxable years involved. It is axiomatic that taxpayers cannot escape responsibility for errors, not otherwise excusable, by shifting the blame to those who prepare the return. M. Rea Gano, 19 B.T.A. 518, 533 (1930); D. C. Clarke, 22 B.T.A. 314, 328 (1931) and Sol H. Goldberg, 36 B.T.A. 44, 53 (1937). This would be particularly true where important data was withheld from the preparer of the return or wrong information was given to him. Russell C. Mauch, 35 B.T.A. 617 (1937), affd. 113 F. 2d 555 (C.A. 3, 1940); Estate of E. A. Wickham, 22 B.T.A. 1393, 1398 (1931), *627 affd. 65 F. 2d 527 (C.A. 8, 1933). As already indicated, we are convinced that the failure by Sam to report his share of the income from the joint venture gambling in his original returns for 1948, 1949 and 1950 was consciously fraudulent. Under the circumstances, the omissions cannot be justified on the theory that Sam had entrusted the preparation of his returns to others. We consider, infra, the similar issue with respect to Rosario and Voigt. In the instant case, only three of the seven joint adventurers are before us, and we do not here consider the issue with respect to the remaining four except as the facts may reflect upon the determination of the instant case. We cannot fail to note in this respect, however, that there is a basis for an inference that the failure on the part of all seven of the joint adventurers to report their joint venture winnings over a period of several years was due to collusive action. It is implausible that Serio would have omitted such large amounts of income (a total of $669,920) of seven different taxpayers over a three-year period without some active approval or condonation by the taxpayers. That Serio inadvertently forgot to include the joint *628 adventure income in so many returns over so long a period is likewise implausible. Moreover, if, as Serio testified in part, he made no record of any kind of the share of each of the joint adventurers for the several years involved (including his own share) it not only fails to absolve the other six, but, tends to strengthen the likelihood that such omissions were intentional and by agreement. Upon the basis of the foregoing, we hold with respect to petitioners in Docket No. 55506 that some part of the deficiency for each of the years 1948, 1949 and 1950 was due to fraud with intent to evade taxes and that the returns of Sam and Edna for the years 1948, 1949 and 1950 were false and fraudulent with intent to evade taxes. Fraud Rosario and Frances Respondent determined additions to tax for fraud for the years 1948, 1949 and 1950 with respect to the Estate of Rosario Maceo, Deceased, and Frances Maceo, Individually, in the respective amounts of $28,174.26, $29,734.67 and $22,818.81. Virtually all of the circumstantial evidence of fraud, such as failing to maintain complete and accurate records of all gambling receipts, discussed hereinabove relating to all of the partners before us is *629 equally applicable to Rosario, and will not be repeated in detail here. Specifically, Rosario and Frances admittedly omitted from their original returns for the years 1948, 1949 and 1950 income in the respective amounts of $72,105, $53,045 and $42,330, which ranges from 42.2 to 52.8 percent of reported income on said returns. It is well settled that such consistent understatements of income in substantial amounts over a number of years, standing alone, may be convincing evidence of fraud. Cefalu v. Commissioner, 276 F. 2d 122 (C.A. 5, 1960), affirming a Memorandum Opinion of this Court. It is contended on behalf of Rosario's estate and Frances that the amounts omitted from their original returns represent their allocable share of outside gambling carried on in their behalf as one of seven venturers by Sam Maceo, and that Serio inadvertently failed to report these amounts on their returns for three consecutive years. In our discussion hereinabove with respect to the joint venture winnings of the adventurers involved here (Sam Maceo, Rosario and Voigt), we held that the adventurers failed to maintain any records of their share of the winnings for any of the taxable years, and that such *630 failure constituted material evidence of an intent to avoid the payment of their income taxes. Spies v. United States, 317 U.S. 492, 499 (1943). Since none of the participants reported any joint venture winnings on their original returns, it may reasonably be inferred that such failure was the result of an organized plan whereby the adventurers knowingly and intentionally attempted to evade their income tax liabilities in each of the taxable years involved. With respect to Rosario's amended returns, it is noteworthy that Serio, in preparing Rosario's return for 1949, specifically inquired about the actual amount of his income from bets and wagers. The work paper used in the preparation of the original 1949 return of Rosario and Frances contains the notation "Bets," which was scratched out by Serio after he had asked Rosario if he had any bets and wagers, and found that Rosario claimed he had none. Rosario's negative reply is convincing evidence that he knew the income being reported on his 1949 return was false. Likewise, as to his 1948 return, Rosario advised Serio that he had only $3,000 in income from bets and wagers in that year. However, Rosario's amended returns for 1948 and *631 1949 show income from bets and wagers in the respective amounts of $72,105 and $53,045. If Rosario had any distinction in his own mind between income from bets on the one hand and joint venture betting on the other, we need only add that whichever view he took, he failed to report his true income for the years in question. As in the case of the others who filed amended returns, we reject the argument that Rosario believed Serio had reported his share of the outside joint venture winnings on the books of Maceo and Company. Considering the substantial amount of outside gambling carried on by Sam Maceo in behalf of his joint venturers and the share of winnings which Rosario received during each of the taxable years (a total of $167,480), we think it clear that Rosario could not honestly have omitted such amounts from his return by inadvertance. Notwithstanding Rosario's limited education, we are convinced that he was fully cognizant of what was going on in his gambling organization, of which he was a dominant partner. The fact that he reviewed the monthly financial statements and profit and loss statements of Maceo and Company shows that he knew precisely what he was doing with respect *632 to his business activities and practices. In our opinion Rosario deliberately omitted his share of the joint venture winnings from his returns for the taxable years involved with the clear intent to avoid payment of a portion of his taxes. Petitioners in Docket No. 55709 urge that, during the taxable years including the period when each of the returns in question was filed, Rosario was suffering from severe nervous and mental ailments which impaired his reasoning faculties, and, therefore, could not have had the intent to defraud as required by section 293(b) of the 1939 Code. We have carefully considered the letter of Dr. Martin L. Tower, dated May 31, 1951, (which is set forth in extenso in our Findings) to the effect that Rosario had been under his care and treatment "off and on since December 1947." Briefly, Rosario suffered from pathologic depression, hypertension and repeated cerebrovascular accidents (strokes), and during March and April of 1950 he was hospitalized for an operative procedure known as a bilateral stellate ganglionectomy. During August 1950, he was again hospitalized because of hypertensive, cardiovascular and cerebral disease. Rosario died March 15, 1954. While *633 the medical statements of record show that Rosario was very ill during the taxable years, there is no contention or testimony before the Court that he was non compos mentis at the time the returns in question were executed and filed, or did not know right from wrong, or was not aware of the significance of his actions. Emanuel Hollman, 38 T.C. 251, 260 (1962). Moreover, we are not convinced that Rosario's illness, although grave, had developed to such an extent by January 13, 1951, (the date of the last original joint return executed by petitioners) that Rosario was unaware of what he was doing. Although his condition was apparently more serious in 1951, when the last return in question had been filed, we believe that his understatement of taxable income in 1950 merely followed the pattern he had established in the preceding taxable years. Fred W. Staudt v. Commissioner, 216 F. 2d 610 (C.A. 4, 1954), affirming per curiam a Memorandum Opinion of this Court. United States v. Peelle, 137 F. Supp. 905 (1956) (E.D.N.Y.), affd. 159 F. Supp. 45 (1958). In the same vein, we find no merit in the argument that Rosario was not able to read a prepared return and had to rely for its correctness *634 on Serio. Suffice it to say, there is nothing in the record to indicate that Rosario was an ignorant individual who could not or did not understand the responsibilities of a taxpayer to the Government. At the trial, it was acknowledged that whenever Rosario did something or entered into a transaction he knew precisely what was going on. From a careful consideration of the entire record, we find that Rosario was capable of and in fact did harbor a fraudulent intention at the time each of his returns for the taxable years involved was filed. Charles E. Mitchell, 32 B.T.A. 1093, 1129 (1935), affd. sub. nom. Helvering v. Mitchell, 303 U.S. 391 (1936). In view of the foregoing, we are convinced that some part of the deficiency determined with respect to petitioners in Docket No. 55709 for each of the taxable years involved is due to fraud with intent to evade taxes and that the respective returns for each of said years were false and fraudulent with intent to evade taxes. Fraud O. E. Voigt With respect to O. E. Voigt, respondent determined additions to petitioner's tax for fraud for the taxable years 1948, 1949 and 1950 in the respective amounts of $9,619.39, $3,679.36 and $2,324.68. *635 In addition to the indicia of fraud discussed supra with respect to Sam and Rosario, (i.e., consistent understatements of income in substantial amounts over several years; failure to cooperate with respondent's agents during the investigation and failure to keep accurate and complete records of income), respondent urges that Voigt failed to report $1,111.56 of interest on his return for 1948, and that he failed to report rental income from an apartment house on his return. The record shows that Voigt received $1,111.56 ($210.82 and $900.74) in interest upon the redemption of certain savings bonds and coupons, and the sale of U.S. Treasury notes, which he failed to report as income on his original or amended tax return for the year 1948. In addition, we have held that Voigt received substantial income from his joint venture gambling activities during each of the taxable years involved which he failed to report on his original return. In explanation of his failure to report all of his income for the taxable periods, and particularly his share of the joint venture winnings, Voigt contends that he relied entirely on his accountant and Serio who prepared his returns for the taxable years *636 involved, and, therefore, that he (Voigt) is not liable for additions to tax for fraud. In this respect, the facts and circumstances are substantially the same in principle as those discussed with respect to Sam and Rosario. We think no extended discussion is necessary upon the applicable facts to demonstrate that Voigt's substantial understatements in each of the taxable years were due, at least in part, to fraud with intent to evade taxes and that Voigt was fully conscious of his omissions. To support this view, we need only specify the fact tha Voigt admits that he omitted income from his original returns for the years 1948, 1949 and 1950 in the respective amounts of $14,421, $10,609 and $8,466. As noted in earlier discussions with respect to Sam and Rosario, it is incredible that Serio would overlook reporting said amounts in three consecutive years for Voigt, or that Voigt would fail to note the absence of such large amounts from his returns. Voigt contends that since he stipulated that there is a $0.54 overassessment in tax for the year 1949, and there is no deficiency in tax for 1950, the Tax Court has no jurisdiction to impose additions to tax on him for said years under sections 293(b)*637 or 294(d)(2) of the 1939 Code. 10Section 293(b)provides "if any part of any deficiency is due to fraud with intent to evade tax," as is the case here, then 50 per centum of the total amount *638 of the deficiency shall be assessed, collected, and paid. The term "deficiency" is defined in section 271(a) of the Code. 11 The first clause of section 271(a) makes it clear that the "deficiency" is the difference between the tax liability and the amount shown on the return. Petitioner's analysis of the statutory definition of a "deficiency" is erroneous. Petitioner directs our attention to the second clause of section 271(a), providing for certain increases in and credits to the amount shown on the return. From this language he concludes that the term "deficiency" as used in section 293(b) means that part of the tax remaining *639 unpaid as set forth in the notice of deficiency. Petitioner's contention fails to give proper significance to the first clause of section 271(a), and disregards the word "total" as used in section 293(b), supra. In section 271(a), the amounts by which the amount shown on the return is to be "increased by the amounts previously assessed (or collected without assessment)" are referred to "as a deficiency." Hence, it is apparent that the phrase "total deficiency" as used in section 293(b) where fraud is present means the amount which is the difference between the tax liability and the amount shown on the return. The return referred to in section 271(a), supra, undoubtedly means the original return. We note that the Commissioner has ruled that the "additional tax shown on an 'amended return,' so called, filed after the due date of the return for the taxable year, is a deficiency within the meaning of the code." Regs. 111, section 29.271-1; Mim. 3428, 1926 C.B. V-1, p. 119. Cf. Mim. 3374, 1926, C.B. V-1, p. 118. Also, it is worthy of note that the precise language of the regulation applicable to the years involved herein, was incorporated into succeeding regulations under both the *640 1939 and 1954 Codes. Respondent's position in respect to this issue was reiterated in Rev. Rul. 56-54. In our view, petitioner's analysis of the term "deficiency" ignores the applicable regulation, which we find to be a reasonable implementation of the statute. We have previously considered the precise issue of jurisdiction raised by petitioner and in each instance have rejected the contention that we lacked jurisdiction to consider a case in which the statutory notice of deficiency did not determine a deficiency in tax but merely gave notice to the taxpayer that he is liable for the 50 percent addition to the deficiency by reason of the application of section 293(b). Herbert Eck, 16 T.C. 511 (1951); Thomas J. McLaughlin, 29 B.T.A. 247-248 (1933); Maitland A. Wilson, 7 T.C. 395, 397-398 (1946); Aaron Hirschman, 12 T.C. 1223, 1228 (1949). In Herbert Eck, supra, we stated (p. 515): Section 293(b) provides that "50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected and paid * * *." "So" must refer to the words in the preceding paragraph, section 293(a), "in the same manner as if it were a deficiency." Gutterman Strauss Co., 1 B.T.A. 243. *641 Section 293(b) is then to be read as providing that the 50 per cent addition to the deficiency shall be assessed, collected and paid in the same manner as if it were a deficiency. A deficiency is assessed, collected and paid only after the Commissioner has made a determination and sent a notice of that determination in accordance with section 272 which provides for the jurisdiction of this Court after the mailing of the notice of deficiency. Thus, the Commissioner, in sending out the notice determining that Eck was liable for the addition to the tax provided by section 293, was complying with the law which required him to proceed in the same manner as if it were a deficiency. The statute was intended to mean also that where such a notice was sent, the Tax Court has jurisdiction. * * * Similarly, in Thomas J. McLaughlin, supra, we held that section 293(b), p. 248, on its face, does not require respondent to enforce penalties simultaneously with the determination of a tax liability. We can find no instance where this or any other court has approved the petitioner's construction. In support of his position, petitioner relies upon McConkey v. Commissioner, 199 F. 2d 892 (C.A. 4, 1952); *642 Stanley A. Anderson, 11 T.C. 841 (1948); Bendheim v. Commissioner 214 F. 2d 26 (C.A. 2, 1954) and Raoul Walsh, 21 T.C. 1063 (1954). We have carefully considered these authorities and find them distinguishable from the instant case in that here additions to tax were determined in the statutory notice of deficiency while no such problem arose in the cases cited. Fraud Vincent and Estelle Respondent determined additions to tax for fraud for the years 1948, 1949 and 1950, inclusive, for Vincent A. Maceo and Estelle Maceo Parmer in the amounts of $1,084.91, $3,100.89 and $2,405.84, respectively. Vincent did not participate with the other partners in the joint venture gambling activities carried on by Sam Maceo during the taxable years involved, and he and Estelle did not file amended returns. In his endeavor to establish fraud with respect to Vincent, respondent avers that the general indicia of fraud (i.e., failure to cooperate with respondent's agents during the investigation and failure to keep adequate books and records) discussed hereinabove, are equally applicable to Vincent. While Vincent, as a partner of Maceo and Company, may have been charged with a duty to cause complete and *643 accurate records of all partnership transactions to be kept, it is clear that he was not in a practical position to do so. Upon consideration of all of the circumstances, we find no basis for imputing fraud to him, and respondent, in our opinion, has failed to establish fraud on his part by clear and convincing evidence. As evidence of fraud with respect to Vincent and Estelle, other than in connection with Maceo and Company, respondent urges that they failed to account for income derived during the taxable period when Vincent brought home a box of jewelry which had been taken in satisfaction of gambling debts owed to Maceo and Company and used at least one ring for a personal gift to his daughter. Similarly, respondent contends there is no accounting on Vincent's 1949 return for $1,450 in income which he received during that year as reflected by his deposit of said amount in silver in his bank account in 1949. Anent the jewelry, petitioners urge that respondent has not established that Maceo and Company or any of its partners ever took jewelry in satisfaction of gambling debts. On the basis of Estelle's testimony we believe that the jewelry in question was not income to Vincent or *644 to Maceo and Company but merely represented pledges for loans which he had made in his individual capacity. In any event, respondent has not met the burden of proving the contrary by clear and convincing evidence. As to the $1,450 in controversy, we have carefully examined the deposit slip dated July 7, 1949, which shows that currency $600of and coin in the amount of $1,000 was deposited by Vincent. We are not satisfied, however, that a deposit of $1,000 in silver actually occurred. Apparently, the wrong spaces were used in filing out the deposit slip. In any event, we think it clear that respondent failed to establish that the deposit represented income to petitioners. In view of the foregoing, we hold that respondent has failed in his burden of proving by clear and convincing evidence that any part of the respective deficiencies of Vincent and Estelle for the years in question was due to fraud with intent to evade taxes. Fraud Joint Liability for Additions to Tax Petitioners maintain that if it is held that deficiencies exist with respect to Sam and Edna, Rosario and Frances, and Vincent and Estelle for the years 1948, 1949 and 1950 and they are due to fraud, then no part of the *645 fraud penalties should apply to Edna's, Frances' and Estelle's one-half of the deficiencies. In essence, petitioners argue that Edna, Frances and Estelle did not assist their husbands in the conduct of their business affairs, and that the wives did not prepare any of their own income tax returns for the years 1948, 1949 and 1950, and knew nothing about the income tax returns filed for those years, except that they signed them. It is petitioners' position that Serio, who supervised the preparation of the returns never delivered the completed returns to any of the partners or their wives or interviewed any of them concerning the preparation thereof. Serio allegedly merely presented the original income tax returns of the partners to them for signature and there was no discussion as to their contents with the partners or their wives. Specifically, as to Frances, it is urged that at the time she signed the amended returns for said period, she was given no explanation as to the purpose for the filing thereof, nor did she inquire about their content. In view of our conclusion, infra, that no part of the deficiency in tax as to Vincent and Estelle for the taxable period involved is due to *646 fraud with the intent to avoid tax, our discussion of this issue is limited only to Edna and Frances. In support of their position, petitioners cite Kann v. Commissioner, 210 F. 2d 247 (C.A. 3, 1953) affirming 18 T.C. 1032 (1952); Macias v. Commissioner, 255 F. 2d 23 (C.A. 7, 1958), affirming a Memorandum Opinion of this Court and Jack Douglas, 27 T.C. 306 (1956) (C.B. 1957-2, 4). In Kann, supra, where one of the issues before the Court was whether the wife was liable for a fraud penalty absent a showing of fraud on her part, the Court of Appeals held, inter alia, that joint returns had been filed, and even absent a showing of fraud on the wife's part, her liability on a joint return was joint and several, and this applied to the fraud penalty. The dissent held that the funds received were embezzled funds and not income, and never reached the question of the extent of the wife's liability on a joint return. In Macias, supra, one of the issues before the Court was whether the petitioner's wife was liable for a fraud penalty. The Court of Appeals held that the funds received were taxable income, but that the Commissioner had not sustained his burden of proof with respect to the fraud *647 issue. The court never reached the issue of whether a wife is liable for the fraud penalty on a joint return absent a showing of fraud on her part as evidenced by the court's comments at pp. 1665-1666: We assume, without deciding, that a fraud penalty may be properly assessed against either or both the husband and wife making a joint return, for a fraud committed by either. We then come to the question as to whether the failure of Arturo to report the income in question was fraudulent with the intent to evade taxes. In our view, this finding was not substantially supported and rests on conjecture * * *. * * *In our judgment, the Commissioner did not carry his burden of proof on the issue of fraud. * * * In Jack Douglas, 27 T.C. 306 (1956) (C.B. 1957-2, 4), Jack and his wife, Dorothy, filed a joint return for 1947. They had permanently separated in 1946 with the intention of getting a divorce, which ultimately was granted in December 1949. Dorothy received no personal income and knew nothing of her husband's business. Jack, through his attorney, entered into a stipulation of settlement in his docketed case whereby he agreed to the assertion of a fraud penalty. Dorothy, through her attorney, *648 contested the Commissioner's determination. With respect to the fraud issue, the Commissioner introduced no evidence regarding fraud for the year 1947, except the stipulation of settlement executed by Jack's attorney. The court held that the stipulation of settlement in the case of Jack Douglas, supra, did not constitute clear and convincing evidence of fraud to make Dorothy liable for the fraud penalty. In our opinion, the instant cases are clearly distinguishable from Jack Douglas, supra.Unlike the facts in Jack Douglas, in the instant case, Frances and Estelle resided with their husbands throughout the entire tax years involved, and respondent introduced clear and convincing evidence of intent to evade taxes on the part of Sam and Rosario. We have repeatedly held that where a joint return is filed and there is a deficiency over and above the liability reported on the original return, the respondent's proof of fraud on either the husband's or wife's part makes both the husband and wife jointly and severally liable for the fraud penalty. Howell v. Commissioner, 175 F. 2d 240, (C.A. 6, 1949), affirming 10 T.C. 859 (1948); Kann v. Commissioner, supra; Boyett v. Commissioner, 204 F. 2d 205*649 (C.A. 5, 1953), affirming 10 T.C.M. 237; Estate of Charles J. Ginsberg v. Commissioner, 271 F. 2d 511 (C.A. 5, 1959). Section 51(b)(1) of the 1939 Code provides as follows: SEC. 51. INDIVIDUAL RETURNS. * * *(b) Husband and Wife. - (1) In general. - A husband and wife may make a single return jointly. Such a return may be made even though one of the spouses has neither gross income nor deductions. If a joint return is made the tax shall be computed on the aggregate income and the liability with respect to the tax shall be joint and several. * * *Since Edna and Frances resided with their husbands during the taxable years and elected to file joint returns with their spouses, their liability with respect to tax for 1948, 1949 and 1950 is clearly joint and several under section 51(b)(1), supra. The fact that there is no affirmative evidence of fraud in the record on the part of Edna or Frances is of no consequence on this issue. Computation of Additions to Tax Petitioners in Docket Nos. 55709 and 63933 argue that if the addition to tax for fraud is held proper in any of these consolidated cases, said addition attaches only to the deficiency or deficiencies as that term is defined in section 271(a)*650 of the 1939 Code. In short, if the so-called fraud penalty applies, it should apply to a deficiency determined after the amounts paid by these petitioners on their original and amended returns are taken into account. Petitioners cite no authority for their position and in fact concede the law is to the contrary. Petitioners' contention is not unique. We have consistently held that the total deficiency for the purpose of computing the 50 percent addition to the tax for fraud under section 293(b), supra, is the difference between the tax liability and the amount shown on the original return; and that a taxpayer, who has filed a fraudulent return, may not, by subsequently filing an amended return and paying the tax due, bar the respondent from determining additions to the tax for fraud. George M. Still, Inc., 19 T.C. 1072, 1077 (1953) and cases cited therein; Middleton v. Commissioner, 200 F. 2d 94, 96 (C.A. 5, 1952), affirming a Memorandum Opinion of this Court (1951); Rev. Rul. 56-54, C.B. 1956-1, 654. Statute of Limitations Findings On May 2, 1951, Vincent Maceo, one of the petitioners in Docket No. 63934, executed a power of attorney to Ernest E. Garrett, a CPA, reading as follows: *651 The State of Texas, County of Galveston: Know All Men By These Presents: THAT I (WE), Vincent A. Maceo of Galveston, in the County of Galveston, State of Texas, do hereby make, constitute and appoint ERNEST E. GARRETT of Houston, in the County of Harris, State of Texas, my (our) true and lawful Attorney-in-Fact, to represent me (us) before the Treasury Department, United States of America, and all offices and bureaus thereunder, in all matters pertaining to the adjustment and settlement of Federal Income Taxes and Claims in connection therewith, for the years 1948-1949-1950, to do and perform any and all acts and things whatsoever requisite and necessary to the full performance of the powers aforesaid, as fully, to all intents and purposes, as I (we) might do or could do if personally present, with full power of substitution and revocation, hereby ratifying and confirming any and all acts and things which my (our) said Attorney shall lawfully do or cause to be done in the premises by virtue hereof. IN WITNESS WHEREOF, I (we) have hereunto set my (our) hand (s) this the 22nd day of May, A.D. 1951. (signed) Vincent A. Maceo The State of TexasCounty of Galveston] BEFORE ME, the undersigned *652 authority, on this day personally appeared Vincent A. Maceo known to me to be the person (s) whose name (s) &s (are) subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed. GIVEN UNDER MY HAND AND SEAL of office, this the 22nd day of May A.D. 1951. (signed) R. N. Cox / Notary Public in and for Galveston County, TexasGarrett executed waivers of the statute of limitations (Treasury Form 872) on February 16, 1953, on behalf of Vincent and Estelle for the taxable years 1948 and 1949. Said waivers contain in a footnote the following statement: This consent may be executed by the taxpayers' attorney or agent provided such act is specifically authorized by a power of attorney which, if not previously filed, must accompany the consent. A schedule of waivers executed by Vincent Maceo and Estelle Maceo Parmer is as follows: Date waiverTax year for whichexecutedDate to whichwaiver exe-by peti-statute ex-cutedWaiver executed bytionertended1948Vincent & Estelle1- 3-526-30-531948Garrett2-16-536-30-541948Vincent & Estelle6-16-549-30-541948Vincent & Estelle8-25-5412-31-541948Vincent & Estelle11- 6-546-30-551948Vincent6-14-556-30-561949Garrett2-16-539-30-541949Vincent & Estelle6-16-549-30-541949Vincent & Estelle8-25-5412-31-541949Vincent & Estelle11-16-546-30-551949Vincent6-14-556-30-56*653 Respondent mailed the 90-day statutory notice of deficiency to petitioners in Docket No. 63934 on June 8, 1956. Statute of Limitations Opinion We granted motions in Docket Nos. 63933 (Rosario and Frances) and 63934 (Vincent and Estelle) permitting petitioners to amend their respective petitions to plead the statute of limitations as a bar to the deficiencies determined by respondent. Since we have held that the returns of Rosario and Frances for the taxable years under review were false and fraudulent within the intendment of section 293(b), supra, we need not consider the issue of limitations as to them. Section 276(a), supra. Accordingly, our discussion is limited to Vincent and Estelle. The primary issue before us is whether or not the waivers for 1948 and 1949 executed on February 16, 1953, by Garrett are invalid because the power of attorney given to Garrett did not specifically authorize him to execute waivers of the statute of limitations as required by section 601.504(a)(2) 12*654 of the Income Tax Regs. and, further, because the waivers in question contained a condition purporting to require specific authority in the power of attorney to execute a waiver. Turning to the question of the validity of the waivers of the statute of limitations executed by Garrett on February 16, 1953, on behalf of petitioners, we believe that a power of attorney of the type granted to Garrett is quite broad enough to cover the power to execute consents to extend the period of limitations insofar as the grantors are concerned. The significant language of the power in each question reads as follows: "I (We) * * * do hereby make, constitute and appoint Ernest E. Garrett, * * * our true and lawful Attorney-in-Fact, to represent us before the Treasury Department, United States of America, and all offices and bureaus thereunder, in all matters pertaining to the *655 adjustment and settlement of Federal Income Taxes and Claims in connection therewith for the years 1948-1949-1950 to do and perform any and all acts and things whatsoever requisite and necessary to the full performance of the powers aforesaid; * * *" Petitioners urge, however, that the waivers for 1948 and 1949 executed on February 16, 1953, by Garrett, were improperly executed because the aforesaid power of attorney did not specifically authorize him to execute waivers of the statute of limitations, and because the waivers required that the consent must be executed by an attorney or agent who is "specifically authorized by a Power of Attorney" to execute a consent or waiver of the statute of limitations. It is petitioners' position that the provision of section 601.504(a)(2) of the Income Tax Regs. (which specifies that the power of attorney must grant express authority to the attorney or agent to execute a consent extending the statute of limitations) is mandatory in nature and binding upon the respondent as well as the taxpayer. We are governed by the Internal Revenue Code of 1939. See 1954 I.R.C., section 7851(6). The pertinent provisions thereof read as follows: SEC. 275. PERIOD *656 OF LIMITATIONS UPON ASSESSMENT AND COLLECTION. Except as provided in section 276 - (a) General Rule. - The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period. * * *SEC. 276. PERIOD OF LIMITATIONS UPON ASSESSMENT AND COLLECTION. - EXCEPTIONS. * * *(b) Waiver. - Where before the expiration of the time prescribed in section 275 for the assessment of the tax, both the Commissioner and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon. * * *Although the aforesaid power of attorney did not specifically grant authority to Garrett to execute consents on behalf of Vincent and Estelle, we have no doubt, as above indicated, that such authority was included in the broad language of the power permitting Garrett, inter alia, to represent them before the Internal *657 Revenue Service "in all matters pertaining to the adjustment and settlement of Federal income taxes and claims in connection therewith, for the years 1948, 1949 and 1950, to do and perform any and all acts and things whatsoever requisite and necessary to the full performance of the powers aforesaid. * * *" In our opinion the power granted in this sweeping language must be construed as authorizing petitioners' attorney-in-fact to execute a waiver of the statute of limitations in connection with his handling of all aspects of the instant case. Absence of explicit words or authority in the circumstances herein did not render the waiver ineffective. J. E. Hample, 12 B.T.A. 342 (1928); E. M. Pringle Naval Stores Co., Inc., 23 B.T.A. 1328 (1931); Tech Hobbs, 26 B.T.A. 241 (1932); Jaffee v. Commissioner, 45 F. 2d 679 (C.A. 2, 1930), affirming 17 B.T.A. 675 (1929); Wood v. United States, 84 Ct. Cls. 367 (1937), certiorari denied 302 U.S. 719 (1937); Vanderlip v. United States, 79 Ct. Cls. 489, certiorari denied 293 U.S. 588. From the perspective of the respondent, it is our view that the conditions provided for in the statute and interpreted by the regulations are directory in nature rather *658 than mandatory. In our view, the acceptance by respondent of a consent extending the statute of limitations which had been executed by a taxpayer's agent without express authority (but within the general scope of his powers) merely constitutes a waiver by the respondent of one of his own requirements designed generally to improve administrative procedures. There is nothing in the law or the regulation calculated to indicate that respondent is to be placed in a strait-jacket which, by iron rule, is to remove all flexibility in administration. We hold that the provisions of section 276(b), supra, and the interpretative regulations are directory or advisory, not mandatory. See Holbrook v. United States, 284 F. 2d 747 (C.A. 9, 1960). We add that, in our opinion, petitioners are estopped to deny the validity of the waivers executed by Garrett. Unquestionably, Garrett was acting on their behalf and with their approval in all matters pertaining to their income tax liability. Petitioners do not deny that the consents in question were executed on their behalf on February 16, 1953, which was almost a month before the statute of limitations would have barred the assessment of deficiencies against *659 them. Therefore, on February 16, 1953, there was sufficient time for the respondent to have taken other action to protect his interests if there had appeared any question as to whether or not petitioners intended to execute consents extending the statute of limitations. Under the circumstances, we are of the opinion that petitioners are estopped to deny the validity of the consents executed on their behalf by Garrett. Aurore B. Benoit, 25 T.C. 656, 669 (1955), relying on Lucas v. Hunt, 45 F. 2d 781 (C.A. 5, 1930); Ruby Y. Llloyd, 29 B.T.A. 74 and Stearns Co. v. United States, 291 U.S. 54 (1934). We hold, therefore, that the power of attorney and consents executed pursuant thereto were not invalid, and that respondent's determination was not barred by the statute of limitations. As to Estelle, no issue has been raised as to whether she is entitled to treatment different from Vincent on the subject of limitations. We, accordingly, find it unnecessary to consider this possibility. Addition to Tax Other Than for Fraud Findings and Opinion Respondent determined that the several petitioners were liable for additions to tax under section 294(d)(2) of the 1939 Code for substantial underestimation *660 of estimated tax for each of the years in question. Petitioners, on whom the burden of proof rests, have offered no acceptable evidence or argument supporting a different conclusion. We have no occasion, therefore, to discuss the problem further except to say that the actual amounts of such additions will be computed under Rule 50 to give effect to adjustments determined in our Opinion. We note that in the statutory notice in the case of Sam and Edna (Docket No. 55506) some reference is made to an addition to tax for the taxable year 1950 under section 294(d)(1)(B) of the 1939 Code, but, since no addition to tax as computed thereunder was determined or added to petitioners' total additions to tax ($23,259.13) for 1950, it appears that no issue under that section is before us. Decisions will be entered under Rule 50. Footnotes1. Proceedings of the following petitioners are consolidated herewith: Estate of Rosario Maceo, Deceased, Frances Maceo. Independent Executrix, and Sam Serio, Independent Executor, and Frances Maceo, Individually, Docket No. 55709; O. E. Voigt, Docket No. 63933, and Vincent A. Maceo and Estelle Maceo Parmer, Docket No. 63934.↩*. At the trial the parties stipulated that there is an overassessment in tax of fifty-four cents in Docket No. 63933 for the year 1949 and that there was no deficiency in income tax in said docket for 1950.↩2. All code section references are to the Internal Revenue Code of 1939 unless otherwise stated.↩a. 20 percent interest in the name of Frank was owned in equal proportions by Frank and Vic C. ↩b. N.A. - information is not available.b. N.A. - information is not available.↩*. Data not available. **. Stock acquired in fiscal year ended 9-30-50.↩*. Data not available.↩*. Initials of Victor J. Fertitta, manager of the Balinese Room.a. Net wins or losses recorded in win-and-loss book at 9-30-50 but not recorded in general ledger at 9-30-50: Bankroll -Balance -Name of Clubroom9-30-509-30-50Win (loss)Balinese Room$15,000$52,218$37,218Studio Lounge10,0004,855(5,145)Silver Moon10,0005,732(4,268)Streamline Dinner Club10,00012,9252,925Edgewater Lounge10,00012,3062,306Western Room10,00010,165165Total$33,201Receipts from betting operations during the years ended September 30, 1948, 1949 and 1950 which were recorded on the accounting records of Maceo and Company and were produced at the trial were as follows: Year ended September 30Income from Betting Operations194819491950Horse race betting: Turf Grill Building$275,480.25$202,711.49$268,662.69Horse operationsLay-off bettingTelephone bettingMurdoch Bath House PierHome Plate Cigar StandChili Bowl79,605.25Baseball, Football, BasketballTurf Grill Building -Horse(23,907.90)3,422.6014,558.95Cigar Stand10,973.454,777.607,436.55Total$262,545.80$210,911.69$371,263.44Receipts from equipment operations during the years ended September 30, 1948, 1949 and 1950 that were recorded on the accounting records of Maceo and Company were as follows: Income from Equipment Operations(Pinball, Slot Machines, Victrola)194819491950General operations throughout Galveston$488,392.50$532,771.10$530,895.50Balinese Room11,256.0010,234.009,766.00Studio Lounge489.001,359.001,474.00Western Room793.00Turf Tap Room13,557.008,652.004,807.00Chili Bowl7,230.00Streamline Dinner Club7,269.50Stewart Beach Catering Co.913.00429.00Corner1,799.00Crystal Sportland #1N.A. Data not available.*↩N.A. *N.A. *Crystal Sportland #2N.A. *N.A. *N.A. *Bird CageN.A. *N.A. *N.A. *Total$513,694.50$553,929.10$564,463.00*. Letter "R" written in lower left-hand corner. Letter "R" indicates check received in connection with horse race betting operations.↩*. Income in excess of amounts reported on original return. ↩**. Computation shown and scratched out - $11,200, $2,500.↩*. Income in excess of amounts reported on original returns. ↩**. Word "bets" written on work sheet in Serio's handwriting and scratched out.↩*. Report states that Voigt followed the practice of making an estimate to cover income from separate bets.↩3. SEC. 3631. RESTRICTIONS ON EXAMINATION OF TAXPAYERS. No taxpayer shall be subject to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Commissioner, after investigation, notifles the taxpayer in writing that an additional inspection is necessary.↩*. N/A - Not available.↩*. Includes the partner's spouse.↩*. Income in excess of amounts reported on original return. **. Computation shown and scratched out - $11,200; $2,500.↩*. Check payable to Sam Maceo. ↩**. Sam's account receivable ledger sheet shows a $4,000 loss on 9-27-48 and a $4,000 cash payment thereon on 9-28-48.↩4. Anderson v. Commissioner, 250 F. 2d 242 (C.A. 5, 1957); Goldberg v. Commissioner, 239 F. 2d 316 (C.A. 5, 1956); Bryan v. Commissioner, 209 F. 2d 822 (C.A. 5, 1954); Hoyett v. Commissioner, 204 F. 2d 205 (C.A. 5, 1953) and Carmack v. Commissioner, 183 F. 2d 1↩ (C.A. 5, 1950), all affirming Memorandum Opinions of this Court.5. When questioned as to his knowledge of Sam's outside gambling activities, Serio testified as follows: I don't know anything about any of the transactions pertaining to these bets except I heard that particular time, that one thing. [Alleged presidential election bet] Outside of that I wouldn't know anything about any of the rest of them because I never inquired about it and I never heard about it.↩6. With respect to the alleged withdrawals of cash from the safe, Serio testified as follows: By Mr. Matthews: Q. No, then, can you tell me - that's fifty thousand dollars you have taken out for Mr. Rose Maceo. Can you tell me when the other fifty thousand dollars for Mr. Rose Maceo was taken out of the safe? Mr. Sullivan: Your Honor, no - The Court: Go ahead, Mr. Sullivan. Mr. Sullivan: What is your question designed to do, ellcit a yes or no answer? Mr. Matthews: Yes. The Court: Answer the question yes or no. A. No. By Mr. Matthews: Q. You can't tell me what year you took out the other fifty thousand? I mean, can you tell me whether it was taken out in these years involved in this proceeding? The Court: Answer yes or no. A. No. By. Mr. Matthews: Q. Can you tell me was it taken out in the years involved in this proceeding? A. Yes. Q. What were the years the fifty thousand dollars was taken out? A. I have no specific memory, that is, nothing I can specifically check to refresh my memory as to when he took his out. The Court: When who took whose out? The Witness: When Rose took his fifty thousand dollars out. By Mr. Matthews: Q. Can you tell me around what year, if not the exact year? A. Either 1949 or 1950.↩*. Subject to call by U.S. Treasury within 5 years prior to due date.7. Revenue Agent Ney, when asked if he had requested information from Serio about the partners' cash on hand testified: We had discussions with Mr. Serio and Mr. Garrett from time to time, and we were trying to get a list of their assets and lists of their liabilities, or net worth statements, or anything that would help us, and we were told that they could not ever arrive at a cash on hand figure, therefore they couldn't give us any net worth statement.↩*. These tables were added by Tax Court Order dated March 25, 1964 and signed by Judge Fisher↩.*. Less amounts included in Y (32nd), Z (32nd), A (33rd).↩8. This rule was renumbered to Rule 31(b)(6)↩ on November 1, 1962.9. SEC. 54. RECORDS AND SPECIAL RETURNS. (a) By Taxpayer. - Every person liable to any tax imposed by this chapter or for the collection thereof, shall keep such records, render under oath such statements, make such returns, and comply with such rules and regulations, as the Commissioner, with the approval of the Secretary, may from time to time prescribe. * * *Regulations 111. Sec. 29.54-1. Records and Income Tax Forms. - Every person subject to the tax, except persons whose gross income (1) consists solely of salary, wages, or similar compensation for personal services rendered * * * shall, for the purpose of enabling the Commissioner to determine the correct amount of income subject to the tax, keep such permanent books of account or records, including inventories, as are sufficient to establish the amount of the gross income and the deductions, credits, and other matters required to be shown in any return under chapter 1. Such books or records shall be kept at all times available for inspection by internal-revenue officers, and shall be retained so long as the contents thereof may become material in the administration of any internal-revenue law. Income-tax forms shall be prescribed by the Commissioner and shall be executed and filed in accordance with these regulations and the instructions on the form or issued therewith.10. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. * * *(b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 percentum addition to the tax provided in section 3612(d)(2). SEC. 294. ADDITIONS TO THE TAX IN CASE OF NONPAYMENT. * * *(d) Estimated Tax. - (2) Substantial underestimate of estimated tax. - If 80 per centum of the tax (determined without regard to the credits under sections 32 and 35), in the case of individuals other than farmers exercising an election under section 60(a), or 66 2/3 per centum of such tax so determined in the case of such farmers, exceeds the estimated tax (increased by such credits), there shall be added to the tax an amount equal to such excess, or equal to 6 per centum of the amount by which such tax so determined exceeds the estimated tax so increased, whichever is the lesser. * * *↩11. SEC. 271. DEFINITION OF DEFICIENCY. (a) In general. - As used in this chapter in respect to a tax imposed by this chapter, "deficiency" means the amount by which the tax imposed by this chapter exceeds the excess of - (1) the sum of (A) the amount shown as the tax by the taxpayer upon his return, if a return was made by the taxpayer and an amount was shown as the tax by the taxpayer thereon, plus (B) the amounts previously assessed (or collected without assessment) as a deficiency, over - (2) the amount of rebates, as defined in subsection (b)(2), made. * * *↩12. Section 601.504(a)(2) of the Income Tax Regs.on conference and practice requirements provides, in part, as follows: * * *(2) Extent of authority delegated. * * * Express authority to perform the following acts must be granted in the power of attorney or such acts will be considered to be beyond the scope of the authority of the attorney or agent; (iii) Agreements to assessment and collection of taxes. To execute waivers or consents agreeing to a later assessment and collection of taxes than is provided by applicable statutes of limitations. * * *↩